UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria, Division)

| | |
|---|---|
| **JOHN C. GRIMBERG COMPANY, INC.** | |
| Plaintiff, | Civil Action No. 1:23-cv-01690 |
| v. | **JURY DEMANDED** |
| **XL SPECIALTY INSURANCE COMPANY, ARCH SPECIALTY INSURANCE COMPANY, XL INSURANCE AMERICA, INC., AND WATFORD SPECIALTY INSURANCE COMPANY** | |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiff John C. Grimberg Company, Inc. ("Grimberg") is a general contractor that is constructing a school in Quantico, Virginia for the Department of the Navy (the "Project"). Grimberg is the named insured in umbrella and/or excess general liability insurance policies sold by defendants XL Specialty Insurance Company, XL Insurance America, Inc., Arch Specialty Insurance Company, and Watford Specialty Insurance Company (collectively the "excess insurers"). Although the excess insurers are obligated to provide insurance coverage to Grimberg in connection with certain property damage at the Project, each has denied coverage. Accordingly, Grimberg brings this Complaint for a declaratory judgment that one or more of the excess insurance policies provides coverage for Grimberg's insurance claim, damages for breach of contract, and damages for breach of the implied duty of good faith and fair dealing.

## PARTIES

1. Grimberg is a company incorporated under the laws of the state of Maryland with its principal place of business in Rockville, Maryland.

2. Grimberg is registered to transact business in the Commonwealth of Virginia, and its registered office is located in Glen Allen, Virginia.

3. XL Specialty Insurance Company ("XL Specialty") is an insurance company incorporated under the laws of the state of Delaware with its principal place of business in Stamford, Connecticut.

4. XL Specialty is registered to transact business in the Commonwealth of Virginia, and its registered office is located in Glen Allen, Virginia.

5. Arch Specialty Insurance Company ("Arch Specialty") is an insurance company incorporated under the laws of the state of Missouri with its principal place of business in Jersey City, New Jersey.

6. Arch Specialty is registered to transact business as a Surplus Lines Carrier in the Commonwealth of Virginia.

7. XL Insurance America, Inc. ("XL America") is an insurance company organized under the laws of the State of Delaware with its principal place of business in Stamford, Connecticut.

8. XL America is registered to transact business in the Commonwealth of Virginia, and its registered office is located in Glen Allen, Virginia.

9. Watford Specialty Insurance Company ("Watford Specialty") is an insurance company organized under the laws of the State of New Jersey with its principal place of business in Morristown, New Jersey.

10. Watford Specialty is registered to transact business as a Surplus Lines Carrier in the Commonwealth of Virginia.

11. Defendants sold insurance policies in this case that relate to "the ownership, maintenance, or use" of the Project within the meaning of Va. Code. Ann. § 38.2-313.

## JURISDICTION AND VENUE

12. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because this is a civil action between residents and citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. This Court has jurisdiction over the request for a declaratory judgment under Federal Rule of Civil Procedure 57 and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

14. Venue is proper in the United States District Court for the Eastern District of Virginia, Alexandria Division, under 28 U.S.C. § 1391(b)(1) and (c)(2) because:

   a. this action arises from insurance policies that cover a Project in Quantico, Virginia, which is located in the Alexandria Division of the Eastern District of Virginia;

   b. Grimberg and the excess insurers maintain licenses to transact business in the Commonwealth of Virginia;

   c. The excess insurers' registered offices and Grimberg's registered office are located within the Eastern District of Virginia;

   d. Grimberg, XL Specialty, Arch Specialty, XL America, and Watford Specialty are subject to this Court's personal jurisdiction; and

   e. The Arch Specialty policy has a "Service of Suit" clause that provides, in part, "the **Insurer** at the request of the **Insured**, will submit to the jurisdiction of any court within the United States and will comply with all requirements necessary to give such court jurisdiction."

