**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria, Division)**

| | |
|---|---|
| JOHN C. GRIMBERG COMPANY, INC. | |
| Plaintiff, | Civil Action No. 1:23-cv-01690 |
| v. | |
| XL SPECIALTY INSURANCE COMPANY, ARCH SPECIALTY INSURANCE COMPANY, XL INSURANCE AMERICA, INC., AND WATFORD SPECIALTY INSURANCE COMPANY | |
| Defendants. | |

**PLAINTIFF JOHN C. GRIMBERG COMPANY, INC.'S OPPOSITION**
**TO XL SPECIALTY INSURANCE COMPANY'S AND**
**XL INSURANCE AMERICA, INC.'S MOTION TO DISMISS AND ARCH**
**SPECIALTY INSURANCE COMPANY'S JOINDER**

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure15(a)(1)(B), Plaintiff John C. Grimberg Company, Inc. ("Grimberg") has filed its Amended Complaint today and that pleading makes moot the Motion to Dismiss filed by Defendants XL Specialty Insurance Company ("XL Specialty") and XL Insurance America, Inc. ("XL America") (collectively, "XL").[1] However, to the extent any of the same challenges raised in the Motion to Dismiss remain, Grimberg provides this substantive response to the arguments in the Motion to Dismiss. *Chien v. O'Grady*, No. 1:18-cv-306, 2018 WL 9597047, at *2 (E.D. Va. July 6, 2018).

---

[1] Defendants Arch Specialty Insurance Company ("Arch") and Watford Specialty Insurance Company ("Watford") filed a separate Motion to Dismiss and Memorandum of Law and Partial Joinder in Support. Grimberg is separately filing an opposition to the Motion to Dismiss and Partial Joinder filed by Arch and Watford.

Grimberg is a general contractor that is constructing a school in Quantico, Virginia for the Department of the Navy (the "Project" or "School"). Grimberg subcontracted with The PCS Group ("PCS") to construct and install load-bearing Insulated Concrete Form ("ICF") walls for the School that were integral to the School's entire framing system. PCS constructed defective ICF walls that caused separate damage to other parts of the School that had been constructed without defect. After learning of the defective ICF Walls, the Navy ordered Grimberg to demolish and reconstruct the ICF walls and to take other steps relating to the damage caused by the defective ICF Walls at Grimberg's own cost. Grimberg proceeded as required under federal law.

Grimberg sought coverage from its excess and umbrella general liability insurers XL, Arch, and Watford[2] (collectively "Defendants") for PCS's damage to conforming work performed by others. Despite well-established Fourth Circuit law that there is coverage under a commercial general liability ("CGL") policy for damage to non-defective work caused by a subcontractor's defective work, each Defendant denied coverage. Grimberg brought this action for a declaratory judgment that one or more of the Defendants provide coverage for Grimberg's claims, damages for breach of contract, and damages for breach of the implied duty of good faith and fair dealing.

XL's Motion to Dismiss (the "Motion") Grimberg's Complaint ("Complaint"), as partially joined by Arch and Watford, relies on inapplicable Maryland law, ignores key allegations in the Complaint and governing law establishing coverage for a subcontractor's damage to other property, and seeks to hold Grimberg to a much higher pleading standard than required under Federal Rule of Civil Procedure 12. The Motion should be denied in its entirety or, alternatively, Grimberg should be granted leave to file a second amended complaint.

---

[2] Watford shared responsibility as an insurer on the Arch policy.

## II. RELEVANT FACTS ALLEGED IN THE COMPLAINT AS AMENDED

***The Navy Ordered Grimberg to Demolish and Reconstruct Load-Bearing ICF Walls and Undertake Bracing and Reconfiguring***

After the Navy awarded the Project to Grimberg in November 2017, Grimberg entered into a subcontract with PCS to, among other things, install the exterior, load-bearing ICF walls for the School. (Compl. [Doc. 1], ¶¶ 14, 16 & 18; Am. Compl. ¶¶ 15, 17, & 19). As part of the School's primary framing system that was designed to resist anticipated maximum vertical and lateral loads, including from wind, seismic activities, and other blasts, the ICF wall systems required strategic placement of vertical steel rebar to ensure these wall systems could resist the expected loads. (Compl. ¶¶ 15, 18; Am. Compl. ¶¶ 16, 19). For example, structural steel beams and joists that support the second-floor slabs and roof systems either bear directly on the ICF walls or are connected to the ICF walls by embedded steel plates on the face of the ICF walls. (Compl.¶ 16; Am. Compl. ¶ 17). These connections carry the loads to the bearing ICF walls and serve to support the second floor and roof. (*Id.*).

In 2021, the Navy identified various issues regarding the PCS-constructed ICF walls and directed Grimberg to conduct inspection and testing of the walls. (Compl. ¶¶ 19-20; Am. Compl. ¶¶ 20-21). During this testing, Grimberg discovered that some of the vertical rebar in the ICF wall systems had drifted inward toward the middle of the walls. (Compl. ¶ 21; Am. Compl. ¶ 22). As a result of PCS's negligence in rebar placement, PCS had produced a defective ICF wall system that, among other things, lacked sufficient structural integrity to withstand wind, blasts, and seismic forces. (Compl. ¶ 23; Am. Compl. ¶ 24). In other words, because the ICF walls could not withstand the necessary lateral forces, their structural integrity was severely compromised and risked a collapse of the School. In July 2021, the Navy determined that the ICF walls, as built by PCS, were so defective as to not be correctable. (Compl. ¶ 24; Am. Compl. [¶ 25). In July 28, 2021 and

August 19, 2021 letters, the Navy ordered that the ICF walls "be demolished and reconstructed." (Compl. ¶¶ 25-26, Ex. A [Doc. 1-2], Ex. B [Doc. 1-3]; Am. Compl. ¶¶ 26, 29, Ex. A, Ex. B). The July 28, 2021 Navy letter made a claim for damages explaining that Grimberg was legally obligated to perform such reconstruction under Federal Acquisition Regulation ("FAR") 52.246-12, Inspection of Construction, paragraph (f). Am. Compl. ¶ 26). The letter also required Grimberg to reinstall other building elements that may require bracing and/or reconfiguring. (*Id.* ¶ 27). In closing, the Navy stressed that the defective work presents "a major concern for the structural integrity of the building." *Id.*

### *Grimberg Had to Repair or Reconstruct Separate, Non-Defective Parts of the School Damaged by PCS's Defective Work*

As ordered by the Navy, Grimberg subsequently demolished and reconstructed the defective ICF walls. Because the defective ICF wall systems had caused damage to other parts of the School that had been constructed by different subcontractors without defect, Grimberg incurred separate costs to repair or replace damaged property, including for ductwork, HVAC piping, insulation, metal decking, roofing, shoring and storing of structural steel, slab protection, underslab radon piping, underground electrical work, foundation dowel bars, concrete masonry unit walls, fireproofing, mechanical, electrical and plumbing ("MEP") work, walls and doorframes, exterior wall waterproofing, vapor barrier, and brickwork. (Compl. ¶ 28; Am. Compl. ¶31). Grimberg and other subcontractors also incurred sums to store property and materials while the demolition and reconstruction took place.  (Compl. ¶ 28; Am. Compl. ¶31).

