IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JOHN C. GRIMBERG COMPANY, INC. )<br>)<br>*Plaintiff*, )<br>)<br>v. )<br>)<br>XL SPECIALTY INSURANCE COMPANY, )<br>*et al.*, )<br>)<br>*Defendants*. )<br>_____) | Case No. 1:23-cv-1690 (AJT/WEF) |

## MEMORANDUM OPINION AND ORDER

In this insurance coverage case, Plaintiff John C. Grimberg Company, Inc ("Grimberg") alleges that it is entitled to recover under certain excess liability policies for certain repair work on a government contract. The excess insurer Defendants[1] have moved to dismiss Plaintiff's first Amended Complaint. [Doc. Nos. 54, 56] (the "Motions"). On May 15, 2024, the Court heard oral argument on the Motions. For the reasons stated below, the Motions are GRANTED.

### I. BACKGROUND

Grimberg is a general contractor that was hired by the Navy to construct a school in Quantico, Virginia. [Doc. No. 46] at 1, ¶ 1. In November 2017, the Navy awarded Grimberg a contract to build a school at the Marine Corps Base Quantico in Quantico, Virginia (the "Project"). *Id.* ¶ 15. The Project is ongoing. *Id.* Grimberg entered a subcontract with The PCS Group ("PCS"), pursuant to which PCS would install Insulated Concrete Form ("ICF") walls (which are depicted in Figures 1 and 2 in the first Amended Complaint). *Id.* at 5, ¶¶ 17, 19. In 2021, the Navy discovered various issues with the construction, after which it was determined that there were

---

[1] The Defendants are XL Specialty Insurance Company ("XL Specialty"), XL Insurance America, Inc. ("XL America," and together, "the XL Defendants"), Watford Specialty Insurance Company ("Watford"), and Arch Specialty Insurance Company ("Arch").

1

several voids in the walls, and that some of the vertical rebar within the walls had drifted inward throughout the Project, thus jeopardizing the structural integrity of the construction. *Id.* ¶¶ 20-24. Consequently, other aspects of the Project's framing system (including steel beams, connecting steel joints, second floor slab, and the roof) were "rendered unusable." *Id.* ¶ 24. In a letter to Grimberg dated July 28, 2021, the Navy ordered that the walls "be demolished and reconstructed" as required by Federal Acquisition Regulation ("FAR") 52.246-12, *id.* ¶ 26, which provides in pertinent part:

> The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price. The Contractor shall promptly segregate and remove rejected material from the premises.

*Id.*; *see also* [Doc. No. 46-1]. The Navy affirmed this demand in a second letter on August 19, 2021. [Doc. No. 46-2].

The Navy and Grimberg settled the resulting dispute. [Doc. No. 46] ¶ 30. Grimberg alleges that the Navy's July 28, 2021 and August 19, 2021 letters constituted a "a claim for damages," and that "PCS's defective work caused damage to other conforming, non-defective work at the Project by other subcontractors." *Id.* ¶¶ 26, 31. As a result of this "claim for damages," Grimberg incurred costs for repairs that included work to "ductwork, HVAC piping, insulation, metal decking, roofing, shoring and storing of structural steel, slab protection, underslab radon piping, underground electrical work, foundation dowel bars, concrete masonry unit walls, fireproofing, mechanical, electrical and plumbing ('MEP') work, walls and doorframes, exterior wall waterproofing, vapor barrier, brickwork, … refurbishing materials … [and] significant shoring expenses." *Id.* ¶ 31. Based on that assessment, following its repair work and settlement with the Navy, Grimberg sought coverage for this "damage to … non-defective work" under its umbrella

and excess insurance policies for damages during the coverage periods of 2018-2019, 2019-2020, and/or 2020-2021. *Id.* ¶¶ 31-32. The Defendants denied coverage. *Id.* ¶¶ 32-33, 48.

