**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria, Division)**

| | |
|---|---|
| JOHN C. GRIMBERG COMPANY, INC.<br><br>        **Plaintiff,**<br><br>v.<br><br>XL SPECIALTY INSURANCE COMPANY, ARCH SPECIALTY INSURANCE COMPANY, XL INSURANCE AMERICA, INC., AND WATFORD SPECIALTY INSURANCE COMPANY<br><br>        **Defendants.** | Civil Action No. 1:23-cv-01690 |

---

**PLAINTIFF JOHN C. GRIMBERG COMPANY, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO ALTER OR AMEND THE COURT'S
JUNE 6, 2024 ORDER AND TO ALLOW FOR
THE FILING OF A SECOND AMENDED COMPLAINT**

---

## I.  INTRODUCTION

Pursuant to Federal Rule of Civil Procedure ("FRCP" or "Rule(s)") 59(e) and 15(a), Plaintiff John C. Grimberg Company, Inc. ("Grimberg") submits this Memorandum of Law in support of its Motion to Alter or Amend the Court's June 6, 2024 Order and to Allow for the Filing of its Second Amended Complaint (the "Motion").

Grimberg brought this action against its umbrella and excess commercial general liability ("CGL") insurers Defendants XL Specialty Insurance Company ("XL Specialty"), XL Insurance America, Inc. ("XL America") (collectively, "XL"), Arch Specialty Insurance Company ("Arch"), and Watford Specialty Insurance Company ("Watford") (collectively "Defendants").  The lawsuit seeks insurance coverage for sums that Grimberg was obligated to pay as damages relating to the negligence of Grimberg's subcontractor, The PCS Group ("PCS") that damaged conforming work

of other subcontractors at school being constructed at Quantico (the "School").  On June 6, 2024, the Court dismissed Grimberg's First Amended Complaint based on its conclusion that "Grimberg has not alleged facts sufficient to establish under any applicable excess policy that Grimberg paid 'damages' in response to a 'claim' by the Navy or suffered 'property damage' from an 'occurrence' under Maryland or Virginia law…"  (Doc. No. 79, at 7 of 14) (the "June 6th Order" or "Opinion"). Grimberg seeks leave to file a Second Amended Complaint, which provides substantially more factual details and makes clear that the load-bearing Insulated Concrete Form ("ICF") walls that PCS defectively constructed and installed, caused separate, extensive, and accidental physical injury or loss of use to other parts of the Project's primary structural framing system that had been constructed without defect.  The Proposed Second Amended Complaint (attached as **Exhibit 1**)[1] adds factual allegations that the Navy ordered and directed Grimberg, at Grimberg's sole cost, to not only demolish and reconstruct the ICF walls, but to take other steps to repair and remediate other physical damage or loss of use to defect-free parts of the primary structural framing system of the School.

Grimberg files this Motion under FRCP 59(e) because a court cannot grant a post-judgment motion for leave to file an amended complaint unless the court first alters, amends, or vacates its judgment.  However, in evaluating whether to grant a post-judgment motion for leave to file an amended complaint, the court applies the same standard as it would under Federal Rule of Civil Procedure 15(a).  *See, e.g.*, *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc); *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 470-71 (4th Cir. 2011).

---

[1] A redline comparison between the Proposed Second Amended Complaint and the First Amended Complaint is attached as **Exhibit 2**.

Pursuant to Rule 15(a), courts must freely give leave when justice so requires, to give effect to the federal policy in favor of resolving cases on their merits.  The instant motion should be granted to allow resolution of this case on its merits and because: (1) the motion has been brought in good faith; (2) the Proposed Second Amended Complaint is not prejudicial to Defendants; and (3) the Proposed Second Amended Complaint is not futile.  This is Grimberg's first motion for leave, as the Amended Complaint that this Court dismissed in its June 6, 2024 Order was filed as of right after Defendants moved to dismiss Grimberg's initial complaint.  The instant motion has been brought expeditiously and, if granted, will not impair Defendants' ability to timely complete discovery and prepare this case for trial.  Prior to the Court's June 6th Order, discovery was underway, but no trial date had been set.

The Proposed Second Amended Complaint contains additional, detailed factual allegations that PCS's defective ICF walls physically injured, damaged, and/or caused loss of use to other parts of the primary structural framing system at the School that had been constructed free of defect.  Grimberg incurred damages to correct, repair, and remediate damage to other parts of the primary structural framing system as ordered by the Navy pursuant to federal law.  Grimberg respectfully submits that these facts as set forth in the Proposed Second Amended Complaint state a plausible claim for coverage under one or more of the Defendants' policies,[2] justifying granting leave to file the Proposed Second Amended Complaint.

## II.    RELEVANT PROCEDURAL HISTORY

On December 11, 2023, Grimberg filed its initial Complaint asserting claims against the Defendants for declaratory relief, breach of contract, and breach of the implied covenant of good

---

[2] In the Proposed Second Amended Complaint, Arch Specialty Insurance Company and Watford Specialty Insurance Company are no longer named as Defendants.

faith and fair dealing. (Doc. No. 1.)  Defendants moved to dismiss the Complaint on February 12, 2024 on several grounds.[3]  (Doc. Nos. 22-25.)  On March 4, 2024, Grimberg simultaneously filed oppositions to Defendants' motions to dismiss (Doc. Nos. 47-48) and filed its Amende d Complaint as of right alleging the same three claims for relief (Doc. No. 46), thereby mooting the Defendants' motions.