## STATEMENT OF FACTS

### *The Project in Quantico, Virginia*

15. In November 2017, the Navy awarded Grimberg a contract for the Project, the construction of a school located at the Marine Corps Base Quantico in Quantico, Virginia. The Project includes the construction of the school buildings, classrooms, science laboratories, an information center, a gymnasium, a food service area, administrative offices, a performance theatre, an auditorium, and athletic field, and other support and program areas required for a fully functioning facility. Grimberg's performance of the contract with the Navy is ongoing, and the Project is not yet complete.

16. The primary framing system for the new school was designed to resist maximum vertical and lateral loads anticipated to be imposed on a school structure located on a Marine base.

17. Structural steel beams and joists that support the second-floor slabs and roof systems either bear directly on the exterior load bearing Insulated Concrete Form ("ICF") walls or are connected to the ICF walls by embedded steel plates on the face of the ICF walls. These connections carry the loads to the bearing ICF walls and serve to support the second floor and roof.

18. Schematic section views of the primary structural framing system are depicted in Figures 1 and 2 below.



Figure 1 – Primary vertical and lateral force resisting system of Quantico M/HS



Figure 2

19.     To perform its contract with the Navy, Grimberg entered into a subcontract with, among others, The PCS Group ("PCS").  PCS agreed to, among other things, install the ICF wall systems required for the Project.  The ICF wall systems required strategic placement of vertical steel rebar to ensure the ICF wall systems could resist the anticipated maximum lateral loads, including wind, seismic, and blast loads.

### *The Navy Ordered Grimberg to Demolish the ICF Walls*

20.     In 2021, the Navy identified various issues in connection with the construction of the Project.  On February 24, 2021, the Navy directed Grimberg to remove all the ICF forms from the ICF walls to allow for visual inspection of the walls for the possibility of voids in the ICF walls.  To minimize the impact on the existing ICF walls, Grimberg proposed evaluating the walls using ground penetrating radar equipment to non-destructively identify locations of voids and strip the ICF forms to expose and repair the voids.

21.     During this non-destructive testing in 2021, significant void spaces were detected in the concrete of the ICF walls.  Grimberg exposed those significant voids that needed to be repaired.

22.     During the ground penetrating radar survey in 2021, it was discovered that some of the vertical rebar in the ICF wall systems construction had drifted inward toward the middle of the walls, resulting in defective walls.

23.     In the summer of 2021, subsequent investigations revealed that a significant number of the vertical rebar had drifted inward toward the middle of the ICF walls throughout the Project.

24.     As a result of this inward drifting of the vertical reinforcing steel to the middle of the ICF walls, PCS produced a defective ICF wall system that, among other things, lacked sufficient structural integrity to withstand wind, blasts, and seismic forces.  The defective ICF walls damaged and/or rendered unusable, other parts of the Project's integrated, primary framing system (e.g.,

steel beams, connecting steel joints, second floor slab, roof) that had been constructed by different subcontractors free of defect, such that those components of the framing system could also no longer carry or withstand the required loads.

25. Navy engineers and the Navy's Engineer of Record, Ewing Cole, determined in July 2021 that the ICF walls as built by PCS were all so defective as to not be correctable.

26. On July 28, 2021, the Navy ordered that the ICF walls "be demolished and reconstructed." **Exhibit A**, Navy Demolition Letter (July 28, 2021).  The Navy's letter was a claim for damages asserting the Federal Acquisition Regulation ("FAR") as the basis for its claim:

> This letter is in accordance with FAR 52.246-12 Inspection of Construction, paragraph (f): "The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price."

*Id.*  By operation of law, the FAR imposes duties or obligations on parties contracting with the Government.