### *Defendants Sold Excess and/or Umbrella Policies to Grimberg that Cover Property Damage to Other Work at the School Caused by PCS's Defective Work*

The Amended Complaint summarizes and quotes from the key provisions in Defendants' excess and/or umbrella insurance policies sold to Grimberg. (Am. Compl. ¶¶ 35-44). These policies provide coverage for the damage to non-defective parts of the School caused by PCS's

defective work.[3] Grimberg provided Defendants notice of these property damage claims in and around August/September 2021 (Compl. ¶ 42; Am. Compl. ¶45), and Defendants denied coverage.

### III. APPLICABLE LEGAL STANDARD

Dismissal pursuant to Rule 12(b)(6) is disfavored. *See, e.g., Dykes v. Portfolio Recovery Assocs., LLC*, 111 F. Supp. 3d 739, 743 (E.D. Va. 2015); *Gillespie v. Ashford*, No. 1:15–cv–350, 2015 WL 4361262, at *2 (E.D. Va. July 14, 2015). As Defendants concede in their Motion, a Rule 12(b)(6) motion cannot resolve factual disputes or the merits of the action. *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). A motion to dismiss should not be granted unless it appears beyond all doubt that the plaintiff can prove no set of facts to support the claim and entitle plaintiff to relief. *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001); *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).[4] When ruling on the Motion, the Court must accept the allegations in the Complaint as true and draw all reasonable factual inferences in favor of

---

[3] True and correct copies of these policies and the underlying polices sold by the primary insurer, Old Republic, are attached as Exhibits C through I to the Amended Complaint.

[4] A court should be even more reluctant to grant a Rule 12(b)(6) motion where, as here (*see* discussion immediately below), the parties' disagreement regarding whether Virginia or Maryland substantive law should be applied to the merits of this action may not be resolved without discovery. *See Wild v. Gaskins*, 30 F. Supp. 3d 458, 462 (E.D. Va. 2014) (in denying various motions to dismiss, court declined to decide choice of law issues when little or no discovery had taken place); *Ctr. for Excellence in Higher Educ., Inc. v. Accreditation Alliance of Career Schs.*, No. 1:22-cv-1223, 2023 WL 6282840, at *7 (E.D. Va. 2023) ("[C]ourts are generally in a better position to decide a choice of law issue after discovery when the factual record is more developed. ... As such, the Court will not resolve the choice-of-law question at this stage of the proceedings").

Grimberg, as the plaintiff. *See, e.g., Factory Mut. Ins. Co. v. Liberty Mut. Ins. Co.*, 518 F.Supp.2d 803, 807 (W.D. Va. 2007) ("*Factory Mut.*").

## IV. ARGUMENT

### A. Virginia Law Should Apply to This Dispute.

In a diversity action like the instant case, the Court must apply the choice-of-law rules of Virginia. *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 623–24 (4th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). In interpreting a contract, Virginia courts generally apply the law of the state where the contract was made. *See, e.g., Lexie v. State Farm Mut. Auto. Ins. Co.*, 251 Va. 390, 394, 469 S.E.2d 61 (1996). However, Va. Code Ann. § 38.2-313 (West) provides that "[a]ll insurance contracts on or with respect to the ownership, maintenance or use of property in this Commonwealth *shall be deemed to have been made in and shall be construed in accordance with the laws of this Commonwealth*." (emphasis added.)

Virginia courts have applied § 38.2-313 to liability policies, like Defendants' policies, that insure damage to property situated in Virginia, as is present here. For example, in *Factory Mutual*, the court was asked to interpret commercial liability policies and excess policies that contained language largely mirroring the language in Defendants' polices. Because the property damage at issue occurred in Virginia, the court applied Virginia substantive law as required under § 38.2-313 even though the policies were issued outside of Virginia. *Factory Mut.*, 518 F. Supp. 2d at 808-09. In so ruling, the court cited to the analogous case of *City Insurance v. Lynchburg Foundry Co.*, No. 88-0178-L, 1989 WL 1102787, at *2 (W.D. Va. Apr. 25, 1989), where the court similarly concluded that Virginia law was to apply to the interpretation of a comprehensive general liability policy that covered the insured's operations in various locations, including at a factory in Radford,

Virginia where the subject bodily injury claim had arisen.[5] The Supreme Court of Virginia has separately indicated that § 38.2-313 should apply, at a minimum, to third-party liability insurance covering property located in Virginia (and maybe first-party property insurance as well, though the Court declined to specifically so find with regard to the first-party insurance before it). *See Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 355 n. 5 (Va. 2019) (citing to VA. CODE ANN. §§ 38.2-2204 and 38.2-2205 and explaining that each statute uses "the 'ownership, maintenance or use' phrase in the third-party liability insurance context"). Virginia law should accordingly apply in this insurance coverage dispute.[6]

## B.  The Rules of Insurance Policy Interpretation Favor Coverage.

Virginia courts consistently hold that where language in an insurance policy is susceptible of two constructions, the policy is construed liberally in favor of the insured and strictly against the insurer. *Sentry Select Ins. Co. v. Acuna*, No. 1:11-cv-581, 2011 U.S. Dist. LEXIS 131940, at *14 (E.D. Va. Nov. 15, 2011). Further, "where two interpretations equally fair may be made, the one which permits a greater indemnity will prevail." *Jefferson-Pilot Fire & Cas. Co. v. Boothe, Prichard & Dudley*, 638 F.2d 670, 674 (4th Cir. 1980), *quoted in Tiger Fibers, LLC v. Aspen Specialty Ins. Co.*, 594 F. Supp. 2d 630, 639 (E.D. Va. 2009); *see also Va. Farm Bureau Mut. Ins. Co. v. Williams*, 677 S.E.2d 299, 302 (Va. 2009) ("Because insurance policies usually are drafted by insurers, we construe ambiguous policy language purporting to exclude certain occurrences from coverage most strongly against the insurer").

---

[5] While the *City Insurance* court indicated Virginia law would apply, the court concluded the point was "probably academic" as there was no conflict among the potentially applicable laws of Virginia and Georgia.

[6] Defendants' contention that Maryland law should govern this dispute completely disregards VA. CODE ANN. § 38.2-313. Even if Maryland law were to apply (it does not), Grimberg submits that, as demonstrated below, a finding of coverage should result under both Virginia and Maryland law.