Grimberg is the named insured in several primary, umbrella and/or excess general liability insurance policies. *Id.* Grimberg bought the following policies:

1. The primary commercial general liability ("CGL") policies issued by Old Republic[2] for the periods of October 1, 2018 to October 1, 2019, *id.* ¶ 33, October 1, 2019 to October 1, 2020, *id.* ¶ 36, and October 1, 2020 to October 1, 2021, *id.* ¶ 39 (the "Primary Policies");

2. The excess liability policies issued by the XL Defendants for the periods of October 1, 2018 to October 1, 2019, *id.* ¶ 34, October 1, 2019 to October 1, 2020, *id.* ¶ 37 (together, the "XL Specialty Policies"), and October 1, 2020 to October 1, 2021, *id.* ¶ 42 (the "XL America 2020-2021 Policy"); and

3. The excess third party liability policy issued by Defendant Arch for the period of October 1, 2020 to October 1, 2021 (the "Arch Policy"). *Id.* ¶ 40.

The excess policies are "follow form" policies, which provide coverage only for claims that are initially covered under the Primary Policies, thereby obligating Grimberg to establish coverage under the terms of the Primary Policies in order to obtain coverage under its excess policies. *See id.* ¶¶ 35, 38, 41, 43; [Doc. No. 46-6] at 17; [Doc. No. 46-8] at 6; [Doc. No. 46-9] at 28. In that regard, the XL Specialty Policies provide as follows:

> (A) Insuring Agreement A – Excess Follow Form Liability
>
> (1) We will pay on behalf of the insured, subject to Section IV. Limits of Insurance, those amounts the insured becomes legally obligated to pay as damages in excess of the scheduled underlying insurance as a result of a claim covered by the scheduled underlying insurance, but only if the scheduled underlying insurance has been exhausted by the actual payment of loss to which this policy applies.

---

[2] Grimberg has settled its coverage claim with Old Republic, its primary liability insurer. *Id.* ¶ 33.

> (2) Coverage under this Insuring Agreement A shall follow the terms, definitions, conditions and limitations of the scheduled underlying insurance, subject to the policy period, Limits of Insurance, premium, and any contrary provisions contained in this policy.
>
> ...
>
> (B) Insuring Agreement B – Umbrella Liability over Self-Insured Retention
>
> (1) We will pay on behalf of the insured, subject to Section IV. Limits of Insurance, those amounts not covered by the scheduled underlying insurance that the insured becomes legally obligated to pay as damages in excess of the self-insured retention because of bodily injury, property damage (including liability assumed by the insured under an insured contract) or personal and advertising injury taking place anywhere in the world and caused by an occurrence during the policy period.
>
> (2) The coverage provided by the Insuring Agreement B will not apply to damages that would have been covered by the scheduled underlying insurance but for its exhaustion by the payment of loss.
>
> (3) The coverage provided by Insuring Agreement B will not apply to any damages covered by Insuring Agreement A, or arising out of subjects of insurance or exposures to loss for which this policy requires the scheduled underlying insurance to be maintained.

[Doc. No. 46] ¶ 35; *see also* [Doc. No. 46-4].

The XL Specialty Policy defines "Occurrence" as, "[w]ith respect to bodily injury or property damage, an accident including continuous or repeated exposure to substantially the same general harmful conditions. All exposure to substantially the same general harmful conditions will be deemed to arise out of one occurrence." [Doc. No. 46] ¶ 35. And it defines "Property damage" as "physical injury to tangible property, including all resulting loss of use of that property, and loss of use of tangible property that is not physically injured." *Id.* Grimberg also purchased an identical excess policy (insofar as it is relevant here) from XL Specialty for the 2019 to 2020 term. *Id.* ¶ 38.

The Arch Policy, which provides excess coverage for covered claims during the 2020-21 period, provides:

### I. INSURING AGREEMENTS

4

> We will pay on behalf of the insured, except as otherwise stated in this policy, those amounts of loss for which coverage is provided under the definitions, terms, conditions, limitations and exclusions of the controlling underlying insurance in effect at the inception of this policy and which exceeds the total Limits of Liability of underlying insurance as stated in Items 3.a. and 3.b. of Schedule A – Schedule of Underlying Insurance of this policy. …

*Id.* ¶ 41; *see also* [Doc. No. 46-8]. Defendant Watford is a 50% quota share participant with Arch on this policy. *See* [Doc. No. 55] at 12.