On March 28, 2024 (Doc. No. 54-57), Defendants filed new motions to dismiss the Amended Complaint asserting some new grounds for the motion and dropping other grounds.[4]  On April 18, 2024, Grimberg opposed these two motions to dismiss and expressly sought leave to amend if the Court agreed with the Defendants' arguments.  (Doc. Nos. 64-65.)  Arch and Watford filed their reply in support of their motion to dismiss on May 2, 2024 (Doc. No. 70), while XL filed its reply in support of its motion to dismiss on May 8, 2024. (Doc. No. 75.)

On May 15, 2024, the Court heard oral argument on the motions to dismiss the Amended Complaint.  (Doc. No. 77.)  The Court's memorandum opinion and order granting the motions and dismissing Grimberg's Amended Complaint was signed and filed on June 6, 2024. (Doc. No. 79.)

### III.   ARGUMENT

#### A.  A Post-Judgment Motion for Leave to Amend Is Evaluated Under Rule 15(a)

A court cannot grant a post-judgment motion for leave to file an amended complaint unless the court first alters its judgment pursuant to FRCP 59(e).  *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (en banc).  However, the standard for determining whether to grant such a vacatur

---

[3] XL alleged no "occurrence," no "property damage," no "legal obligation to pay damages," and no coverage based on what XL called the business-risk exclusions (*i.e.*, exclusions (j)(4), (j)(5), and (j)(6)).

[4] In these motions, XL asserted, for the first time, a defense based on the impaired property exclusion (*i.e.*, exclusion m).  Defendants did not move on its previously asserted defenses of exclusions (j)(4), (j)(5), and (j)(6).

is not based on the criteria set forth in FRCP 59(e), but instead is the same standard as would be applied to a prejudgment motion for leave pursuant to FRCP 15(a).  *Id.*  Thus, in considering a post-judgment motion to amend, "[t]he court need only ask whether the amendment should be granted, just as it would on a prejudgment motion to amend pursuant to Fed. R. Civ. P. 15(a)." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 470-71 (4th Cir. 2011).

Rule 15(a)(2) requires a court to "freely give leave when justice so requires."  This liberal rule gives effect to the federal policy in favor of resolving cases on their merits.  *Laber*, 438 F.3d at 426.  "The Fourth Circuit directs trial courts to construe Rule 15(a) liberally in order to give plaintiffs the opportunity to cure defects in their pleadings, so that cases are resolved on the merits." *Deutsche Nat. Bank Tr. Co. v. Batmanghelidj*, No. 1:07CV683 (JCC), 2007 WL 4125403, at *4 (E.D. Va. Nov. 19, 2007).  "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Mao v. Glob. Tr. Mgmt., LLC*, No. 4:21CV65 (RCY), 2022 WL 989012, at *15 (E.D. Va. Mar. 31, 2022) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed.2d 222 (1962)). The liberal standard for permitting amendment "is especially important where the law is uncertain." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 523 (7th Cir. 2015).

Thus, "[a]fter a dismissal under Federal Rule of Civil Procedure 12(b)(6), a court 'normally will give plaintiff leave to file an amended complaint' because '[t]he federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that plaintiff be given every opportunity to cure a formal defect in his pleading.'" *Small v. Tate*, No. 2:18CV315, 2019 WL 446594, at *10 (E.D. Va. Jan. 29, 2019) (citing *Ostrzenski v. Seigel*, 177 F.3d 245, 252-53 (4th Cir. 1999)); *see also Certusview Techs., LLC v. Usic, LLC*, No. 2:14CV373,

2014 WL 12591937, at *18 (E.D. Va. Dec. 15, 2014).  "This is true even though the court doubts that plaintiff will be able to overcome the defects in his initial pleading.  Amendment should be refused only if it appears to a certainty that plaintiff cannot state a claim."  *Ostrzenski v. Seigel*, 177 F.3d 245, 253 (4th Cir. 1999) (citing 5A CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 360–67 (2d ed.1990)).  The Court must grant leave to amend unless "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile."  *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986); *Laber*, 438 F.3d at 426; *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009); *Mao v. Glob. Tr. Mgmt., LLC*, No. 4:21CV65 (RCY), 2022 WL 989012, at *15 (E.D. Va. Mar. 31, 2022); *Matter of Vulcan Constr. Materials*, LLC, 433 F. Supp. 3d 909, 915 (E.D. Va. 2019); *Pfizer Inc. v. Teva Pharms. USA, Inc.*, No. 2:10CV128, 2011 WL 13118100, at *1 (E.D. Va. June 30, 2011).

### B.  The Filing of a Second Amended Complaint Will Not Prejudice Defendants

Prejudice is "'[p]erhaps the most important factor for a court considering whether to grant leave to amend."  *Summit Investments II v. Sam's East, Inc.*, No. 3:23CV479 (RCY), 2024 WL 3046713, at *4 (E.D. Va. June 18, 2024) (citation omitted).  The "absence of prejudice, though not alone determinative, will normally warrant granting leave to amend."  *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980).  "The party opposing amendment bears the burden of proof as to whether prejudice will result."  *Pfizer Inc. v. Teva Pharms. USA, Inc.*, No. 2:10CV128, 2011 WL 13118100, at *1 (E.D. Va. June 30, 2011) (citing *Atlantic Bulk Carrier Corp. v. Milan Exp. Co.*, No. 3:10cvl03, 2010 WL 2929612, at *4 (E.D. Va. July 23, 2010) (unpublished)).  Whether an amendment to a complaint poses prejudice to the opposing party "will often be determined by the nature of the amendment and its timing."  *Laber*, 438 F.3d at 427.  Prejudice

does not exist where, as is the case here, the "defendant was from the outset made fully aware of the events giving rise to the action." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980); *see also Laber*, 438 F.3d at 427 (no prejudice by proposed amendment even though case had progressed to summary judgment). Moreover, an amendment is not prejudicial "if it merely adds an additional theory of recovery to the facts already pled," *Laber*, 438 F.3d at 427, or asserts facts that already are known to the opposing party. *Summit Investments II v. Sam's East, Inc.*, No. 3:23CV479 (RCY), 2024 WL 3046713, at *4 (E.D. Va. June 18, 2024) (citing *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 280 (4th Cir. 1987)).