27. The letter also required (*i.e.*, "shall be reinstalled") Grimberg to reinstall other building elements that may require bracing and/or reconfiguring. (*Id.*)  The Navy stressed in closing that the defective work presents "a major concern for the structural integrity of the building." *Id.*  The Navy also unequivocally stated that no work could proceed without Navy approval. *Id.*

28. The Navy's letter was a claim within the meaning of the Contract Disputes Act.  Pursuant to FAR, if directed by the Navy to undertake work, a general contractor like Grimberg has a duty to proceed under threat of default termination.  The Navy sent its claim letter not just to Grimberg but to Liberty Mutual, Grimberg's bond insurer that would have been responsible in the event of Grimberg's default.

29. In an August 19, 2021 letter, the Navy affirmed its prior order to Grimberg that the ICF walls had to be demolished and reconstructed.  **Exhibit B**, Navy Demolition Letter (August 19,

7

2021).

30.     Subsequently, the Navy and Grimberg settled their disputes.  The excess insurers were apprised of the settlement with the Navy and did not object.

31.     PCS's defective work caused damage to other conforming, non-defective work at the Project by other subcontractors.  Grimberg incurred costs to repair or replace this separate property damage.  This work includes ductwork, HVAC piping, insulation, metal decking, roofing, shoring and storing of structural steel, slab protection, underslab radon piping, underground electrical work, foundation dowel bars, concrete masonry unit walls, fireproofing, mechanical, electrical and plumbing ("MEP") work, walls and doorframes, exterior wall waterproofing, vapor barrier, brickwork, and refurbishing materials.  Grimberg incurred significant shoring expenses.  While the demolition and reconstruction work was taking place, property and material were stored on site, which were not under Grimberg's exclusive custody, care or control.

32.     Grimberg sought coverage from its umbrella and excess liability insurers for damages that fall within their policies during the coverage periods of 2018-2019, 2019-2020, and/or 2020-2021.  The defendant insurers have refused to acknowledge any coverage for Grimberg and that refusal gives rise to this action.

### *The Excess Insurance Policies*

#### *(a)     Policy Year 2018-2019*

33.     Old Republic sold Grimberg a commercial general liability insurance policy, effective from October 1, 2018 to October 1, 2019.  The Old Republic Policy contains a $1 million per-occurrence limit and a $2 million general-aggregate limit.  **Exhibit C**, Old Republic 2018-2019 Policy, "Renewal Declarations."  Exhibit C is a true and accurate copy of the Old Republic 2018-2019 Policy.  Grimberg and Old Republic have settled Grimberg's claims against Old Republic relating

8

to the Project. Grimberg's damages exceed the limits of the Old Republic Policy.

34. In the same year, XL Specialty sold Grimberg a commercial Excess Follow Form and Umbrella Liability policy, No. US00063327LI18A, effective from October 1, 2018 to October 1, 2019. The XL Specialty Policy contains a $25 million per-occurrence limit and a $25 million general-aggregate limit. **Exhibit D**, XL Specialty 2018-2019 Policy, "Declarations." Exhibit D is a true and accurate copy of the XL Specialty 2018-2019 Policy.

35. The XL Specialty 2018-2019 Policy provides the following excess coverage:

> (A) **Insuring Agreement A - Excess Follow Form Liability**
>
> > (1) We will pay on behalf of the **insured**, subject to Section IV. Limits of Insurance, those amounts the **insured** becomes legally obligated to pay as damages in excess of the **scheduled underlying insurance** as a result of a **claim** covered by the **scheduled underlying insurance**, but only if the **scheduled underlying insurance** has been exhausted by the actual payment of **loss** to which this policy applies.
> >
> > (2) Coverage under this Insuring Agreement A shall follow the terms, definitions, conditions and limitations of the **scheduled underlying insurance**, subject to the **policy period**, Limits of Insurance, premium, and any contrary provisions contained in this policy. . . .