The burden rests on XL and Arch to establish the clear applicability of an exclusion from coverage. *Johnson v. Ins. Co. of North Am.*, 350 S.E.2d 616, 619 (Va. 1986) (citation omitted). Exclusions from coverage will apply only when the exclusions "unambiguously bring the particular act or omission within [their] scope." *Floyd v. N. Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993). In short, "exceptions and exclusions are to be strictly construed against the insurer." *Allied Prop. & Cas. Ins. Co. v. Zenith Aviation, Inc.*, 336 F. Supp. 3d 607, 611 (E.D. Va. 2018). "[E]xclusions from coverage are enforceable only when the exclusions 'unambiguously bring the particular act or omission within [their] scope.'" *Builders Mut. Ins. Co. v. ARC Constr., LLC*, 2015 WL 13066125, at *3 (E.D. Va. July 2, 2015) (brackets in original in internal quote) (quoting *Floyd v. N. Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993)); *see also Hamilton Jewelry, LLC v. Twin City Fire Ins. Co.*, 560 F. Supp. 3d 956, 965 (D. Md. 2021) (exclusions will be enforced when the insurer "properly and unambiguously uses language in its exclusion" (quoting *Megonnell v. United Servs. Auto. Ass'n*, 796 A.2d 758, 772 (Md. 2002))).

### C. Courts Typically Resolve Issues Relating to Insurance Coverage for Construction Defect Claims at the Summary Judgment Stage or at Trial, not on a Motion to Dismiss.

As the cases cited below illustrate, insurance coverage claims for construction defects are rarely resolved at the pleading stage. *French v. Assurance Co. of America*, 448 F.3d 693 (4th Cir. 2006) (issues resolved on summary judgment); *Stanley Martin Cos. v. Ohio Cas. Grp.*, 313 F. App'x 609 (4th Cir. 2009) (unpublished) (same); *Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 882 F.3d 952 (10th Cir. 2018) (same); *State Auto. Mut. Ins. Co. v. Old Republic Ins. Co.*, 115 F. Supp. 3d 615 (D. Md. 2015) (same). This is for good reason. Even though it is widely recognized that property damage caused by a subcontractor is covered, issues of fact often have to be developed on a claim-by-claim basis in discovery. For example, there is often discovery to create

a factual record about whether there was covered "property damage" or whether certain exclusions apply. Discovery also is useful, and often necessary, to identify evidence that the parties may utilize to clarify policy language and establish that specified damage is covered as the parties intended. In this case, Grimberg already has sought discovery relating to the insurance policy provisions at issue, including the drafting history of the various provisions at issue, and relating to the insurers' claims handling.[7] Therefore, the motion to dismiss should accordingly be denied because the parties should have an opportunity to conduct discovery.

**D. Grimberg Suffered Covered "Property Damage" Caused by an "Occurrence."**

> *1. The Complaint Alleges an "Occurrence", as that Term Is Defined in the Policies and Has Been Interpreted by Numerous Courts.*

Defendants' policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Compl. ¶¶ 32, 41; Am. Compl. ¶¶ 35, 44). The Fourth Circuit has found an occurrence within the meaning of a liability policy when, as Grimberg has alleged, a subcontractor's defective work damages otherwise non-defective property. The seminal case is *Stanley Martin*. In *Stanley Martin*, a general contractor hired a subcontractor to supply wood trusses for the construction of townhouses. Mold was found in the townhouses and an investigation revealed that the mold originated from the subcontractor's trusses. In reversing the trial court's grant of summary judgment, the Fourth Circuit found that the spread of the mold from the defective trusses to the non-defective surrounding components constituted an occurrence. The Fourth Circuit reasoned that the definition of "occurrence is broad and inclusive, providing coverage for any 'accident'- that is 'any event that takes place without one's foresight or expectation." 313 F. App'x 613–14 (citing *Wooden v. John Hancock Mut. Life*

---

[7] As discussed below, numerous courts have used drafting history of the CGL policy form to interpret the CGL policies. *See, e.g.*, *French*, 448 F.3d at 700-06; *Black & Veatch*, 82 F.3d at 965–66.

*Ins. Co.*, 205 Va. 750, 139 S.E.2d 801, 804 (1965)). Citing *French*, 448 F.3d at 702 (applying Maryland law), the Fourth Circuit in *Stanley Martin* found that damage to portions of the property other than where the defective work was performed was unexpected and thus an "accident." *Id.* at 613.

In *French* (which Defendants themselves cite), a general contractor agreed to construct a home and hired a subcontractor to apply cladding to the home's exterior. The homeowners subsequently discovered moisture and water damage to the interior structure and walls. The water damage was caused by defective exterior cladding work. The Fourth Circuit reversed entry of summary judgment in favor of the insurance company, finding that the damage to the interior structure and walls constituted an "occurrence" because the damage was to otherwise non-defective portions of the property. The court further held that damage to portions of the property other than where the defective work was performed was unexpected and thus, an "accident"— qualifying as an "occurrence." 448 F.3d at 706.

Other recent cases applying Virginia law have expressly followed *Stanley Martin. See, e.g., Builders Mut. Ins. Co. v. ARC Constr., LLC*, No. 1:15-cv-00406, 2015 WL 13066125, at *3 (E.D. Va. July 2, 2015) (following *Stanley Martin* and finding a duty to defend due to allegations of damage extending "beyond the defective work itself to the ceilings and other aspects of their property"); *Nautilus Ins. Co. v. Strongwell Corp.*, 968 F. Supp. 2d 807, 816 (W.D. Va. 2013) (applying *Stanley Martin* and recognizing coverage for physical damage to other property caused by a defective product); *see also Dragas Mgmt. Corp. v. Hanover Ins. Co.*, 798 F. Supp. 2d 758, 763 (E.D. Va. 2011) (applying *Stanley Martin* and holding, in connection with summary judgment proceedings, that the replacement of defective drywall was not an occurrence but that "any repair

or replacement of non-defective components of the homes…or personal property of the homeowners constituted an occurrence").[8]

Courts have frequently held that finding coverage for property damage caused by a subcontractor's work is consistent with the drafting history of the CGL policy form and carveouts from policy exclusions for damage from subcontractors' work. *French*, 448 F.3d at 700-06 (the Fourth Circuit analyzed the drafting history of the CGL policy form and found that the subcontractor exception to the policy exclusion restores coverage for damage by subcontractor); *Black & Veatch*, 882 F.3d at 965-66 (the Tenth Circuit reviewed and relied upon drafting history in finding coverage for a construction defect claim). In this case, the XL and Arch policies incorporate the "Damage to Your Work" exclusion from the Old Republic policies that specifically carves out damage from a subcontractor's work from the "your work" exclusion:

This insurance does not apply to:

\* \* \*

**l. Damage to your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard". [sic]

This exclusion does not apply if the damaged work or the work out of which it arises was performed on your behalf by a subcontractor.