Also in the 2020 to 2021 term, Grimberg bought the XL America 2020-2021 Policy from XL America, which provides:

> **SECTION I – INSURING AGREEMENTS** . . .
>
> A. We will pay on your behalf all "Loss" that you become legally obligated to pay in excess of all "Underlying Insurance" as shown in Item 4. of the Declarations providing that:
>
> 1. Such "Loss" is insured by all of the policies shown in our Schedule of "Underlying Insurance". If any "Underlying Insurance" does not pay damages, for reasons other than exhaustion of the aggregate limit of insurance, then we shall not pay such damages.
>
> 2. "Underlying Insurance" has been reduced or exhausted by payment of "Loss" to which this policy applies. In the event of a reduction or exhaustion in the underlying limit due to payment of such "Loss" we will:
>
> a. Pay excess over the reduced underlying limit of the "Underlying Insurance"; or
>
> b. Continue in force should the "Underlying Insurance" be completely depleted.
>
> B. The terms, conditions, definitions, limitations and exclusions of the "Controlling Underlying Policy", as shown in the Schedule of "Underlying Insurance", apply to this policy unless they are inconsistent with the provisions of this policy. Insurance provided by this policy will not be broader than the insurance provided by the "Underlying Insurance."

*Id.* ¶ 43; *see also* [Doc. No. 46-9].

The Arch Policy and the XL America 2020-2021 Policy both define "occurrence" and "property damage" as the Old Republic 2020-2021 Policy does: "occurrence" is defined as "an

5

accident, including continuous or repeated exposure to substantially the same general harmful conditions," and "property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property. … [and a]ll such loss of use shall be deemed to occur at the time of the physical injury that caused it," or "[l]oss of use of tangible property that is not physically injured, [and a]ll such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." [Doc. No. 46] ¶ 44; *see also* [Doc. No. 46-7].

In its First Amended Complaint, Grimberg seeks coverage under the excess policies in three counts: (1) a demand for a declaratory judgment that "[t]he excess insurers are obligated to provide Grimberg with insurance coverage for property damage to conforming work caused by PCS at the Project," *id.* ¶ 55; (2) breach of contract, *id.* ¶ 62; and (3) breach of the implied covenant of good faith and fair dealing based on allegations that the Defendants "failed to conduct a factual investigation of the claim, apply the policy to the facts of Grimberg's claim, and convey a prompt determination of coverage in view of the applicable case law," *id.* ¶¶ 68, 46.

## II. LEGAL STANDARD

Under Rule 12(b)(6), a complaint "must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted." *Adams v. NaphCare, Inc.*, 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). In addressing a Rule 12(b)(6) motion, a court must assume the truth of all facts alleged in the complaint and construe the factual allegations in favor of the plaintiff. *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009). However, to survive a motion to dismiss, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks and citations omitted). Dismissal of a complaint is appropriate when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). While the well-pleaded facts within a complaint are considered by the Court to be true, legal conclusions are not afforded the same presumption. *Id*. at 678.

### III. ANALYSIS

The Motions raise three main issues: (1) whether Virginia or Maryland law applies; (2) whether Grimberg alleged facts sufficient to establish coverage under the terms of the Primary Policies, and therefore under the excess policies; and (3) whether Grimberg sufficiently pleaded a claim for a breach of the implied covenant of good faith and fair dealing under Virginia law. With respect to these issues, as discussed below, the Court concludes that Grimberg has not alleged facts sufficient to establish under any applicable excess policy that Grimberg paid "damages" in response to a "claim" by the Navy or suffered "property damage" from an "occurrence" under either Maryland or Virginia law, and therefore has no claim under either Maryland and Virginia law for breach of a duty of good faith and fair dealing, either because Maryland does not recognize such a claim or because actual coverage under a policy is required for such a claim under Virginia law.