Here, Grimberg's Motion has been timely filed in accordance with FRCP 59(e). The Motion requests leave to file a further amended complaint that addresses the Court's Opinion that found the earlier pleading too conclusory or lacking sufficient factual details. Because no trial date had been set in this case at the time the Court granted Defendants' motions to dismiss and no depositions have occurred, the filing of the Proposed Second Amended Complaint will not impair Defendants' ability to complete discovery and prepare for trial.[5] Nor will the Proposed Second Amended Complaint impact the resolution of any other dispositive motions, as none were pending at the time of the Court's June 6th Order. There is simply no prejudice to Defendants in allowing the filing of the Proposed Second Amended Complaint. In fact, Grimberg respectfully submits that it will suffer prejudice if this matter does not proceed on the merits.

### C. Grimberg Is Acting in Good Faith in Seeking Leave to Amend

A finding of bad faith requires a party to act "with a dishonesty of purpose," encompassing such behaviors as "outright lying, deceiving, playing unjustifiable hardball, slacking off,

---

[5] Written discovery was in progress when the Court issued the June 6th Order. Grimberg had produced approximately 68,000 pages in discovery.

intentionally causing confusion, or stubbornly refusing to follow rules." *Urben v. GridKor, LLC*, No. 1:23CV138 (DJN), 2024 WL 844861, at *7 (E.D. Va. Feb. 28, 2024) (citation omitted).  No such conduct exists here. Grimberg's Motion is borne out of a good faith desire to demonstrate to the Court that the deficiencies in the Amended Complaint that the Court determined existed can be cured with more detailed factual allegations establishing Grimberg incurred sums "as damages" in response to a "claim" by the Navy, and that there was an occurrence that caused property damage covered under Defendants' policies.

This is Grimberg's first motion for leave to amend, as the First Amended Complaint was filed as of right after Defendants filed their motions to dismiss the initial complaint.  *Cf. Small v. Tate*, No. 2:18CV315, 2019 WL 446594, at *10 (E.D. Va. Jan. 29, 2019) (granting leave to amend after court's 12(b)(6) dismissal, even though plaintiff had amended as of right after the defendants filed their original motion to dismiss). The Court's June 6th Order was the Court's first review of the sufficiency of Grimberg's allegations and, accordingly, Grimberg's first opportunity to consider the Court's opinions and to attempt to persuade this Court that a further amended complaint meets the minimum pleading standards under *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009).  There is accordingly no dilatory motive or other bad faith in bringing this Motion.

**D.  The Proposed Second Amended Complaint Is Not Futile**

The Court examines the issue of futility under the lenient standard of Rule 15(a), freely giving leave to amend "when justice so requires."  *AdvanFort Co. v. Int'l Registries, Inc.*, No. 1:15cv220, 2015 WL 4254988, at *5 (E.D. Va. July 13, 2015).  Leave to amend should be denied for futility "when the proposed amendment is clearly insufficient or frivolous on its face." *Johnson*, 785 F.2d at 510, or when the claim it presents would not survive a Rule 12(b)(6) motion

to dismiss.  *Sigoloff v. Austin*, No. 123CV00230PTGLRV, 2023 WL 3026703, at *2 (E.D. Va.

Apr. 20, 2023).  "Futility is apparent if the proposed amended complaint fails to state a claim under

the applicable rules and accompanying standards: '[A] district court may deny leave if amending

the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the

requirements of the federal rules.'  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,

525 F.3d 370, 376 (4th Cir. 2008) (internal quotation marks omitted)."  *Katyle*, 637 F.3d at 471.

The facts alleged in the complaint "must be enough to raise a right to relief above the

speculative level" and "to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at

555.  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.*

(internal quotation marks and citations omitted).  At the same time, dismissal pursuant to Rule

12(b)(6) is disfavored.  *See, e.g., Dykes v. Portfolio Recovery Assocs., LLC*, 111 F. Supp. 3d 739,

743 (E.D. Va. 2015); *Gillespie v. Ashford*, 1:15cv350, 2015 WL 4361262, at *2 (E.D. Va. July 14,

2015).  A Rule 12(b)(6) motion cannot resolve factual disputes or the merits of the action. *Randall*

*v. United States*, 30 F.3d 518, 522 (4th Cir. 1994).  A motion to dismiss should not be granted

unless it appears beyond all doubt that the plaintiff can prove no set of facts to support the claim

and entitle plaintiff to relief. *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001); *Mylan Lab., Inc.*

*v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  Finally, when ruling on a motion to dismiss, a court

must assume the truth of all facts alleged in the complaint and construe the factual allegations in favor

of the plaintiff.  *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009); *see also Factory*

*Mut. Ins. Co. v. Liberty Mut. Ins. Co.*, 518 F. Supp. 2d 803, 807 (W.D. Va. 2007).