The policy also provides the following umbrella coverage:

> (B) **Insuring Agreement B – Umbrella Liability Over Self-Insured Retention**
>
> > (1) We will pay on behalf of the **insured**, subject to Section IV. Limits of Insurance, those amounts not covered by the **scheduled underlying insurance** that the **insured** becomes legally obligated to pay as damages in excess of the **self-insured retention** because of **bodily injury**, **property damage** (including liability assumed by the **insured** under an **insured contract**) or **personal and advertising injury** taking place anywhere in the world and caused by an **occurrence** during the **policy period.**
> >
> > (2) The coverage provided by the Insuring Agreement B will not apply to damages that would have been covered by the **scheduled underlying insurance** but for its exhaustion by the payment of **loss**.
> >
> > (3) The coverage provided by Insuring Agreement B will not apply to any

9

>damages covered by Insuring Agreement A, or arising out of subjects of insurance or exposures to **loss** for which this policy requires the **scheduled underlying insurance** to be maintained.

*   *   *

**Exhibit D**, XL Specialty 2018-2019 Policy, "Insuring Agreements."

The XL Specialty policy follows form to, and incorporates, the "your work" exclusion in the underlying Old Republic policy:

>This insurance does not apply to:
> * * *
>
>**l.  Damage to your Work**
>
>"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard". [sic]
>
>This exclusion does not apply if the damaged work or the work out of which it arises was performed on your behalf by a subcontractor.

Ex. C [Doc. 1-4] at p. 12 of 88 (bold typeface in original)]).

>Relevant definitions in the XL policies include:
>
>>(BB) **Occurrence** means:
>>
>>>(1) With respect to **bodily injury** or **property damage**, an accident including continuous or repeated exposure to substantially the same general harmful conditions. All exposure to substantially the same general harmful conditions will be deemed to arise out of one **occurrence**.
>>
>> *   *   *
>>
>>(HH) **Property damage** means physical injury to tangible property, including all resulting loss of use of that property, and loss of use of tangible property that is not physically injured. . . .

**Exhibit D**, XL Specialty 2018-2019 Policy, "Definitions."

***(b)    Policy Year 2019-2020***

36.     Old Republic sold Grimberg a commercial general liability insurance policy, effective from October 1, 2019 to October 1, 2020. The Old Republic Policy contains a $1 million per-occurrence

limit and a $2 million general-aggregate limit.  **Exhibit E**, Old Republic 2019-2020 Policy, "Renewal Declaration."  Exhibit E is a true and accurate copy of the Old Republic 2019-2020 Policy.  Grimberg and Old Republic have settled Grimberg's claims against Old Republic relating to the Project.  Grimberg's damages exceed the limits of the Old Republic Policy.

37. In the same year, XL Specialty sold Grimberg a commercial Excess Follow Form and Umbrella Liability Policy No. US00063327LI19A, effective from October 1, 2019 to October 1, 2020.  The XL Specialty Policy contains a $25 million per-occurrence limit and a $25 million general-aggregate limit.  **Exhibit F**, XL Specialty 2019-2020 Policy, "Declarations."  Exhibit F is a true and accurate copy of the XL Specialty 2019-2020 Policy.

38. The XL Specialty 2019-2020 Policy has the same excess coverage grants and definitions of the XL Specialty 2018-2019 Policy and incorporates the "your work" exclusion from the Old Republic policy.  *See supra* ¶ 35.

### (c) Policy Year 2020-2021

39. Old Republic sold Grimberg a commercial general liability insurance policy, effective from October 1, 2020 to October 1, 2021.  The Old Republic Policy contains a $1 million per-occurrence limit and a $2 million general-aggregate limit.  **Exhibit G**, Old Republic 2020-2021 Policy, "Renewal Declarations."  Exhibit G is a true and accurate copy of the Old Republic 2020-2021 Policy.  Grimberg and Old Republic have settled Grimberg's claims against Old Republic relating to the Project.  Grimberg's damages exceed the limits of the Old Republic Policy.