(Am. Compl., ¶ 35). The "import" of the subcontractor exception for the occurrence issue "is that [it] lends insight into the baseline definition of 'occurrence' from which parties and courts interpreting CGL policies should operate." *Stanley Martin*, 313 F. App'x at 613 n.2. What the exception shows is that the baseline definition of occurrence covers damage arising out of a

---

[8] *See State Auto. Mut. Ins. Co.*, 115 F. Supp. 3d at 621-22 (D. Md. 2015) (finding, at the summary judgment stage, that damage to non-defective pipes constituted an occurrence); *Mut. Ben. Grp. v. Wise M. Bolt Co., Inc.*, 227 F. Supp. 2d 469, 476 (D. Md. 2002) (holding that allegations that loss of use of property and damage to other property within a home were caused by defective construction were sufficient to fall within the definition of an occurrence).

subcontractor's defective work. The reason it shows this is because if an occurrence did not include a subcontractor's defective work, then an exclusion removing coverage for certain damage but restoring coverage arising out of a subcontractor's defective work would be "nugatory." *Id.*

The subcontractor exception thus provides a carve out from the exclusion clarifying that damage from a subcontractor's defective work is covered. In other words, when property damage to other property from a subcontractor's defective work constitutes an occurrence, then all parts of the Policy—the occurrence term, the your-work exclusion, and the subcontractor exception—are "give[n] effect." *French*, 448 F.3d at 705; *Black & Veatch*, 882 F.3d at 965-66 (the Tenth Circuit relied, in part, on evidence of the history of the drafting of the commercial general liability policies to conclude that the standard policy forms had evolved to clarify that property damage to an insured general contractor's work caused by faulty subcontractor work was a covered occurrence); *see also* NEW APPLEMAN LAW OF LIABILITY INSURANCE § 28.04 (Matthew Bender, Rev. Ed. 2022) (explaining that the subcontractor exception preserves coverage "when a general contractor becomes liable for damage to work performed by a subcontractor—or for damage to the general contractor's own work arising out of a subcontractor's work").

The application here is ultimately fairly straightforward. Contrary to Defendants' assertions, Grimberg's allegations summarized above allege that PCS's defective work on the ICF walls damaged other non-defective work at the Project that Grimberg had to repair and reconstruct. This is an occurrence under Defendants' policies. Nowhere does Grimberg allege that its restorative work on the non-defective work caused any damage to the School, as Defendants wrongly contend. *See* XL's Memo. of Law [Doc. 23] at 13-14 (where Defendants wholly misread Paragraph 28 of the Complaint). Instead, as Grimberg alleges, it was PCS that caused damage to the other parts of the School that had been constructed without defect. Here, Grimberg is only

seeking coverage for the damage that PCS's work caused to other parts of the Project, and not for the demolition or reconstruction of the ICF walls.[9] It is therefore inapt for Defendants to characterize Grimberg's work as "ripping and tearing" or its costs as "rip and tear" costs.

### 2. Grimberg Alleges it Has Suffered Covered "Property Damage."

Defendants' policies define "property damage" broadly to include both (a) "[p]hysical injury to tangible property, including all resulting loss of use of that property" and (b) "[l]oss of use of tangible property that is not physically injured." (Compl. ¶¶ 32, 41; Am. Compl. ¶¶ 35, 44). Though physical injury is not defined, undefined terms "must be given their plain, ordinary and accepted meaning." *State Farm Fire & Cas. Co. v. Franklin Ctr.*, No. 1:13-cv-957 (AJT/TRJ), 2014 U.S. Dist. LEXIS 47051, at *16 (E.D. Va. Apr. 4, 2014); *Klein v. Fid. & Deposit Co. of Am.*, 700 A.2d 262, 270 (Md. Ct. Spec. App. 1997) ("[C]ourts give words their ordinarily accepted meaning when contract terms are undefined").

Courts use dictionaries to discern plain meaning. *Id.* at *18-19. The plain meaning of physical is "having material existence." Physical, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/physical (last visited Mar. 3, 2024). The plain meaning of injury is "hurt, damage, or loss sustained." Injury, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/injury (last visited Mar. 3, 2024). Equally instructive is the plain meaning of injure, which means "to impair the soundness of." Injure, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/injure (last visited Mar. 3, 2024).

Given these definitions, the facts alleged in the Complaint show that PCS's defective work in constructing the ICF walls caused physical injury to tangible property that is covered by

---

[9] Defendants' arguments about Grimberg's "intentional" (and thereby not "accidental") work to fix the ICF walls (*see* XL's Mem. of Law [Doc. 23] at 14-15) are totally irrelevant.

Defendants' policies. Specifically, and as summarized above, Grimberg was ordered by the Navy to demolish and reconstruct PCS's defective ICF walls. These defective wall systems had caused damage to other non-defective work that had been constructed by different subcontractors. Grimberg incurred separate costs to repair or replace this property, including for ductwork, HVAC piping, insulation, metal decking, roofing, shoring and storing of structural steel, slab protection, underslab radon piping, underground electrical work, foundation dowel bars, concrete masonry unit walls, fireproofing, MEP work, walls and doorframes, exterior wall waterproofing, vapor barrier, and brickwork. (Compl. ¶ 28; Am. Compl. ¶ 31).[10] This constitutes property damage under the plain language of Defendants' policies and should be controlling. *Tiger Fibers, LLC*, 594 F. Supp. 2d at 639.

Additional case law supports this plain reading. For example, in *United States Fidelity & Guaranty Company v. Nevada Cement*, the Nevada Supreme Court considered whether there was property damage where the insured supplied defective concrete that weakened the structural integrity of a building and required the insured to incur costs to shore up the structure. 561 P.2d 1335, 1336–37 (Nev. 1977). The insurer argued there was no property damage because there was no injury to or destruction of tangible property. *Id.* The Court rejected the insurer's argument and found coverage:

> [T]he presence of defective cement significantly weakened the total structure, thereby requiring additional shoring to avoid the danger of collapse. We are not persuaded by [the insurer's] argument that structural damage may be recognized only if collapse or removal ensues, and not if replacement is averted by a shoring process. We therefore think the trial court properly determined that the defective cement caused injury to tangible property within the meaning of [the insured's] insurance policy, even though financial loss was minimized by and limited to installation of shoring and related expenses.

---

[10] These costs were accordingly not "rip and tear costs" incurred to "access" the ICF walls, as Defendants inaptly claim. (*See* XL's Memo. of Law [Doc. 23] at 15-16).

*Id.* at 1337–38 (citation omitted).[11]

Like the building in *Nevada Cement*, the entire structure of the School was weakened and otherwise compromised once PCS's defective ICF walls were installed. (Compl. ¶¶ 14-26; Am. Compl. ¶¶ 15-29)). Grimberg incurred significant shoring expenses. (Am. Compl. ¶31). PCS's defective work damaged the structural integrity of the School, and that is physical injury based on a plain understanding of these words.

Further, courts have found physical injury to tangible property when a defective part or work is incorporated into a larger product or system. *See, e.g., Nautilus Ins. Co.*, 968 F. Supp. 2d at 816–17 (W.D. Va. 2013) (dismissing insurer's assertion of no "property damage" where fiberglass materials incorporated into a reactor caused property damage to the reactor); *Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. 256, 304–07, 802 A.2d 1070, 1099–1100 (2002) (finding, on summary judgment, that "the continued presence of asbestos-containing building materials constitutes 'property damage' within the reach of the standard CGL policy"); CONSTRUCTION INSURANCE: COVERAGES AND DISPUTES § 5.03 (2d ed., LexisNexis Matthew Bender 2022) ("[I]f a material incorporated into a structure contaminates the building with dangerous substances or weakens the structural integrity, there is covered property damage").[12]

---

[11] *See also Swank Enters., Inc. v. All Purpose Servs., Ltd.*, 154 P.3d 52, 56 (Mont. 2007) (considering identical definition of physical injury and finding, in connection with summary judgment proceedings, physical injury where "application of improper paint . . . altered . . . tanks and pipes, resulting in a detriment . . . [because] the pipes and tanks had to be stripped and repainted").