#### A. The Amended Complaint Fails to State Claims Under Either Maryland or Virginia Law[3]

Defendants argue that Maryland law governs this action because the insurance policies were delivered to Grimberg in Maryland, which, under Virginia's choice-of-law rules, means that

---

[3] This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. *Id*. ¶ 12. Grimberg is incorporated in and is a citizen of Maryland. *Id*. ¶ 1. XL Specialty and XL America are incorporated in and organized under the laws of Delaware, with a principal place of business in Connecticut. *Id*. ¶ 3. Arch is incorporated in Missouri with a principal place of business in New Jersey. *Id*. ¶ 5. Watford is organized under the laws of New Jersey with its principal place of business in New Jersey. *Id*. ¶ 9. The amount in controversy exceeds $75,000 and the parties are diverse. *Id*. ¶ 12.

Maryland law governs. *See* [Doc. No. 46-4] at 10; [Doc. No. 46-6] at 10; *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.*, 709 F. Supp. 2d 432, 436 (E.D. Va. 2010) (quoting *Buchanan v. Doe*, 431 S.E.2d 289 (Va. 1993)). But Grimberg argues that Va. Code Ann. § 38.2-313, a Virginia statute that modifies the common law choice-of-law rule, applies here and overrides the common law rule, subjecting this action to Virginia substantive law. *See* [Doc. No. 46] ¶ 11. That statute provides that "[a]ll insurance contracts on or with respect to the ownership, maintenance or use of property in this Commonwealth shall be deemed to have been made in and shall be construed in accordance with the laws of this Commonwealth." Va. Code Ann. § 38.2-313. Accordingly, Grimberg posits that the excess policies are "on or with respect to the ownership, maintenance or use of property" in Virginia.

The Court does not need to determine whether the statute applies here. There are no material differences between Maryland and Virginia law for the purposes of determining whether Grimberg paid sums as "damages" to the Navy for a "claim," or whether "property damage" was caused by an "occurrence" under the policies. *See City Ins. v. Lynchburg Foundry Co.*, No. 88-0178-L, 1989 WL 1102787, at *3 (W.D. Va. Apr. 25, 1989) (noting that the meaning of Va. Code § 38.2-313 is merely "academic" when there is no conflict in the underlying state caselaw). And because Grimberg's good faith claim, to the extent one exists under Virginia law, rises and falls with Grimberg's claim for insurance coverage, there is no need to determine which law actually applies given the Court's determination, as discussed below, that Grimberg has not stated a claim for coverage. *See Manu v. GEICO Cas. Co.*, 798 S.E.2d 598, 606 (Va. 2017); *Tiger Fibers, LLC v. Aspen Specialty Ins. Co.*, 594 F. Supp. 2d 630, 654 (E.D. Va. 2009) (Trenga, J.) (citing *Cuna Mut. Ins. Soc. v. Norman*, 375 S.E.2d 724, 726 (Va. 1989)). And even if Grimberg had stated a good faith and fair dealing claim under Maryland law—and it did not, *see* [Doc. No. 64] at 27—

8

the claim would fail for the same reasons as under Virginia law. *See Tate v. Am. Gen. Life Ins. Co.*, 627 F. Supp. 3d 480, 493 (D. Md. 2022) (quoting *Magnetti v. Univ. of Md.*, 909 A.2d 1101, 1105 n.3 (Md. App. Ct. 2006)).