### 1.   The Proposed Second Amended Complaint Alleges Facts Establishing There Was an "Occurrence" Under Defendants' Policies

Defendants' policies define an "occurrence" as "an accident, including continuous or

repeated exposure to substantially the same general harmful conditions."[6]  (Proposed Second Amended Complaint ("Prop. SAC") ¶¶ 44, 52).  The Fourth Circuit has held that the definition of "occurrence is broad and inclusive, providing coverage for any 'accident'- that is 'any event that takes place without one's foresight or expectation.'"  *French v. Assurance Co. of America*, 448 F.3d 693 (4th Cir. 2006).  In its June 6th Order, the Court referred to the Fourth Circuit decisions in *Stanley Martin Cos. v. Ohio Cas. Grp.*, 313 F. App'x 609 (4th Cir. 2009), and *French*, 448 F.3d 693.  In these cases, the defective work of a subcontractor causing damage to other conforming property was found to be an "occurrence" within the meaning of a liability policy.  This Court summarized those cases by stating: "Thus, under *French* and *Stanley Martin*, while the replacement of defective work is not an 'occurrence' under such CGL policies, damage to nondefective work that is *caused by* that defective work can be an 'occurrence' and therefore trigger coverage."  Opinion at p. 10.  The Court found Grimberg had not alleged sufficient facts to state an "occurrence."

In its Proposed Second Amended Complaint, Grimberg provides additional factual allegations relating to the "occurrence."  Specifically, Grimberg first explains in more detail how its subcontractor PCS negligently constructed/installed the ICF walls that were part of the School's primary structural framing system that was designed to resist anticipated maximum vertical and lateral loads, including from wind, seismic activities, and other blasts.  (Prop. SAC ¶¶ 13-20).  The primary structural framing system consists of steel beams and joists that support the second-floor

---

[6] The Court stated: "Here, the Amended Complaint does not allege any facts regarding a 'continuous or repeated exposure to substantially the same harmful conditions' that would constitute an 'occurrence,' i.e., an accident, under the policies."  Opinion at 13.  The definition of occurrence is meet if there is an "accident" alone and nothing more is required.  The policies offer "continuous or repeated exposure to substantially the same harmful conditions" as one example of an "accident."

slabs and roof systems and either bear directly on the exterior load bearing ICF walls or are connected to the ICF walls by embedded steel plates on the face of the ICF walls. (*Id.* ¶¶ 13-15). The steel frame and connections carry the loads to the bearing ICF walls and serve to support the second floor and roof deck. (*Id.*). At the Project, after the ICF walls were installed, other components of the framing system were connected to the ICF walls making up the primary structural framing system. (*Id.*).

In the Proposed Second Amended Complaint, Grimberg alleges that PCS negligently installed a significant amount of the vertical steel rebar in the ICF walls causing the rebar to drift inward toward the middle of the ICF walls during the concrete pours because the vertical rebar was not fixed in place between alternating rows of horizontal rebar. (*Id.* ¶ 18). As a result, PCS's negligently installed or constructed ICF walls caused unexpected present existing physical injury to the rest of the School's primary structural framing system, which lost structural integrity and thus no longer could resist the anticipated wind, blast, and seismic loads. (*Id.* ¶¶ 17-35). As constructed, the framing system was physically injured as it did not have its designed structural integrity and this created an unacceptable danger of injury or death to occupants of the School. (*Id.* ¶¶ 17-38, Ex. A). Thus, PCS's negligent and defective work caused unexpected damage to other parts of the primary structural framing system and, therefore, constitutes an "occurrence."

### 2. The Proposed Second Amended Complaint Alleges Facts Establishing "Property Damage"

The policies require the Defendants to pay damages because of property damage caused by an occurrence. Defendants' policies define "property damage" broadly to include *both* (a) "[p]hysical injury to tangible property, including all resulting loss of use of that property" and

(b) "[l]oss of use of tangible property that is not physically injured." (Prop. SAC ¶ 44).[7]  The plain meaning of physical is "having material existence." Physical, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/physical (last visited July 3, 2024).   The plain meaning of injury is "hurt, damage, or loss sustained." Injury, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/injury (last visited July 3, 2024).   Equally instructive is the plain meaning of injure, which means "to impair the soundness of."  Injure, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/injure (last visited July 3, 2024).   As with the "occurrence" requirement, the Court's June 6th Order states that, while Grimberg had asserted a conclusory legal claim that "the defective ICF walls 'caused damage to other conforming, non-defective work,'" there was insufficient "facts regarding any 'physical injury to tangible property, including all resulting loss of use of that property' or 'loss of use of tangible property that is not physical injured' that would constitute 'property damage' to nondefective work caused by the defective ICF walls."  Opinion at 12-13.  Grimberg's Proposed Second Amended Complaint provides additional factual allegations to describe the "property damage."

"[I]f a material incorporated into a structure contaminates the building with dangerous substances or weakens the structural integrity, there is covered property damage." CONSTRUCTION INSURANCE: COVERAGES AND DISPUTES § 5.03 (2d ed., LexisNexis Matthew Bender 2022).  Here, the primary structural framing system of the Project was weakened and otherwise compromised by PCS's defective ICF walls. (Prop. SAC ¶¶ 17-38).  Courts recognize there is physical injury to tangible property when a defective part or work is incorporated into a larger product or system.

---

[7] Courts use dictionaries to discern plain meaning.  *See, e.g., Bausch & Lomb Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 780–81, 625 A.2d 1021, 1032 (1993).