40. In the same year, Arch Specialty sold Grimberg an Excess Third Party Liability policy, No. UXP1040336-00, effective from October 1, 2020 to October 1, 2021.  The Arch Specialty Policy contains a $1 million per-occurrence limit and a $2 million general-aggregate limit.  **Exhibit H**, Arch Specialty 2020-2021 Policy, "Declarations."  Exhibit H is true and accurate copy of the Arch

Specialty 2020-2021 Policy. Watford Specialty is a 50% quota share participant with Arch Specialty in the Policy. *Id.* "Insurer Participation Endorsement."

41. The Arch Specialty Policy relating to the scope of coverage states as follows:

> **I.   INSURING AGREEMENTS**
>
> We will pay on behalf of the **insured,** except as otherwise stated in this policy, those amounts of **loss** for which coverage is provided under the definitions, terms, conditions, limitations and exclusions of the **controlling underlying insurance** in effect at the inception of this policy and which exceeds the total Limits of Liability of **underlying insurance** as stated in Items 3.a. and 3.b. of Schedule A – Schedule of Underlying Insurance of this policy. . . .

**Exhibit H**, Arch Specialty 2020-2021 Policy, "Insuring Agreements." The Arch Policy incorporates the "1. Damage to Your Work" exclusion from the Old Republic Policy.

42. In the same year, XL America sold Grimberg an Excess Liability policy, No. US00102881LI20A, effective from October 1, 2020 to October 1, 2021. The XL America Policy contains a $10 million per-occurrence limit and a $10 million general-aggregate limit. **Exhibit I**, XL America 2020-2021 Policy, "Declarations." Exhibit I is a true and accurate copy of the XL America 2020-2021 Policy.

43. The XL America Policy relating to the scope of coverage states:

> **SECTION I – INSURING AGREEMENTS** . . .
>
> A. We will pay on your behalf all "Loss" that you become legally obligated to pay in excess of all "Underlying Insurance" as shown in Item 4. of the Declarations providing that:
>
> > 1. Such "Loss" is insured by all of the policies shown in our Schedule of "Underlying Insurance". If any "Underlying Insurance" does not pay damages, for reasons other than exhaustion of the aggregate limit of insurance, then we shall not pay such damages.
> >
> > 2. "Underlying Insurance" has been reduced or exhausted by payment of "Loss" to which this policy applies. In the event of a reduction or exhaustion in the underlying limit due to payment of

>> such "Loss" we will:
>
>> > a. Pay excess over the reduced underlying limit of the "Underlying Insurance"; or
>>
>> > b. Continue in force should the "Underlying Insurance" be completely depleted.
>
>> B. The terms, conditions, definitions, limitations and exclusions of the "Controlling Underlying Policy", as shown in the Schedule of "Underlying Insurance", apply to this policy unless they are inconsistent with the provisions of this policy. Insurance provided by this policy will not be broader than the insurance provided by the "Underlying Insurance."

**Exhibit I**, XL America 2020-2021 Policy, "Endorsement No. 5." The XL Policy incorporates the "1. Damage to Your Work" exclusion from the Old Republic Policy.

44. Both the Arch Specialty and XL America 2020-2021 polices have the same definitions of "occurrence" and "property damage" found in the Old Republic 2020-2021 Policy. Those definitions are:

>> 13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
>> \*   \*   \*
>
>> 17. "Property damage" means:
>
>> > a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>>
>> > b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**Ex. G**, Old Republic 2020-2021 Policy, "Definitions."

### *The Excess Insurers Refuse to Provide Coverage*

45. In or about August or September 2021, Grimberg provided notice to the excess insurers of the Navy's demand and the property damage caused by PCS's work at the Project.

13

46. In order for an insurer to fulfill its obligations of good faith and fair dealing, the insurer must conduct an investigation of the insured's claim, apply the policy to the facts of the claim, and convey a prompt determination of coverage in view of the applicable case law to the insured. The excess insurers failed to do so with respect to Grimberg's claim.

47. Between August 2021 and March 2022, Grimberg had communications with the excess insurers and provided numerous documents relating to its claim for insurance coverage. During this period, Grimberg also asked for the excess insurers' coverage positions.