[12] The 1973 ISO forms were at issue in CONSTRUCTION INSURANCE: COVERAGE AND DISPUTES. The definition of property damage in those forms, however, is not meaningfully different—defining property damage as:

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or

As alleged in the Amended Complaint, the defective ICF walls that PCS constructed were incorporated into, and a key part of, the School's framing system. These damaged walls, unsurprisingly, caused damage to other, non-defective parts of the framing system and other structural components of the School. All of this damage constitutes physical injury to tangible property under any reasonable reading of these terms.

PCS's defective work also resulted in a loss of use of the defect-free parts of the School, which, as quoted above, is another form of "property damage" covered under Defendants' policies. While the policies do not define the phrase "loss of use," the plain meaning of use is the "employment of a thing for the purpose for which it is adapted." *Use*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Use*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/use (last visited Mar. 3, 2024)) (use is "the act or practice of employing something"). Notably, the polices do not require any particular degree or extent of loss of use. At least under Virginia law as cited above, any ambiguity in the meaning of "loss of use" must be construed in favor of Grimberg.

In *Penn National Security Insurance Co. v. Linkone SRC*, 542 F. Supp. 3d 355 (E.D.N.C. 2021), the insured's employee left a cleaning brush in a tanker truck that was then filled with product and delivered to the customer's facility. Faced with the same definition of property damage as is found in Defendants' policies, the court held that the insured's contaminated product caused a loss of use of the customer's tangible property because the customer was forced to shut down its manufacturing facility for cleaning, thus preventing the customer's equipment from being

---

(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

*Id.*

employed to accomplish its usual purpose, *i.e.*, the manufacture of pet food. *Id.* at 364. Similarly, as alleged in the Amended Complaint, PCS's defective ICF walls rendered other, defect-free parts of the School's framing system (*e.g.*, structure steel beams and joists supporting the second floor slabs and roof) unable to accomplish their usual purpose, namely to resist vertical and lateral loads like wind, other blasts, and seismic forces. (Am. Compl. ¶¶ 24, 31). This is covered loss of use under Defendants' policies.

### E. The Exclusions Do Not Bar Coverage.

#### 1. *Exclusion j(4) Does Not Bar Coverage.*

Exclusion (j)(4) excludes from coverage "property damage" to "[p]ersonal property in the care, custody, or control of the insured." (*See* XL's Memo. of Law [Doc. 23] at 19). Defendants argue this exclusion bars coverage for the cost of storing Grimberg's and non-PCS subcontractors' refurbishing materials during the period of reconstruction of the defective ICF walls and the non-defective parts of the School damaged by PCS's work (which cost is described at the end of Paragraph 28 of the Complaint) because the materials were, at all times, within Grimberg's control. (*Id.* at 19-20). Defendants ignore, however, that Paragraph 28 makes clear that at least some of the materials were stored by various subcontractors (other than PCS), and thus not within Grimberg's "care", "custody", or "control." While there is a dearth of case law interpreting this exclusion (at least in Virginia and Maryland), a leading treatise states that "[g]enerally, the control of the property in question must be exclusive or the exclusion does not apply" and "[w]here others have access to the property, control is not exclusive." *See* 1 SCOTT C. TURNER, INSURANCE COVERAGE OF CONSTRUCTION DISPUTES § 20:12 (2d ed.). The fact that Paragraph 28 alleges that some materials were <u>not</u> within Grimberg's exclusive control (and separately implies that subcontractors may have had access to Grimberg's stored materials) should be more than sufficient to overcome Defendants' argument at the pleading stage, particularly when construing this exclusion against

Defendants as is required under Virginia law. *See ARC Constr.*, 2015 WL 13066125, at *3. At a minimum, the issue of "control" (or "care" or "custody") is one of fact that is not properly decided on a motion to dismiss. *See* Turner, *supra*, § 20:6 (existence of control is usually a question of fact, and it is extremely rare for there to be no factual controversy regarding this issue in the construction industry).

## 2. *Exclusion j(5) Does Not Bar Coverage.*

Exclusion j(5) precludes coverage for property damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." (*See* XL's Memo. of Law [Doc. 23] at 19). Consistent with Virginia's mandate to construe exclusions in insurance policies against the drafting insurance company, exclusion j(5) should be read narrowly. *See ARC Constr.*, 2015 WL 13066125, at *3.

This exclusion is specific to property damage to that "particular part of real property." The phrase "particular part of real property" is undefined. But, by its plain language, it conveys a specific portion. "Particular" means "1. Of, belonging to, or associated with a single person, group, thing, or category. 2. Separate and distinct from others: SPECIFIC." Webster's II, New Riverside University Dictionary. "Part" means "a portion, division, or segment of a whole: PIECE." *Id.* Accordingly, courts have explained that the phrase "'that particular part' is narrowing language" and applies only to the part of property that was "directly subject" to the insured's work. *MTI, Inc. v. Emplrs. Ins. Co.*, 913 F.3d 1245, 1249 (10th Cir. 2019) (collecting cases); *Roaring Lion, LLC v. Nautilus Ins. Co.*, 2011 WL 3956132 (D. Mont. 2011) ("*Roaring Lion*") (exclusions j(5) and j(6) did not apply to damage to the entire structure due to defective work on the foundation); *see also Fortney & Weygandt, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 595 F.3d 308, 311 (6th Cir. 2010)

(describing "that particular part" as "trebly restrictive, straining to the point of awkwardness to make clear that the exclusion applies only to building parts on which defective work was performed, and not to the building generally").[13]

In *Mid-Continent Casualty Co. v. JHP Development, Inc.*, the contractor failed to properly install water seal exterior finishes and retaining walls. 557 F.3d 207, 211 (5th Cir. 2009). The Fifth Circuit determined that "[t]he exterior finishes and retaining walls were distinct component parts that were each the subject of separate construction processes and are severable from the interior [components]"; thus, the "particular part of real property" language of the exclusion did not bar coverage for the damage that the exterior work caused to the interior of the property. *Id.* at 217. Similarly, in *MTI*, *supra*, the subcontractor's defective anchor bolts did not preclude coverage "for the cost of replacing the entire tower" because the anchor bolts were "'distinct component parts' of the tower." 913 F.3d at 1251. In both *JHP* and *MTI*, the circuits narrowed the exclusion to the specific work that the subcontractor defectively performed.