### B. Grimberg Does Not Allege Facts Sufficient to Establish That the Policies Provide Coverage

As an initial matter, Grimberg contends that its repair costs incurred in response to the Navy's demand letters constitute "damages" paid to the Navy in response to a "claim." But Grimberg has not established that the Navy's demands were anything more than a demand for contract performance, or that the repair costs Grimberg incurred were monies that could reasonably be viewed as sums paid to the Navy as "damages" or otherwise. *See, e.g.*, *Electric Motor & Contracting Co., Inc. v. Travelers Indemnity Co. of America*, 235 F. Supp. 3d 781, 789, 791 (E.D. Va. 2017). In any event, Grimberg's coverage claims fail since it does not allege facts that make plausible that any sums paid were for "property damage" caused by an "occurrence," *i.e.*, an "accident," under the terms of the Primary Policies. *See* [Doc. No. 46-3] at 8 ("We will pay those sums that the insured becomes legally obligated to pay as damages because of … 'property damage' to which this insurance applies. … This insurance applies to … 'property damage' only if … [it] is caused by an 'occurrence' … ."); *id.* at 22 (defining "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions").

In *French v. Assurance Co. of America*, 448 F.3d 693 (4th Cir. 2006), the Fourth Circuit considered what coverage a CGL policy[4] provided to a general contractor under Maryland law regarding defective stucco workmanship performed by a subcontractor on a house project. *Id.* at

---

[4] The policy in *French* provided, as do the Primary Policies here, that the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of ... 'property damage' to which this insurance applies." *Id.* at 697. Similarly, the insurance policy applied to "property damage" only if the "'property damage' [was] caused by an 'occurrence.'" *Id.*

9

696. The Appeals Court concluded that while the defective stucco exterior itself was not an accident, and therefore not an "occurrence" under the policy, damage caused by the resulting moisture intrusion to the nondefective structure and walls of the house *was* an accident and therefore a covered "occurrence." *Id.* at 703. In other words, such policy language "provides liability coverage for the cost to remedy unexpected and unintended property damage to the contractor's otherwise nondefective work-product caused by the subcontractor's defective workmanship." *Id.* at 706.

The Fourth Circuit followed *French* in a similar case that arose under Virginia law in *Stanley Martin Companies, Inc. v. Ohio Casualty Group*. 313 F. App'x 609, 612–13 (4th Cir. 2009) (citing *French* and noting that "Virginia insurance law is not materially different from Maryland insurance law"). There, Stanley Martin, a general contractor, hired a subcontractor to provide wood trusses for a townhouse development. *Id.* at 610. Reports of mold growth in the townhouses led to the discovery that the mold had originated from the defective trusses. *Id.* Stanley Martin sought coverage under its umbrella insurance policy, which covered "property damage … caused by an 'occurrence,'" defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 611. The Fourth Circuit concluded:

> Under the analytical framework established by *French*, Stanley Martin's obligation to repair or replace the defective trusses was not unexpected or unforeseen under the terms of its building contracts for the townhouses and does not trigger a duty to indemnify. However, any mold damage that spread beyond the defective trusses and the gypsum fire walls to nondefective components of the townhouses was an unintended accident, or an occurrence that triggered coverage under the Ohio Casualty policy.

*Id.* at 614. Thus, under *French* and *Stanley Martin*, while the replacement of defective work is not an "occurrence" under such CGL policies, damage to nondefective work that is *caused by* that defective work can be an "occurrence" and therefore trigger coverage.

10

Grimberg contends that the defective ICF walls caused damage to Grimberg's nondefective work, thus obliging Grimberg to coverage pursuant to *French* and *Stanley Martin*. Specifically, Grimberg argues that "the facts alleged in the Amended Complaint show that PCS's defective work in constructing the ICF walls caused physical injury to tangible property that is covered by one or more of the Defendants' policies." [Doc. No. 64] at 21. To summarize the Amended Complaint, Grimberg alleges that (1) PCS installed defective ICF walls, [Doc. No. 46] ¶ 25; (2) the walls were found to be defective after other nondefective work had been installed, including framing components such as steel beams, connecting steel joints, second floor slab, and the roof, *see id.* ¶ 24, and other work including, among other things, HVAC piping, underground electrical work, and fireproofing, *see id.* ¶ 31; (3) the defective walls "caused damage" to this nondefective work, *id.*; and (4) Grimberg's subsequent "demolition and reconstruction work" involved the "repair or replace[ment]" of this separate, nondefective work, as well as shoring and storage expenses, *id.*