*See, e.g., Nautilus Ins. Co.*, 968 F. Supp. 2d at 816–17 (W.D. Va. 2013) (dismissing insurer's assertion of no "property damage" where fiberglass materials incorporated into a reactor caused property damage to the reactor); *Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. 256, 304–07, 802 A.2d 1070, 1099–1100 (2002) (finding, on summary judgment, that "the continued presence of asbestos-containing building materials constitutes 'property damage' within the reach of the standard CGL policy").[8]

Grimberg previously cited *United States Fidelity & Guaranty Company v. Nevada Cement*, 561 P.2d 1335 (Nev. 1977). The facts alleged in the Proposed Second Amended Complaint are similar to that case. In that case, there was property damage when the insured supplied defective concrete that weakened the structural integrity of a building and required the insured to incur costs to shore up the structure. *Id.* at 1336–37. The insurer argued there was no property damage because there was no injury to or destruction of tangible property. *Id.* The Court rejected this argument and found coverage:

> [T]he presence of defective cement significantly weakened the total structure, thereby requiring additional shoring to avoid the danger of collapse. We are not persuaded by [the insurer's] argument that structural damage may be recognized only if collapse or removal ensues, and not if replacement is averted by a shoring process. We therefore think the trial court properly determined that the defective cement caused injury to tangible property within the meaning of [the insured's] insurance policy, even though financial loss was minimized by and limited to installation of shoring and related expenses.

---

[8] The 1973 ISO forms were at issue in CONSTRUCTION INSURANCE: COVERAGE AND DISPUTES. The definition of property damage in those forms, however, is not meaningfully different—defining property damage as:

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

*Id.*

*Id.* at 1337–38 (citation omitted).

In the Proposed Second Amended Complaint, Grimberg alleges that PCS's defective ICF walls caused physical injury to tangible property or loss of use that is covered by one or more of Defendants' policies.  Specifically, and as described above, PCS's negligently-constructed and installed ICF walls materially injured or damaged the other parts of the School's primary structural framing system that had been constructed free of defect, including steel beams, connecting steel joints, the second floor slab, metal decking, and the roof.  (Prop. SAC ¶¶ 34-38).  Grimberg cites and attaches Corrective Action Plan 31 that is the exchange between Grimberg's structural engineers WDP and Thornton Tomasetti with the Navy's Engineer of Record, EwingCole. EwingCole's conclusion was that there was existing physical damage to the building's structural framing system,  (Prop. SAC ¶¶ 17-38; Ex. A).  The other parts of the primary structural framing system were the Navy's property as Grimberg had been paid for them.  (Prop. SAC ¶ 34). Grimberg incurred significant expense, as ordered and directed by the Navy, to repair, remediate, and otherwise correct this physical injury to various elements of the School's primary structural framing system.  (*Id.* ¶¶ 17-38).  This constitutes property damage under the plain language of Defendants' policies and should be controlling.

Grimberg's Proposed Second Amended Complaint (Prop. SAC ¶¶ 34-35) also alleges PCS's defective work resulted in a loss of use of the defect-free parts of the primary structural framing system, which, as quoted above, is another form of "property damage" covered under one or more of Defendants' policies.  For example, Grimberg alleges it "incurred significant shoring expenses, as specifically directed by the Navy's July 28, 2021 letter, attached hereto as **Exhibit B**. (*Id.* ¶ 35).  In view of the lack of structural integrity of the primary structural framing system, other parts of the Project, such as the structural steel, could not be used for its intended purpose and had

to be braced or shored.  Grimberg's bracing and shoring costs alone are approximately \$1.5 million."  (Prop. SAC ¶¶ 35, 38).  While the policies do not define the phrase "loss of use," the plain meaning of use is the "employment of a thing for the purpose for which it is adapted."  *Use*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Use*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/use (last visited July 3, 2024) (use is "the act or practice of employing something"); *Penn Nat'l Security Ins. Co. v. Linkone SRC*, 542 F. Supp. 3d 355 (E.D.N.C. 2021).  Notably, the polices do not require any particular degree or extent of loss of use.

### 3. The Proposed Second Amended Complaint Alleges Facts Establishing a Claim Against Grimberg for Damages

In its Proposed Second Amended Complaint, Grimberg alleges that the Navy made a claim for damages in its July 28, 2021 (Ex. B) and August 19, 2021 (Ex. D) letters by ordering and directing Grimberg, at Grimberg's sole cost, to demolish and reconstruct the ICF walls *and* to reinstall other building elements that required bracing and/or reconfiguring to remediate the now-compromised primary structural framing system of the School caused by PCS's defective ICF walls.  (Prop. SAC ¶¶ 23-34).  The Navy ordered remediation of the other parts of the primary structural framing system that were owned by the Navy and damaged by PCS's negligent work.  (Prop. SAC ¶ 34).  The Navy was involved in the remediation of damage caused by PCS's defective ICF walls.  (*Id.*)  Specifically, the Navy reviewed and approved Corrective Action Plans that were submitted about how to repair the other parts of the primary structural framing system and the implementation of the work.  (*Id.*)  Therefore, the Navy's claim and order sought damages within the meaning of the policies.