48. On March 22, 2022, XL Specialty and XL America denied coverage. **Exhibit J**, XL Denial Letter. On October 6, 2022, Arch Specialty denied coverage. **Exhibit K**, Arch Specialty Denial Letter.

49. For the policies applicable from 2018 to 2020, XL Specialty denied coverage under the umbrella coverage erroneously asserting there was no "property damage" or "occurrence" within the meaning of the XL Specialty policy. In doing so, XL Specialty failed to conduct a proper factual investigation by interviewing witnesses with knowledge of the Project and the claim. XL Specialty did not cite any cases, and chose to ignore cases, in the construction defect context that found there was "property damage" caused by an "occurrence" when a subcontractor's defective work caused damage to other conforming work. In connection with the umbrella coverage, XL Specialty asserted five exclusions (contractual liability; damage to impaired property; damage to real and personal property; damage to your product; and a professional services exclusion) without any factual analysis about how the exclusions might apply. XL Specialty did not cite any of the exclusions it now relies on or attempt to explain how these exclusions might apply to Grimberg.

50. XL Specialty and XL America also denied coverage under their excess coverage in the 2018 to 2021 policy years on the basis of Old Republic's denial of coverage and the failure to

exhaust the underlying Arch and/or Old Republic policies. Under XL Specialty and XL America's interpretation, a denial of coverage by a primary insurer or underlying insurer forfeits coverage for the insured under umbrella or excess coverage in the same year. XL Specialty and XL America's position is directly contradicted by their excess policy language that allows exhaustion by the "actual payment of loss" but does not specify the primary insurer (as opposed to the insured) must make the payment of loss. XL failed to disclose that the CGL form has been construed to cover subcontractor's damages to non-defective property. In addition, XL, now that it has been sued, has asserted defenses that are not in its denial letter. Upon information and belief, this is a business strategy designed to dissuade insureds from filing claims for coverage by increasing the costs of litigation. XL's defenses do not apply to Grimberg's claim.

51. At a minimum, the XL Specialty and XL America's policies are ambiguous and must be construed in favor of coverage. For example, and without limitation, exclusions j(4), j(5), and j(6) are ambiguous. Exclusions j(5) and j(6) are ambiguous because the phrase "that particular part" is unclear and could be read to refer solely to the direct object on which the insured was operating." Further, courts have found the phrase "real property on which [the insured] . . . [is] performing operations" in j(5) to be ambiguous. Exclusion j(4) also uses ambiguous terms, as the words "care", "custody" and "control" could have narrow or broad meaning, depending on the circumstances. These provisions and others must be construed in favor of coverage.

52. Arch likewise erroneously denied coverage. Arch erroneously asserted three grounds: 1) the purported failure to exhaust the Old Republic coverage payment of judgments or settlements; 2) the "Pre-existing Injury or Damage and Continuous or Progressive Injury Or Damage Exclusionary" endorsement applies because "deficiencies were noted in a design inspection and occurred sometime prior to November 13, 2019"; and 3) there "may have been" a lack of consent

15

by Arch to the settlement between the Navy and Grimberg. Arch failed to conduct a proper claim investigation by failing to interview key witnesses with knowledge of the property damage at the Project. Arch has failed to set forth facts in support of these defenses that demonstrate the absence of coverage. Arch failed to disclose that the CGL form has been construed to cover a subcontractor's damages to non-defective property. In addition, Arch, now that it has been sued, has asserted defenses that are not in its denial letter. Upon information and belief, this is a business strategy designed to dissuade insureds from filing claims for coverage by increasing the costs of litigation. Arch's defenses do not apply to Grimberg's claim.

53. At a minimum, the Arch policy is ambiguous and must be construed in favor of coverage. Examples of ambiguous terms are those in the exclusions set forth in ¶ 51 above.