In this case, both the Complaint and the Amended Complaint make clear that the "particular part of real property" on which PCS was "performing operations" was the ICF walls. PCS installed the defective ICF walls, but as explained earlier, Grimberg is not seeking coverage for costs to demolish and rebuild these walls. Instead, Grimberg seeks coverage for damage to other property—the steel beams, concrete slabs, subgrade, etc. that PCS did not work on. Accordingly, PCS did not "perform[ ] operation[s] on 'that particular part' of the property which was damaged." Exclusion j(5) does not apply.

---

[13] Both exclusion j(5) and j(6) use the phrase "that particular part" to modify the property at issue. Thus, cases construing that language are instructive regardless of whether they are construing subpart 5 or 6 of exclusion j.

Moreover, the exclusion has a temporal element. The plain language of exclusion j(5) uses the phrase "are performing operations." This language demonstrates that the exclusion only applies to property damage that occurred during PCS's "active performance of work." *JHP Dev., Inc.*, 557 F.3d at 213; *see also CU Lloyd's of Texas v. Main St. Homes Inc.*,79 S.W. 3d 687, 697 (Tex. App. 2002) ("[T]he use of the present tense indicates that the exclusion applies to circumstances where the contractor or subcontractors are *currently* working on the project." (emphasis in original)). For example, in *JHP* "Mid-Continent argue[d] that JHP was performing operations at the time of the damage because the project had not yet been completed." *Id.* The damage, however, from the subcontractor's defective retaining walls was caused during a "complete suspension of work." *Id.* Even though the subcontractor eventually resumed its work on the project, the exclusion did not apply because the subcontractor was not actively working. *Id.*

In their motion, Defendants have not carried their burden to show exclusion j(5) applies, especially now at the pleading stage, as they have not demonstrated the property damage at issue occurred during PCS's active performance of work.

### 3. *Exclusion j(6) Does Not Bar Coverage.*

As to the narrow exclusion in j(6), it removes coverage for "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (*See* XL's Memo. of Law [Doc. 23] at 19). This exclusion has the same "particular part" language as in exclusion j(5) and should likewise be construed narrowly. *See, e.g., ARC Constr., LLC*, 2015 WL 13066125, at *3; *MTI, Inc.*, 913 F.3d at 1249 (declining to apply exclusion j(6) because "that particular part of real property" where work was "incorrectly performed" was limited to the narrow part of property subject to subcontractor's faulty work); *Roaring Lion*, 2011 WL 3956132 at *7 (holding that exclusion j(6) applies only to the part where defective work was

performed). Moreover, the exclusion is limited to property that must be "restored, repaired or replaced because 'your work' was incorrectly performed on it."

The holding in *JHP Development, Inc.*, is again on point. There, the Fifth Circuit also found that exclusion (j)(6) did not apply to property damage caused to the interior of the building when the contractor failed to properly seal exterior finishes and retaining walls. 557 F.3d at 211. Analyzing the plain language of exclusion j(6), the court stated:

> The plain meaning of the exclusion—property damage to "that particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it"—is that property damage only to parts of defective work is excluded. This becomes clear when the exclusion is broken down into its component requirements: the "particular part" referred to is the part of the property that (1) must be restored, repaired or replaced (2) because the insured's work was incorrectly performed on it. The second requirement makes clear that the "particular part" of the property must have been the subject of incorrectly performed work. The narrowing "that particular part" language is used to distinguish the damaged property that was itself the subject of the defective work from other damaged property that was either the subject of non-defective work by the insured or that was not worked on by the insured at all.

*Id.* at 215.

In this case, the only work that falls into the category of "incorrectly performed" is the defective ICF walls. Again, Grimberg is not seeking coverage to restore, repair, or replace the ICF walls. Instead, Grimberg seeks coverage for property where work was *correctly* performed, but damaged by the defective ICF walls. Thus, exclusion j(6) does not apply.[14]

Further, Defendants' arguments that exclusion j(6) (and exclusion j(5)) eliminate coverage for subcontractors would make the subcontractor exception to the Your Work exclusion discussed above meaningless, in violation of basic cannons of insurance policy construction. *See*

---

[14] Defendants' citation to *Erie Insurance Exchange v. Salvi*, 86 Va. Cir. 132 (2013), is not persuasive because the court did not substantively address the precise language of exclusion j or the case law set forth in this brief.

*Cherrington v. Erie Ins. Prop. & Cas. Co.*, 745 S.E.2d 508, 525–26 (W. Va. 2013) ("[Exclusion m] on its face, precludes coverage for the very same work of subcontractors that [the Your Work exclusion] specifically found to be covered by the subject policy. . . . We do not subscribe to an insurance policy construction that lends itself to the mantra: what the policy giveth in one exclusion, the policy then taketh away in the very next exclusion"); *see also French*, 448 F.3d at 705-06 (holding that the subcontractor exception restores coverage because "effect must be given to each clause or phrase so that a court does not cast out or disregard a meaningful part of the writing." (quoting *Bausch & Lomb, Inc. v. Utica Mutual Ins. Co.*, 625 A.2d 1021, 1033 (Md. 1993))).

### 4. At a Minimum, Exclusions j(4), j(5) and j(6) Are Ambiguous, Thereby Precluding a Determination of Their Applicability on a Motion to Dismiss.

At a minimum, exclusions j(5) and j(6) are ambiguous because the phrase "that particular part" "could be read to refer solely to the direct object on which the insured was operating" or that "it could apply to those parts of the project directly impacted by the insured party's work." *MTI*, 913 F.3d at 1250. Further, courts have found the phrase "real property on which [the insured] . . . [is] performing operations" in j(5) to be ambiguous. *See, e.g., Liberty Mut. Fire Ins. Co. v. Bizzack Constr., LLC*, 259 F. Supp. 3d 451, 460 2 (W.D. Va. 2017). Exclusion j(4) also uses ambiguous terms, as the words "care", "custody" and "control" could have narrow or broad meaning depending on the circumstances. The Motion should accordingly be denied for the separate reason that discovery should be allowed to identify extrinsic evidence that may help resolve any such ambiguities. *See, e.g., S. Ins. Co. of Virginia v. Williams*, 561 S.E.2d 730, 733 (Va. 2002) (parol evidence admissible to interpret latent ambiguities in insurance policy).[15]

---

[15] Maryland law also allows for the use of such extrinsic evidence. *Certain Underwriters at Lloyd's, London v. Cohen*, 785 F.3d 886, 892 (4th Cir. 2015) (citing to Maryland law).

**F. When Ordered by the Navy to Reconstruct the Defective ICF Walls, Which Caused Separate Damage to Other Parts of the School that Grimberg also Had to Reconstruct, Grimberg Became Legally Obligated to Pay Damages Under Defendants' Policies.**

Defendants wrongly contend that Grimberg has not alleged that it became legally obligated to pay sums as damages in order to trigger coverage under Defendants' policies, instead incorrectly claiming that Grimberg voluntarily undertook to fix the work at the School. (*See* XL's Memo. of Law [Doc. 23] at 17-18). To the contrary, when the Navy ordered Grimberg to demolish the defective ICF walls and to take other steps with respect to building elements that required bracing and/or reconfiguring, Grimberg became legally obligated to pay the costs of repair or reconstruction as damages as discussed below.