Defendants contend that Grimberg's allegations establish that the "damage" to Grimberg's nondefective work is nothing more than the costs of replacement of Grimberg's own defective work, which is not covered under the policies. [Doc. No. 55] at 25. In that regard, Defendants argue that Grimberg has not alleged that "the *defect itself* damage[d] non-defective property," but that "the *repair process* damage[d] non-defective property," which is insufficient to establish coverage under Maryland and Virginia law.[5] That is, Defendants argue, Grimberg effectively seeks

---

[5] *See Stanley Martin*, 313 Fed. App'x at 614 (holding that "mold damage that spread beyond the defective trusses … was an unintended accident, or an occurrence that triggered coverage under the Ohio Casualty policy"); *Woodfin Equities Corp. v. Harford Mut. Ins. Co.*, 678 A.2d 116, 131 (Md. App. Ct. 1996) (holding that there was no coverage for "property damages" resulting from "costs associated with tearing out walls, molding, and carpeting in order to repair and remove … [defective] HVAC units" because such damage was not caused by an "occurrence"), *overruled in part on procedural grounds*, 687 A.2d 652 (1997); *Travelers Indem. Co. of Am. v. Tower-Dawson, LLC*, 299 F. App'x 277, 282 (4th Cir. 2008) (holding that there was no coverage either for the costs of installing a new wetland retaining wall or for wetland repaid costs necessitated by the installation of the new wall) (unpublished); *French*, 448

coverage for what some commentators have described as "rip and tear" or "get-to" expenses based on the theory that the nondefective work was "damaged" when Grimberg was required to repair or replace it in order to remedy the defective ICF walls.[6]

> But Grimberg asserts that it is *not* seeking "rip and tear" damages. Rather, it explains:
>
> Nowhere does Grimberg allege that its repair or replacement work on the non-defective work caused any damage to the School, as XL wrongly suggests. (*See* XL's Memo. of Law [Doc. 55] at pp. 24-25, where XL implies that Grimberg alleged its repair process damaged the non-defective work). Instead, Grimberg has clearly alleged that PCS caused damage to the other parts of the School that had been constructed without defect. (Am. Compl. [Doc. 46] ¶¶ 24, 31). Grimberg is seeking coverage for the damage that PCS's work caused to other parts of the Project, and not for the demolition or reconstruction of the ICF walls themselves.
>
> [Doc. No. 64] at 20 n.16.

Grimberg has failed to allege facts that state a plausible claim for coverage. To be sure, Grimberg has asserted a conclusory *legal* claim that the defective ICF walls "caused damage to other conforming, non-defective work." *See* [Doc. No. 46] ¶ 31. But that is precisely the sort of "unadorned, the-defendant-unlawfully-harmed-me accusation" that is unable, without more, to overcome a 12(b)(6) motion. *Iqbal*, 556 U.S. at 678. Instead, a complaint "must contain sufficient

---

F.3d at 704–05 (holding that "moisture intrusion into the nondefective structure and walls of the Frenches' home was an accident, and therefore, an 'occurrence' under the initial grant of coverage of the 1986 ISO CGL Policies").