The language of XL's policies also establishes coverage is to be provided even in the absence of formal legal proceedings.  "Insuring Agreement A – Excess Follow Form Liability"

coverage extends to "amounts the **insured** becomes legally obligated to pay as damages in excess of the **scheduled underlying insurance** as a result of a **claim**" (Prop. SAC ¶¶ 43, 47; bold in original).  "**Claim**" is defined to include "an express demand for damages, including a **suit,** resulting from an **occurrence** covered by this policy."  (Prop. SAC, Ex. F at 30 of 65, Ex. H at 30 of 66; bold in original).  The use of "including" reflects the parties' intent that a demand for damages could take any number of forms outside of a formal lawsuit. Further, "Insuring Agreement B – Umbrella Liability Over Self-Insured Retention" requires XL to pay "those amounts not covered by the **scheduled underlying insurance** that the **insured** becomes legally obligated to pay as damages in excess of the **self-insured retention** because of . . . **property damage** . . . taking place anywhere in the world and caused by an **occurrence** during the **policy period**." (Prop. SAC ¶¶ 43, 47; bold in original).  This language does not even require a formal "claim" or suit, and courts have declined to read such language into the policy.  *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 123 Wash.2d 891, 896, 874 P.2d 142, 154 (1994) ("There is nothing in the insurance policy language which requires a 'claim' or an overt threat of legal action and, therefore, the insurers' argument that a claim is a prerequisite to coverage seems to us to be an effort to add to the language of the policies").

"[A]n insured becomes 'legally obligated to pay [a sum] as damages' when some claim, order, or adjudication has directed the insured to pay a sum, pursuant to a binding legal obligation, as compensation or remediation for a loss or injury."  *Elec. Motor & Contracting Co. v. Travelers Indem. Co.*, 235 F. Supp. 3d 781, 789 (E.D. Va. 2017) (discussing *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.* ("*Dragas I*"), 709 F. Supp. 2d 432, 440 (E.D. Va. 2010); *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.* ("*Dragas II*"), 709 F. Supp. 2d 441, 447 (E.D. Va. 2010); *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.* ("*Dragas III*"), 793 F. Supp. 2d 785, 796–97 (E.D. Va. 2011), *vacated*

*on other grounds*, 497 F. App'x 313 (4th Cir. 2012)).[9]  Stated another way, coverage exists when the insured was subject to a "coercive directive to pay" and not just a contractual duty to incur costs.  *Elec. Motor*, 235 F. Supp. 3d at 789.  A final judgment or settlement of a lawsuit obligating payment is not necessary.  An insured need only allege: (1) facts sufficient to show that a claim for monetary compensation or remediation existed; and (2) facts sufficient to show that the insured was legally obligated to pay such a claim.  235 F. Supp. 3d. at 790.

In its June 6th Order, the Court stated that Grimberg had "not established that the Navy's demands were anything more than a demand for contract performance, or that the repair costs Grimberg incurred were monies that could reasonably be viewed as sums paid to the Navy as 'damages' or otherwise." (Doc. No. 79, at 9).  Grimberg's proposed amendments provide additional details regarding these issues. Specifically, in the Proposed Second Amended Complaint, Grimberg asserts additional factual allegations and attaches letters that establish that the Navy ordered and directed Grimberg to demolish and reconstruct the defective ICF walls and to pay for other repairs or reconstruction with respect to building elements owned by the Navy that required bracing and/or reconfiguring due to PCS's defective work at Grimberg's own cost.  (Prop. SAC ¶¶ 17-34; Exs. A, B, D.) Grimberg undertook this remediation work with the Navy's oversight and participation (Prop. SAC ¶ 34) to address property damage to the other parts of the building's primary structural framing system caused by PCS's defective ICF walls. (Prop. SAC ¶¶ 17-38, Exs. A, B, D).

---

[9] "Remediation" means "the process of improving or correcting a situation[.]" *Remediation*, CAMBRIDGE  DICTIONARY,  https://dictionary.cambridge.org/us/dictionary/english/remediation (last visited July 3, 2024); *see also Remedial,* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "remedial" as "[i]ntended to correct, remove, or lessen a wrong, fault, or defect").

The July 28, 2021 letter from the Navy constituted a claim within the meaning of the policies because under the Federal Acquisition Regulation ("FAR"), as cited in the letter, FAR 52.246-12, Inspection of Construction, paragraph (f) states: "[t]he Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price." (Prop. SAC ¶ 29; Ex. B).  Using mandatory language (*i.e.*, "shall be reinstalled"), the Navy's letter required and commanded Grimberg to reinstall other building elements that may require bracing and/or reconfiguring, which work Grimberg completed at its sole cost to compensate for or remediate the damage to building elements caused by PCS's defective ICF walls.  (Prop. SAC ¶¶ 23-32; Ex. B). The Navy's letter evidenced its adversarial and coercive posture towards Grimberg.  (*Id.*).[10]  The letter demanded that Grimberg provide it with demolition and reconstruction plans and a work schedule, unequivocally stating that no work could proceed without Navy approval of the plans and schedule.  (*Id.* ¶ 30).

These allegations establish Grimberg did not voluntarily undertake its reconstruction and repair work relating to the damages caused by the defective ICF walls or do so solely because of a contractual duty.  Instead, Grimberg's reconstruction and repair activities relating to the physical injury to the primary structural framing system caused by the defective ICF walls were undertaken pursuant to the Navy's *coercive federal law*, as the obligation is under the FAR to undertake work directed and ordered by the Navy to remedy property damage under threat of default.  (Prop. SAC

---

[10] The Navy's letter separately served as a "claim" within the meaning of the Contract Disputes Act.  Pursuant to FAR 52.233-1 Alternate I, if directed by the Navy to undertake work, a general contractor like Grimberg has a duty to proceed under threat of default termination.  (Prop. SAC ¶¶ 8, 31).  *See Garrett v. General Elec. Co.*, 987 F.2d 747, 749 (Fed. Cir. 1993) (holding government direction to repair or replace defective jet engines was a government "claim" under the Contract Disputes Act).