## COUNT I – DECLARATORY JUDGMENT

54. Grimberg incorporates paragraphs 1 to 53.

55. The excess insurers are obligated to provide Grimberg with insurance coverage for property damage to conforming work caused by PCS at the Project.

56. The excess insurers have refused to provide insurance coverage under the Policies sold to Grimberg.

57. Accordingly, there is an actual and justiciable controversy concerning the excess insurers' obligations to Grimberg and Grimberg's rights under such Policies.

## COUNT II – BREACH OF CONTRACT

58. Grimberg incorporates paragraphs 1 to 53.

59. The excess insurers are obligated to provide insurance coverage to Grimberg for property damage caused by PCS to conforming work.

60. Grimberg has submitted a claim that is covered under one or more of the defendants'

policies.

61. No exclusion bars coverage for Grimberg's claim.

62. The defendant excess insurers' refusal to provide coverage for Grimberg's claim is a breach of their contracts.

63. As a result of the excess insurers' breaches, Grimberg has suffered and continues to suffer damages.

## COUNT III – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

64. Grimberg incorporates paragraphs 1 to 53.

65. The excess insurers are obligated to provide insurance coverage to Grimberg for property damage to conforming work caused by PCS.

66. Grimberg has submitted a claim that is covered under one or more of the defendants' policies.

67. No exclusion bars coverage for Grimberg's claim.

68. The defendant excess insurers failed to conduct a factual investigation of the claim, apply the policy to the facts of Grimberg's claim, and convey a prompt determination of coverage in view of the applicable case law.

69. The defendant excess insurers lacked a reasonable basis to deny or compromise the claim.

70. The defendant excess insurers' conduct in the handling of this claim breaches their implied duty of good faith and fair dealing.

71. As a result of the excess insurers' breaches, Grimberg has suffered and continues to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Grimberg requests that this Court enter judgment in its favor as follows:

1. Compensatory and consequential damages against the excess insurers in an amount to be proven at trial;

2. Prejudgment and post judgment interest;

3. An award of court costs and costs incurred in obtaining the coverage due under the Policy or Policies;

4. An award of attorneys' fees pursuant to Va. Code Ann. § 38.2-209;

5. Interest on such court costs and attorneys' fees and costs;

6. Declaratory judgment in favor of Grimberg and against the excess insurers declaring that one or more of the policies provides coverage, in whole or in part, for amounts incurred in connection with Grimberg's claim; and

7. Such other and further relief that this Court deems just and proper.

## JURY DEMAND

Grimberg demands a trial by jury for all the triable issues according to Federal Rule of Civil Procedure 38 and Local Civil Rule 38.

Dated: March 4, 2024

        Respectfully submitted,

        **JOHN C. GRIMBERG COMPANY, INC.**

        */s/ Arnie B. Mason*
        Arnie B. Mason, Esq. (VSB #45611)
        Zahra S. Abrams, Esq. (VSB #95997)
        Williams Mullen
        8350 Broad Street
        Suite 1600
        Tysons, VA 22102

          Telephone: (703) 760-5200
          Facsimile:　(703) 748-0244
          amason@williamsmullen.com
          zabrams@williamsmullen.com

Andrew M. Reidy (pro hac vice)
Ramy R. Simpson (pro hac vice)
Nossaman LLP
1401 New York Avenue, NW
Suite 800
Washington, DC 20005
Telephone:　(703) 283-5576
areidy@nossaman.com
rsimpson@nossaman.com

*Counsel for Plaintiff*
*John C. Grimberg Company, Inc.*

## **CERTIFICATE OF SERVICE**

Notice of electronic filing constitutes a certificate of service as to all parties to whom electronic notice is sent. I hereby certify that on this 4th day of March 2024, I caused a true and accurate copy of the foregoing to be filed with the Clerk of Court and served pursuant to the Court's electronic filing procedures upon all counsel of record via email.

*/s/ Zahra S. Abrams*
Zahra S. Abrams