As a preliminary matter, the parties do not agree as to the relevant language to analyze in the XL policies. "Insuring Agreement A – Excess Follow Form Liability" coverage in the XL Policies extends to "amounts the **Insured** becomes legally obligated to pay as damages in excess of the **scheduled underlying insurance** as a result of a **claim**." (Compl. ¶¶ 32, 35; Am. Compl. ¶¶ 35, 38). "**Claim**" is a defined term in the XL Policies and includes "an express demand for damages, including a **suit,** resulting from an **occurrence** covered by this policy." (*Id.* Ex. D, "Definitions").[16] As described below, the Navy's letter is a claim and therefore meets the

---

[16] Insuring Agreement B – Umbrella Liability Over Self-Insured Retention in the XL Policies requires XL to pay "those amounts not covered by the **scheduled underlying insurance** that the **insured** becomes legally obligated to pay as damages in excess of the **self-insured retention** because of . . . **property damage** . . . taking place anywhere in the world and caused by an **occurrence** during the **policy period**." There is not an express requirement for a "claim" or suit in this insuring agreement, and courts have declined to read such language into the policy. *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 123 Wash. 2d 891, 913, 874 P.2d 142, 154 (1994) ("There is nothing in the insurance policy language which requires a 'claim' or an overt threat of legal action and, therefore, the insurers' argument that a claim is a prerequisite to coverage seems to us to be an effort to add to the language of the policies").

requirements of the XL policy. The citation of different language on the same issue by each party ought to preclude a determination at the pleading stage.

Turning to XL's argument on the "legally obligated to pay" language, this Court has previously held that "an insured becomes 'legally obligated to pay [a sum] as damages' when some claim, order, or adjudication has directed the insured to pay a sum, pursuant to a binding legal obligation, as compensation or remediation for a loss or injury." *Elec. Motor & Contracting Co. v. Travelers Indem. Co.*, 235 F. Supp. 3d 781, 789 (E.D. Va. 2017) (discussing *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.* ("*Dragas I*"), 709 F. Supp. 2d 432, 440 (E.D. Va. 2010); *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.* ("*Dragas II*"), 709 F. Supp. 2d 441, 447 (E.D. Va. 2010); *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.* ("*Dragas III*"), 793 F. Supp. 2d 785, 796–97 (E.D. Va. 2011), *vacated on other grounds*, 497 F. App'x 313 (4th Cir. 2012)).[17] In other words, coverage exists when "the insured was subject to a coercive directive to pay." *Elec. Motor*, 235 F. Supp. 3d at 789. A final judgment or settlement of a lawsuit obligating payment is not necessary – for pleading purposes, an insured need only allege: (1) facts sufficient to show that a claim for monetary compensation or remediation existed; and (2) facts sufficient to show that the insured was legally obligated to pay such a claim. 235 F. Supp. 3d. at 790.

Here, Grimberg has alleged, and attached letters evidencing, that the Navy ordered Grimberg to demolish and reconstruct the ICF walls at its own cost. (Am. Compl. ¶ 27, Ex. A, Ex. B). The first Navy letter made a claim for damages explaining that Grimberg was legally obligated to perform such reconstruction under Federal Acquisition Regulation ("FAR") 52.246-12,

---

[17] "Remediation" means "the process of improving or correcting a situation[.]" *Remediation*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/remediation (last visited Mar. 3, 2024); *see also Remedial,* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "remedial" as "[i]ntended to correct, remove, or lessen a wrong, fault, or defect").

Inspection of Construction, paragraph (f): "[t]he Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price." (*Id.* Ex. A). By operation of law, the FAR imposes duties or obligations on parties contracting with the Government. The letter also required (*i.e.*, "shall be reinstalled") Grimberg to reinstall other building elements that may require bracing and/or reconfiguring. (*Id.*) The Navy stressed in closing that the defective work presents "a major concern for the structural integrity of the building." *Id.*

The Navy's Order also was a claim within the meaning of the Contract Disputes Act. *Garrett v. General Elec. Co.*, 987 F.2d 747, 749 (Fed. Cir. 1993). The FAR imposed duties and obligations with which Grimberg was required to comply. For example, if directed by the Navy to undertake work, a general contractor like Grimberg has a duty to proceed under threat of default. *Valley View Enters., Inc. v. United States*, 35 Fed. Cl. 378 (1996). The Navy sent its claim letter not just to Grimberg but to Liberty Mutual, Grimberg's bond insurer that would have been responsible in the event of Grimberg's default. (*Id.* [addresses included liz.teicher@libertymutal.com and christina.craddock@libertymutual.com].) Ultimately, all of the issues between the Navy and Grimberg were resolved in a settlement agreement. (Compl. ¶ 27; Am. Compl. ¶ 30).

Construing these facts and all reasonable inferences to be drawn therefrom in the light most favorable to Grimberg as the plaintiff, as is appropriate at this stage of the pleadings, Grimberg has sufficiently alleged that it was under a coercive legal directive or obligation to pay for the costs of repairing and reconstructing all of the property damage caused by PCS's defective work, including to defect-free parts of the School. *See Elec. Motor,* 235 F. Supp. 3d at 789. The Navy

contractor in *Electric Motor* only alleged "immense pressure" from the Navy to repair a defective generator before voluntarily undertaking the repair work without any claim, demand or other communication from the Navy directing that such sums be incurred. In stark contrast, Grimberg has alleged in here that the Navy required Grimberg, pursuant to federal law, to perform the reconstruction work to property damage caused by PCS's defective work on the ICF walls. Simply put, Grimberg *has* alleged: (1) facts sufficient to show that a claim for monetary compensation or remediation [from the Navy] existed; and (2) facts sufficient to show that Grimberg was legally obligated to pay such a claim. *Id.* at 790.[18]

This outcome is consistent with the vast majority of cases. *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 780, 625 A.2d 1021, 1032 (1993); *Cent. Il. Light Co. v. Home Ins. Co.*, 213 Ill. 2d 141, 175, 821 N.E.2d 206, 225 (2004) (finding that insured was "legally obligated to pay damages" when it paid remediation costs in response to "tacit threat" by regulator to commence litigation); *C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.*, 326 N.C. 133,

---

[18] In citing to *W.M. Schlosser Co. v. Ins. Co. of N. Am.*, 325 Md. 301, 306 (1992), and *Aetna Ins. Co. v. Aaron*, 112 Md. App. 472, 494 (1996), for the proposition that Grimberg's reconstruction work only amounted to uncovered work to prevent (more) serious property damage (*see* XL's Memo. of Law [Doc. 23] at 17), Defendants ignore, once again, that Grimberg has alleged in its Complaint that the Navy ordered Grimberg to perform work to remediate *existing property damage* caused by PCS's defective work. The cases cited by Defendants are simply inapposite.