[6] *See, e.g.*, Steptoe & Johnson PLLC, *"Getting To" the Root of the Problem: Insurance Coverage for "Get-To" or "Rip-and-Tear" Damages*, THE NAT'L L. REV. (May 12, 2017), https://natlawreview.com/article/getting-to-root-problem-insurance-coverage-get-to-or-rip-and-tear-damages (describing "get-to" or "rip-and-tear" expenses as those "incurred when a contractor or subcontractor must remove, repair, and/or replace non-defective work in order to repair an otherwise inaccessible construction defect"). While courts appear to be split on whether such "rip and tear" expenses constitute "property damage" caused by an "occurrence" under CGL policies, *see id.*, courts applying Maryland and Virginia law have rejected similar arguments. *See, e.g.*, *OneBeacon Ins. v. Metro Ready-Mix, Inc.*, 427 F. Supp. 2d 574, 577–78 (D. Md. 2006) (holding under Maryland law that the destruction and reconstruction of nondefective pile caps and columns due to defective grout underlying the construction was not an "occurrence" because it was "clearly fore[seeable] that breaching [a] contract in causing the construction of a building (garage) on pilings supported by defective grout would require the demolition and reconstruction of the underlying pilings and columns, which were thereby rendered worthless in respect to their intended purpose"), *aff'd sub nom. OneBeacon Ins. Co. v. Metro Ready-Mix, Inc.*, 242 F. App'x 936 (4th Cir. 2007); *Hotel Roanoke Conf. Ctr. Comm'n v. Cincinnati Ins. Co.*, 303 F. Supp. 2d 784, 787 (W.D. Va. 2004) (holding under Virginia law that "[w]hen an insured defectively performs a contract and the defective performance only damages the insured's work or product, the resulting contractual liability is expected for purposes of a commercial general liability insurance policy and therefore excluded from coverage"), *aff'd*, 119 F. App'x 451 (4th Cir. 2005); *see also Woodfin*, 678 A.2d at 132 n.8.

*factual* matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (emphasis added) (quoting *Twombly*, 550 U.S. at 570). Here, the Amended Complaint does not allege any facts regarding a "continuous or repeated exposure to substantially the same harmful conditions" that would constitute an "occurrence," *i.e.*, an "accident," under the policies. *Cf. Stanley Martin*, 313 Fed. App'x at 614 (holding that mold was such an occurrence); *French*, 448 F.3d at 705 (holding that moisture intrusion was such an occurrence); *Dragas Mgmt. Corp. v. Hanover Ins. Co.*, 798 F. Supp. 2d 758, 759, (E.D. Va. 2011) (holding under Virginia law that the replacement of defective drywall which "corrod[ed] HVAC coils, damage[ed] wiring, tarnish[ed] or corrod[ed] metal objects, and caus[ed] a bad odor" was such an occurrence). Nor does Grimberg allege facts regarding any "physical injury to tangible property, including all resulting loss of use of that property" or "loss of use of tangible property that is not physical injured" that would constitute "property damage" to nondefective work caused by the defective ICF walls. *See* [Doc. No. 46] ¶ 35. Instead, Grimberg simply repeats its legal claim that "PCS's defective work caused damage to other conforming, non-defective work at the Project by other subcontractors." *Id.* ¶ 31; *see also id.* ¶¶ 24, 45, 55, 59, 65. In the absence of any factual allegations in support of these legal assertions, Grimberg has not pleaded a plausible claim for relief.[7]

## IV. CONCLUSION

Accordingly, it is hereby

**ORDERED** that the Motions, [Doc. Nos. 54, 56], be, and the same hereby are, **GRANTED**; and it is further

---

[7] Arch and Watford concur in the XL Defendants' arguments, [Doc. No. 57] at 2 n.3, but add in their separate motion to dismiss that regardless of whether there is some coverage under the terms of the Primary Policies, the Arch Policy's "Pre-Existing Injury or Damage and Continuous or Progressive Injury or Damage Exclusion" bars coverage, *see id.* at 3–4. They argue that because Grimberg alleges that its damages are "covered under the 2018-2019 and 2019-2020 policies, before the Arch Policy incepted," the "Pre-Existing Injury" exclusion applies to exclude coverage for those damages because they allegedly preexisted the inception of the Arch Policy on October 1, 2020. *See id.* at 18–19. Because the Court concludes that there is no coverage under the excess policies, it does not reach this argument.

13

**ORDERED** that Grimberg's first Amended Complaint, [Doc. No. 46], be, and the same hereby is, **DISMISSED**.

The Clerk is directed to forward a copy of this Order to all counsel of record.

Alexandria, Virginia
June 6, 2024

/s/
Anthony J. Trenga
Senior United States District Judge