¶¶ 23-34); *see Valley View Enters.*, *Inc. v. United States*, 35 Fed. Cl. 378 (1996). Grimberg was faced with a coercive legal directive and order from the Navy to pay for remediation under FAR 52.246-12(f). *Elec. Motor,* 235 F. Supp. 3d at 790. Therefore, Grimberg's costs in undertaking repair/reconstruction work in response to this mandatory order and directive to correct, at Grimberg's sole cost, property damage to previously defect-free parts of the primary structural framing system (owned by the Navy) caused by PCS's defective ICF walls are damages that Grimberg was legally obligated to pay. *Id.* at 789.[11]

Construing these alleged facts and all reasonable inferences to be drawn therefrom in the light most favorable to Grimberg, Grimberg has sufficiently alleged in the Proposed Second Amended Complaint that it was under a coercive legal directive to pay for the repair and reconstruction of the property damage to the primary structural framing system caused by PCS's defective work. *See Elec. Motor,* 235 F. Supp. 3d at 789.[12] The contractor in *Electric Motor* only alleged "immense pressure" from the Navy to repair a defective generator before voluntarily undertaking the repair work without any claim, demand, or other communication from the Navy directing that such sums be incurred. Here, in contrast, Grimberg has alleged that the Navy *required* Grimberg, pursuant to coercive federal law, to perform repair and reconstruction work at its sole cost to remedy property damage caused by PCS's defective ICF walls. The Proposed

---

[11] The fact that Grimberg was not sued by the Navy or some other party is of no moment because the cases in this District have concluded that, for purposes of general liability policies like those at issue here, an insured becomes legally obligated to pay damages not only when compelled by a final judgment or settlement of a lawsuit but also when mandated by some other coercive legal obligation. *Elec. Motor*, 235 F. Supp. 3d at 789.

[12] Highlighting the coercive legal nature of its directive and order, the Navy also sent its initial letter to Liberty Mutual, Grimberg's bond insurer. Liberty Mutual would have been responsible if Grimberg had not repaired and reconstructed the ICF walls and other parts of the Project's primary structural framing system damaged by the defective ICF walls in compliance with its obligations under the FAR. (Prop. SAC ¶ 3 n.2, Ex. B).

Second Amended Complaint alleges facts sufficient to show that: (1) a claim for monetary compensation or remediation [from the Navy] existed; and (2) Grimberg was legally obligated to pay such costs as damages. *Id.* at 790.

In *Bausch & Lomb, Inc.*, the court affirmed a trial court's finding that an insured that removed hazardous waste materials from its premises, in the absence of any legal proceedings against it for damages, any governmental directive to do so, or any other evidence of an overtly adversarial and coercive posture by the government towards the insured, *had nevertheless paid sums the insured became legally obligated to pay as damages under the liability policies at issue*. 625 A.2d at 1031-32. The court explained that state environmental statutes giving the State of Maryland authority to enforce laws through "direct remediation at the owner's expense" were sufficient to trigger coverage. *Id.* Thus, the fact that the insured incurred remediation costs to comply with environmental laws was sufficient to obligate the insurer to cover those costs as sums the insured was legally obligated to pay as damages. *Id.* at 1032. Here, Grimberg was compelled to perform the reconstruction and repair work and related remediation by federal law.

Finding that the Proposed Second Amended Complaint sufficiently states a plausible claim is consistent with the vast majority of cases. *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 780, 625 A.2d 1021, 1032 (1993); *Cent. Il. Light Co. v. Home Ins. Co.*, 213 Ill. 2d 141, 175, 821 N.E.2d 206, 225 (2004) (finding that insured was "legally obligated to pay damages" when it paid remediation costs in response to "tacit threat" by regulator to commence litigation); *C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.*, 326 N.C. 133, 155, 388 S.E.2d 557, 570–71 (1990) ("costs incurred pursuant to State order to remedy this environmental injury are 'damages' which the insured was legally obligated to pay"); *Weyerhaeuser Co.*, 123 Wash.2d at 896 (insured was "obligated to pay damages" when it agreed to cleanup of pollution damages in

cooperation with an environmental agency, even in the absence of a threat of litigation); *Morrow Corp. v. Harleysville Mut. Ins. Co.*, 101 F. Supp. 2d 422, 434 (E.D. Va. 2000) ("The sounder conclusion, and the one followed by the majority of courts, is that environmental remediation costs constitute damages within the meaning of a comprehensive general liability insurance policy"); *Helena Chem. Co. v. Allianz Underwriters Ins. Co.*, 357 S.C. 631, 641, 594 S.E.2d 455, 460 (2004) ("[W]e find the trial court erred in ruling that Helena's environmental cleanup costs were not 'damages' contemplated under the insurance policies"); *see also U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 891 (Fla. 2007) (costs incurred by contractor to replace and repair work damaged by subcontractors' improper work constituted covered damages).