A more instructive Maryland case is *Bausch & Lomb, Inc.*, 625 A.2d 1021, where the court affirmed a trial court's finding that an insured that removed hazardous waste materials from its premises, in the absence of any legal proceedings against it or any governmental directive to do so, had nevertheless paid sums that the insured became legally obligated to pay as damages under the liability policies at issue. *Id.* at 1031-32. The court explained that state environmental statutes giving the State of Maryland authority to enforce laws through "direct remediation at the owner's expense" were sufficient to trigger coverage. *Id.* Thus, the fact that the insured incurred response costs to comply with environmental laws was sufficient to obligate the insurer to cover those costs as sums the insured was legally obligated to pay as damages. *Id.* at 1032. Here, too, Grimberg was compelled to perform the reconstruction work at the School by federal law. Unlike the facts in *Bausch & Lomb*, Grimberg faced a governmental order and a claim from the Navy. Thus, Maryland law should yield the same result as Virginia law.

155, 388 S.E.2d 557, 570–71 (1990) ("costs incurred pursuant to State order to remedy this environmental injury are 'damages' which the insured was legally obligated to pay"); *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 123 Wash. 2d 891, 896, 874 P.2d 142, 145 (1994) (insured was "obligated to pay damages" when it agreed to cleanup of pollution damages in cooperation with an environmental agency, even in the absence of a threat of litigation); *see also Morrow Corp. v. Harleysville Mut. Ins. Co.*, 101 F. Supp. 2d 422, 434 (E.D. Va. 2000) ("The sounder conclusion, and the one followed by the majority of courts, is that environmental remediation costs constitute damages within the meaning of a comprehensive general liability insurance policy"); *Helena Chem. Co. v. Allianz Underwriters Ins. Co.*, 357 S.C. 631, 641, 594 S.E.2d 455, 460 (2004) ("[W]e find the trial court erred in ruling that Helena's environmental cleanup costs were not 'damages' contemplated under the insurance policies").

## G. The Claim for Breach of the Covenant of Good Faith and Fair Dealing is Sufficiently Pled

In reviewing Grimberg's allegations in support of Count III for breach of the implied covenant of good faith and fair dealing, the court assesses whether Grimberg has "state[ed] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To satisfy the plausibility requirement, this claim need only set forth "enough factual matter (taken as true) to *suggest*" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted, emphasis added). Thus, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Although courts generally consider only the allegations of the complaint, courts can consider documents that are "explicitly

incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (internal citation omitted).

Grimberg's claim in Count III is a *contract* claim for breach of the implied covenant of good faith and fair dealing in the insurance context. For such a claim, Virginia law requires establishing: (1) the insurer's contractual liability to pay under the policy; and (2) the lack of a reasonable basis to deny or compromise the claim. *Manu v. GEICO Cas. Co.*, 798 S.E.2d 598 (Va. 2017) (automobile liability policy at issue); *see also Crescent Hotels & Resorts, LLC v. Zurich Am. Ins. Co.*, No. CL-2021-02974, 2021 WL 8315236, at *3 (Va. Cir. Ct. Aug. 18, 2021) (same elements apply with respect to an "all-risk" policy covering property damage).

Grimberg has alleged particularized facts evidencing Defendants' lack of good faith in denying Grimberg's claims. (Am. Compl. ¶¶ 48-52). In Paragraphs 49-50 of the Amended Complaint, Grimberg alleges specific wrongful conduct. For purposes of the motion to dismiss, the Court must assume the following allegations can be proven:

- XL Specialty failed to conduct a proper factual investigation by interviewing witnesses with knowledge of the Project and the claim. (Am. Compl. at ¶ 49).

- XL Specialty did not cite any cases, and chose to ignore cases, in the construction defect context that found there was "property damage" caused by an "occurrence" when a subcontractor's defective work caused damage to other work. (Am. Compl. at ¶ 49).

- XL Specialty asserted five exclusions without any factual analysis about how the exclusions might apply. (Am. Compl. at ¶ 49).

- XL Specialty did not cite all of the exclusions it now relies on or attempt to explain how these exclusions might apply to Grimberg. (Am. Compl. at ¶ 49).

- XL failed to disclose that the CGL form has been construed to cover subcontractor's damages to non-defective property. (Am. Compl. at ¶ 50).

- Now that XL has been sued, it has asserted defenses that are not in its denial letter. Upon information and belief, this is a business strategy designed to dissuade insureds from filing claims for coverage by increasing the costs of litigation. (Am. Compl. at ¶ 50).

As required under Virginia law, Grimberg has alleged (and will further establish later in these proceedings) that (1) Defendants are liable to pay Grimberg's claims under the subject policies; and (2) Defendants had no reasonable basis to deny the claims. At a minimum, these allegations suggest a plausible claim for breach of the covenant of good faith and fair dealing under Virginia law, all that is required under *Twombly* and *Iqbal*.

### H. Leave to Further Amend Should be Granted if This Court is Inclined to Sustain Some or All of the Motion to Dismiss.

Rule 15(a)(2) requires a court to freely give leave when justice so requires. "This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (citations omitted). To the extent this Court perceives any deficiencies in Grimberg's existing allegations supporting one or more of the counts in its Amended Complaint, Grimberg respectfully requests leave to file a further amended complaint to add additional, clarifying detail to respond to any of the Court's concerns and thereby permit a determination of these claims on the merits. Leave should also be granted because leave would not be prejudicial to Defendants at this relatively early stage of the case and Grimberg's request for leave, if exercised, would be based on a good faith belief that amendment would not be futile. *Laber*, 438 F.3d at 426.

## V.    CONCLUSION

For the foregoing reasons, Grimberg respectfully requests that this Court deny Defendants'

Motion to Dismiss in its entirety or alternatively grant further leave to amend.

Dated:  March 4, 2024

Respectfully submitted,

/s/ Arnie B. Mason
Arnie B. Mason, VA Bar No. 45611
Zahra Abrams, VA Bar No. 95997
**WILLIAMS MULLEN**
8350 Broad Street, Suite 1600
Tysons, VA 22102
Telephone: (703) 760-5200
Facsimile: (703) 748-0244
amason@williamsmullen.com
zabrams@williamsmullen.com

*Counsel for Plaintiff*
*John C. Grimberg Company, Inc.*

Andrew M. Reidy (*pro hac vice*)
Ramy R. Simpson (*pro hac vice*)
**Nossaman LLP**
1401 New York Avenue, NW
Suite 800
Washington, DC 20005
Telephone: (703) 283-5576
areidy@nossaman.com
rsimpson@nossaman.com

*Counsel for Plaintiff*
*John C. Grimberg Company, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

Notice of electronic filing constitutes a certificate of service as to all parties to whom electronic notice is sent. I hereby certify that on this 4th day of March 2024, I caused a true and accurate copy of the foregoing to be filed with the Clerk of Court and served pursuant to the Court's electronic filing procedures upon all counsel of record via email.

*/s/ Zahra S. Abrams*
Zahra S. Abrams