### 4. Grimberg Has Alleged Additional Facts Regarding the Defendants' Intent to Cover Claims By Governmental Entities and Damage to Conforming Work By Subcontractors

The Proposed Second Amended Complaint alleges facts relating to the intent to cover claims like those at issue. Grimberg alleges facts that Defendants' policies were drafted with an intent to cover claims by governmental entities as well as damage to conforming work by subcontractors. First, Grimberg alleges the Defendants had exclusions for claims by the government and chose not to use them. (Prop. SAC ¶ 39). Courts have held the failure to use available exclusions is relevant to the scope of coverage. *Greenbaum v. Travelers Ins. Co.*, 705 F. Supp. 1138, 1143 (E.D. Va. 2010) ("If [Defendant] intended to insure only the partnership entity, it could have written the named insured to reflect this intent or could have drafted provisions in the policy to clearly exclude individual coverage. Having failed to do so, [Defendant] cannot now rewrite a policy it issued in hopes of avoiding the terms of an instrument it drafted"); *Rossman v. State Farm Mut. Auto. Ins. Co.*, 832 F.2d 282, 287 (4th Cir. 1987) ("If Consolidated wished to avoid suit in Virginia or any other forum, it could have excluded that state from the 'policy

territory' defined in the policy. Consolidated is well aware that such a limitation would make its policy less marketable"); *Minnesota Laws. Mut., Ins. Co. v. Protostorm, LLC*, 197 F. Supp. 3d 87 n.126, 885 (E.D. Va. 2016) (noting exclusion that could have been included but was not). Defendants' omission of an exclusion for claims by governmental entities at the time Defendants issued each of the liability policies at issue here is telling, as Defendants knew Grimberg was a government contractor.  (Prop. SAC ¶ 39.)

Second, Defendants were also aware of cases like *Bausch & Lomb, Inc.*, 625 A.2d at 1031-32, which concluded that an insured becomes legally obligated to pay sums as damages when it incurs costs to repair, remediate, or replace damaged property.  (*Id.* ¶ 54).  However, Defendants elected to not include in their policies available policy forms defining the term "damages" to exclude such costs.  (*Id.*).

Finally, courts have held that finding coverage for property damage caused by a subcontractor's work is consistent with the intent in drafting of the CGL policy form.  *French*, 448 F.3d at 700-06 (the Fourth Circuit analyzed the drafting history of the CGL policy form and found the subcontractor exception to the "your work" exclusion restores coverage for unintended damage by subcontractor to others' work); *Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 882 F.3d 952, 965-66 (10th Cir. 2018) (the Tenth Circuit reviewed and relied upon drafting history in finding coverage for a construction defect claim); *Elec. Motor*, 235 F. Supp. 3d at 792-93 (noting drafting history of subcontractor exception and acknowledging it expanded coverage for damage caused by subcontractors).[13]

---

[13] *See also* Prop. SAC ¶¶ 56-64.

In this case, the XL policies incorporate the "Damage to Your Work" exclusion from the Old Republic (Grimberg's primary insurer in each of the policy years at issue) policies that specifically carves out damage from a subcontractor's work from the "your work" exclusion:

> This insurance does not apply to:
>
> * * *
>
> **l.  Damage to your Work**
>
> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard". [sic]
>
> *This exclusion does not apply if the damaged work or the work out of which it arises was performed on your behalf by a subcontractor.*

(Prop. SAC ¶ 44; emphasis added).  The "import" of the subcontractor exception for the occurrence issue "is that [it] lends insight into the baseline definition of 'occurrence' from which parties and courts interpreting CGL policies should operate."  *Stanley Martin*, 313 F. App'x at 613 n.2.  The exception shows the baseline definition of occurrence covers damage arising out of a subcontractor's defective work.  If an occurrence did not include a subcontractor's defective work, an exclusion removing coverage for certain damage but restoring coverage arising out of a subcontractor's defective work would be "nugatory."  *Id.*; *see also* NEW APPLEMAN LAW OF LIABILITY INSURANCE § 28.04 (Matthew Bender, Rev. Ed. 2022) (explaining that the subcontractor exception preserves coverage "when a general contractor becomes liable for damage to work performed by a subcontractor—or for damage to the general contractor's own work arising out of a subcontractor's work").  Therefore, these factual allegations of intent support Grimberg's position that is has asserted a plausible claim in the Proposed Second Amended Complaint.

**IV.    CONCLUSION**

For the foregoing reasons, Grimberg respectfully requests that this Court grant this motion to alter or amend the Court's Order of June 6, 2024 dismissing the Amended Complaint and grant Grimberg leave to file the Proposed Second Amended Complaint.

Dated:  July 3, 2024

Respectfully submitted,

**JOHN C. GRIMBERG COMPANY, INC.**

*/s/ Arnie B. Mason*
Arnie B. Mason, Esq. (VSB #45611)
Zahra S. Abrams, Esq. (VSB #95997)
Williams Mullen
8350 Broad Street
Suite 1600
Tysons, VA 22102
Telephone: (703) 760-5200
Facsimile:   (703) 748-0244
amason@williamsmullen.com
zabrams@williamsmullen.com

Andrew M. Reidy (pro hac vice)
Ramy R. Simpson (pro hac vice)
Nossaman LLP
1401 New York Avenue, NW
Suite 800
Washington, DC 20005
Telephone:  (703) 283-5576
areidy@nossaman.com
rsimpson@nossaman.com

Herman M. Braude (pro hac vice forthcoming)
Edward D. Manchester (pro hac vice forthcoming)
Braude Law Group, P.C.
11820 ParkLawn Drive, Suite 401
Rockville, MD 20852
Telephone: (202) 471-5400
hbraude@braudelawgroup.com
emanchester@braudelawgroup.com

*Counsel for Plaintiff*
*John C. Grimberg Company, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

Notice of electronic filing constitutes a certificate of service as to all parties to whom electronic notice is sent. I hereby certify that on this 3rd day of July 2024, I caused a true and accurate copy of the foregoing to be filed with the Clerk of Court and served pursuant to the Court's electronic filing procedures upon all counsel of record via email.

*/s/*_____

Arnie B. Mason