**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria, Division)**

JOHN C. GRIMBERG COMPANY, INC.

          **Plaintiff,**

          **v.**

XL SPECIALTY INSURANCE COMPANY, ~~ARCH SPECIALTY INSURANCE COMPANY, AND~~ XL INSURANCE AMERICA, INC., ~~AND WATFORD SPECIALTY INSURANCE COMPANY~~

          **Defendants.**

Civil Action No. 1:23-cv-01690

**JURY DEMANDED**

**SECOND AMENDED COMPLAINT [PROPOSED]**

Plaintiff John C. Grimberg Company, Inc. ("Grimberg") is a general contractor that is constructing a school in Quantico, Virginia for the Department of the Navy (the "Project"). Grimberg is the named insured in connection with umbrella and/or excess general liability insurance policies (the "excess policies")[1] sold by defendants XL Specialty Insurance Company, and XL Insurance America, Inc., ~~Arch Specialty Insurance Company, and Watford Specialty Insurance Company,~~ (collectively the "~~excess insurers~~Defendants"). Although the ~~excess insurers~~Defendants are obligated to provide insurance coverage to Grimberg in connection with ~~certain "~~property damage~~"~~ at the Project, each has denied coverage. Accordingly, Grimberg brings this Second Amended Complaint for a declaratory judgment that one or more of the ~~excess insurance~~Defendants' policies ~~provides~~provide coverage for Grimberg's insurance claim,

---

[1] The "excess policies" refer to the Defendants' policies sold to Grimberg for the period 2018 to 2021.

damages for breach of contract, and damages for breach of the implied duty of good faith and fair dealing.

**PARTIES**

1.      Grimberg is a ~~company~~general contractor that performs construction projects primarily for the Federal Government.  Grimberg is incorporated under the laws of the state of Maryland with its principal place of business in Rockville, Maryland.

2.      Grimberg is registered to transact business in the Commonwealth of Virginia, and its registered office is located in Glen Allen, Virginia.

3.      XL Specialty Insurance Company ("XL Specialty") is an insurance company incorporated under the laws of the state of Delaware with its principal place of business in Stamford, Connecticut.

4.      XL Specialty is registered to transact business in the Commonwealth of Virginia, and its registered office is located in Glen Allen, Virginia.

~~5.      Arch Specialty Insurance Company ("Arch Specialty") is an insurance company incorporated under the laws of the state of Missouri with its principal place of business in Jersey City, New Jersey.~~

~~6.      Arch Specialty is registered to transact business as a Surplus Lines Carrier in the Commonwealth of Virginia.~~

~~7.~~5.      XL Insurance America, Inc. ("XL America") is an insurance company organized under the laws of the State of Delaware with its principal place of business in Stamford, Connecticut.

~~8.~~6.      XL America is registered to transact business in the Commonwealth of Virginia, and its registered office is located in Glen Allen, Virginia.  XL Specialty and XL America are collectively referred to as "Defendants."

9. ~~Watford Specialty Insurance Company ("Watford Specialty") is an insurance company organized under the laws of the State of New Jersey with its principal place of business in Morristown, New Jersey.~~

10. ~~Watford Specialty is registered to transact business as a Surplus Lines Carrier in the Commonwealth of Virginia.~~

7.    Defendants sold liability insurance policies in this case that ~~relate~~are "on or with respect to ~~"~~the ownership, maintenance, or use" of the ~~Project~~property within the meaning of Va. Code. Ann. § 38.2-313 as the liability policies cover property damage to real property in Virginia, specifically at the Project.

~~11.~~8.    As Grimberg is a construction contractor who performs a significant amount of work for the Federal Government, which was disclosed to Defendants at the time the insurance policies were entered into, the reasonable expectations of the parties at the time Defendants sold Grimberg the insurance policies was that the insurance policies would provide coverage for claims brought by the Federal Government against Grimberg under the Contract Disputes Act of 1978, 41 U.S.C. Sec. 701 et seq., including Federal Acquisition Regulation ("FAR") Sec. 52.233-1, Disputes, which codifies the Disputes procedures for claims between government contractors and the Federal Government.  Defendants have denied coverage for this case for claims brought by the Navy under the Contract Disputes Act and FAR.

**JURISDICTION AND VENUE**

~~12.~~9.    This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because this is a civil action between residents and citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3

13.10.  This Court has jurisdiction over the request for a declaratory judgment under Federal Rule

of Civil Procedure 57 and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

14.11.  Venue is proper in the United States District Court for the Eastern District of Virginia,

Alexandria Division, under 28 U.S.C. § 1391(b)(1) and (c)(2) because:

    a.    this action arises from insurance policies that cover a Project in Quantico, Virginia,
which is located in the Alexandria Division of the Eastern District of Virginia;

    b.    Grimberg and the excess insurers Defendants maintain licenses to transact business
in the Commonwealth of Virginia;

    c.    The excess insurers' Defendants' registered offices and Grimberg's registered
office are located within the Eastern District of Virginia; and

    d.    Grimberg, XL Specialty, Arch Specialty, and XL America, and Watford Specialty
are subject to this Court's personal jurisdiction; and.

    e.    The Arch Specialty policy has a "Service of Suit" clause that provides, in part, "the
**Insurer** at the request of the **Insured**, will submit to the jurisdiction of any court
within the United States and will comply with all requirements necessary to give
such court jurisdiction."

### STATEMENT OF FACTS

*The Project in Quantico, Virginia*

15.12.  In November 2017, the Navy awarded Grimberg a contract for the Project, the construction

of a middle and high school located at the Marine Corps Base Quantico in Quantico, Virginia.  The

Project includes the construction of the school buildings, classrooms, science laboratories, an

information center, a gymnasium, a food service area, administrative offices, a performance

theatre, an auditorium, and athletic field, and other support and program areas required for a fully

functioning facility.  Grimberg's performance of the contract with the Navy is ongoing, and the Project is not yet complete.

16.13.  The primary structural framing system for the new school (depicted below) was designed to resist maximum vertical and lateral loads anticipated to be imposed on a school structure located on a Marine base, including wind, blast and seismic loads.

17.14.  StructuralThe primary structural framing system consists of steel beams and joists that support the second-floor slabs and roof systems and either bear directly on the exterior load bearing Insulated Concrete Form ("ICF") walls or are connected to the ICF walls by embedded steel plates on the face of the ICF walls. These The steel frame and connections carry the loads to the bearing ICF walls and serve to support the second floor and roof. deck.

18.15.  Schematic section views of the primary structural framing system are depicted in Figures 1 and 2 below.



Figure 1 – Primary vertical and lateral force resisting system of Quantico M/HS

5



Figure 2

To            perform            its            contract            with



Figure 1 – Primary vertical and lateral force resisting system of Quantico M/HS



Figure 2

19.16.  As the NavyPrime Contractor, Grimberg entered into a subcontract with, among others,

The PCS Group ("PCS").  PCS agreed to, among other things, installPCS constructed or installed

the ICF wall systems requiredsystem  for the Project.  The ICF wall systemssystem required

strategic placement of vertical steel rebar to ensure the ICF wall systemssystem could resist the

anticipated maximum lateral loads, including wind, seismic, and blast loads.

*The Navy Ordered Grimberg to Demolish the ICF Walls*

**Pursuant to the Federal Acquisition Regulations ("FAR"), the Navy Contracting Officer
Issued a Final Decision Ordering Grimberg to Demolish and Rebuild the Defective ICF
Walls That Supported the Structural Framing System Depicted in Figure 1 and 2 in Order
to Correct Existing Physical Property Damage to the Building's Structural Framing System,
Which the Government's Designer of Record, EwingCole, Determined Was Unable to Resist
the Anticipated Wind, Seismic and Blast Loads**

17.    In 2021, the Navy identified various issues in connection with the construction of the

Project.  On February 24,

8

20. 18.  In 2021, the Navy directed Grimberg to remove all the ICF forms from the ICF walls to allow for visual inspection of the walls for the possibility of voids in the ICF walls.  To minimize the impact on the existing ICF walls, Grimberg proposed evaluating the walls using ground penetrating radar equipment to non-destructively identify locations of voids and strip the ICF forms to expose and repair the voids. investigations revealed that a significant amount of the vertical steel rebar was negligently installed in the ICF walls by Grimberg's subcontractor PCS and had drifted inward toward the middle of the ICF walls during the concrete pours because the vertical rebar was not fixed in place between alternating rows of horizontal rebar, resulting in the ICF walls losing their ability to resist the anticipated wind, blast and seismic loads.  PCS's failure to fix the vertical rebar in place unexpectedly and severely compromised the ICF walls and also caused present existing physical injury and/or loss of use to the other parts of the building's primary structural framing system.  The other parts of the building's primary structural framing system were owned by the Navy.  PCS's defective ICF walls caused the loss of the structural integrity and/or loss of use of the other parts of the primary structural framing system.

21.     During this non-destructive testing in 2021, significant void spaces were detected in the concrete of the ICF walls.  Grimberg exposed those significant voids that needed to be repaired.

22.     During the ground penetrating radar survey in 2021, it was discovered that some of the vertical rebar in the ICF wall systems construction had drifted inward toward the middle of the walls, resulting in defective walls.

23.     In the summer of 2021, subsequent investigations revealed that a significant number of the vertical rebar had drifted inward toward the middle of the ICF walls throughout the Project.

24.     As a result of this inward drifting of the vertical reinforcing steel to the middle of the ICF walls, PCS produced a defective ICF wall system that, among other things, lacked sufficient

structural integrity to withstand wind, blasts, and seismic forces.  The defective ICF walls damaged and/or rendered unusable, other parts of the Project's integrated, primary framing system (e.g., steel beams, connecting steel joints, second floor slab, roof) that had been constructed by different subcontractors free of defect, such that those components of the framing system could also no longer carry or withstand the required loads.

19.     Navy engineers and the Navy's Engineer of Record,  On June 14, 2021, Grimberg's structural engineers presented Corrective Action Plan 31.  On July 1, 2021, the Navy's Engineer of Record, EwingCole, rejected structural calculations performed by Grimberg's structural engineers WDP and Thornton Tomasetti on the basis that there was existing physical damage to the buildings' structural framing system which Thornton Tomasetti did not consider.  A copy of WDP and Thorton Tomasetti's calculations and EwingCole's response (also known as Corrective Action Plan 31) is attached hereto as **Exhibit A**.

20.     EwingCole identified present existing physical damage caused by the vertical rebar displacement from its design position in a multitude of areas, which produced injury to the structural integrity of other parts of the primary structural framing system and created unacceptable danger of injury or death to the occupants of the building due to the failure of the building's primary structural framing system.  EwingCole specifically noted the following deficiencies in Thornton Tomasetti's calculations:

      "1. Wall slenderness has not been considered.

      2. Combined effects of axial loads with moment have not been considered.

      3. As-built wall out of plumbness has not been considered.

      4. Table on sheet 5 tabulates "unbraced wall height" for several conditions.  These heights often appear to assume that the slab on grade braces the wall, which is not the case:

            A.) Bracing points should be considered at the following locations:

i.) Top of footing (walls are not positively anchored to the slab on grade)

ii.) 2nd floor slab on deck, where applicable

iii.) Metal roof deck

B.) At two-span conditions it does not appear that the longer span is always considered.

5. Per table on sheet 5, the following cases appear to be considered:

A.) Generic 8" wall with 20' span and no openings

B.) Generic 12" wall with 40' span and no openings

C.) Specific walls and piers (if applicable) along Grids P, 6, M, J.5, A & K

Additional specific checks are necessary along the following grids: U, V, U.2, C.1, 17, 7, 6.1, L, and longspan 8" walls at grids B/7 and B/17.

6. Generic 8" and 12" cases appear to be intended to cover walls without pairs of openings that create a narrow pier.  Moment caused by eccentricity of gravity loading does not appear to be considered for these cases.

7. Table on sheet 6 notes each grid location as a typical wall or corner.  Grids M & A should be analyzed with corner wind loads.

8. Sheets 7 & 8 address moment due to gravity load eccentricity at joist bearing seats, however gravity load eccentricity at beam bearing pockets and embed plate connections do not appear to be addressed.  Additionally, only roof load is considered, but the span between foundation and 2nd floor is often the controlling span for wind moment design, and therefore second floor loading should also be considered.

9. Sheet 8 notes load combination of 1.2D+0.2S+W.  Per ASCE 7-10 the appropriate load factor for snow is 0.5.

10. Sheet 10 Table column for "Max Moment from Joist Ecc – Wind": it is unclear how these values are derived; they do not appear to correspond to the moments calculated on Page 8.

11. Sheet 10 states "The reinforcement spacing and cover at locations above with a DCR greater than 1.0 were verified in the field.  The actual cover was less than the worst-case scenarios previously analyzed, and the as-built reinforcement at the critical sections was adequate such that there are no issues at those locations."

A.) It is unclear what method was used to determine as-built cover

11

B.) As-built cover survey data was not provided

C.) Calculations were not provided to support the conclusion that as-built cover is adequate.

12. Analysis for the wall on Grid 28 states that the wall is adequate with a maximum clear cover of 3", and that the as-built cover satisfies this at all but one location:

A.) As-built clear cover survey information has not been provided.

B.) Calculations have not been provided to justify the statement that 3" clear cover is adequate at all locations.

13. Sheet 11: calculated shear capacity does not appear to apply a strength reduction factor.

14. Sheet 11 states that at grid 28 horizontal reinforcement is spaced at 18" (9" is specified on drawings).  SW-28 must be evaluated for the increased spacing.

15. Note that ACI 318-11 Chapter 14.3.4 requires for walls with thickness greater than 10", reinforcement must be placed in two layers with one layer no more than 1/3*thickness from the interior face and the other layer no more than 1/3*thickness from the exterior face.  The information in this submittal indicates that this provision is violated at Grid 28.  Clear cover should be verified at all 12" walls.

The reinforcement placement discrepancies addressed in this submittal are being considered in combination with other reinforcement discrepancies observed in the field. The method for evaluation of all reinforcement as-built conditions is to be determined."

21.    In sum, EwingCole concluded that the analysis performed by Thornton Tomasetti was deficient in both overstating the as-built wall structural capacity (reference EwingCole comments 1, 3, 4, 11, 13, and 14) and also understating the required life safety loading (reference EwingCole comments 2, 5, 6, 7, 8, 9, and 10).  The Navy adopted EwingCole's position finding, among other things, that Thorton Tomasetti's calculations did not comply with specifications.  Exhibit A at page 1 of 16.

25.22.  As a result of EwingCole's comments, Navy engineers and Ewing Cole, determined in July 2021 that the ICF walls as built by PCS were all so defective as to not be correctable., and that

**Formatted:** Widow/Orphan control

12

there was existing physical damage or loss of use to other parts of the building's primary structural framing system caused by the defective ICF walls.

23.     On July 28, 2021, the ~~Navy~~Navy's Contracting Officer issued a Contracting Officer's Final Decision and determined that "*a significant portion of the steel reinforcement in the ICF walls has been identified as nonconforming with contract requirements which presents a major concern for the structural integrity of the building*" and ordered and directed that the ICF walls "be demolished and reconstructed.~~"~~" by Grimberg at its own cost, and that Grimberg also undertake other work to remedy damage caused by PCS's defective ICF walls. **Exhibit ~~A~~B**, Navy Demolition Letter (July 28, 2021).

24.     By operation of law, the FAR imposes separate duties or obligations on parties contracting with the Government and, if directed by the Navy to undertake work, a general contractor like Grimberg had a duty to proceed under threat of default.  As a government contractor, the government had the ability to order Grimberg to take action to remedy property damage.

25.     FAR 52.233-1, Disputes, defines a "Claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract."

26.     FAR 52.233-1 is incorporated by reference into the Grimberg – Government prime contract at page 25 of 48.  A copy of the Prime Contract is attached hereto as **Exhibit C**.

27.     FAR 52.333-1 Alternate I provides: "The ~~Navy's~~ Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer."

Formatted: Font: Times New Roman, Font color: Auto

28.     FAR 52.233-1 Alternate I is incorporated by reference into the Grimberg-Government prime contract at page 25 of 48.  *See* **Exhibit C**.

~~26.~~29.  Pursuant to FAR 52.333-1, the July 28, 2021 Navy letter ~~was a claim for damages asserting the Federal Acquisition Regulation ("FAR") as the basis for its~~, signed by Frank G. Decker, as Contracting Officer constitutes a claim~~:~~ within the meaning of the FAR, as well as a contracting officer's final decision ordering Grimberg to fix the ICF walls and the conforming work damaged by the ICF walls.

> This letter is in accordance with FAR 52.246-12 Inspection of Construction, paragraph (f): "The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price."

~~*Id.*  By operation of law, the FAR imposes duties or obligations on parties contracting with the Government.~~

~~27.~~30.  The Navy's letter ~~also~~specifically required and commanded (*i.e.*, "shall be reinstalled") Grimberg to reinstall other building elements that may require bracing and/or reconfiguring ~~(*Id.*) The Navy stressed in closing that~~, which work Grimberg again completed at its sole cost to compensate for, or remediate, the damage to building elements owned by the Navy caused by PCS's defective ~~work presents "~~ICF walls.  (*Id.*)  In so doing, the Navy acknowledged there was a ~~major~~present concern ~~"~~for the structural integrity of the building." ~~*Id.*  The Navy also~~*Id.*  The Navy separately demanded that Grimberg provide it with demolition and reconstruction plans and a work schedule, unequivocally ~~stated~~stating that no work could proceed without Navy approval of the plans and schedule.  *Id.*  The Navy's letter evidenced its adversarial and coercive posture towards Grimberg.

14

28.31.  The Navy's letter was separately served as a claim within the meaning of the Contract Disputes Act.  Pursuant to FAR 52.233-1 Alternate I, if directed by the Navy to undertake work, a general contractor like Grimberg has a duty to proceed under threat of default termination.  The Navy sent its claim letter not just to Grimberg but to Liberty Mutual, Grimberg's bond insurer that would have been responsible in the event of Grimberg's default. [2]

29.32.  In an August 19, 2021 letter, the Navy affirmed its prior order and directive to Grimberg that the ICF walls had to be demolished and reconstructed.  **Exhibit BD**, Navy Demolition Letter (August 19, 2021).

30.33.  Subsequently, the Navy and Grimberg settled their disputes.  The excess insurers Defendants were apprised of the settlement with the Navy and did not object.

***Subcontractor PCS's Defective ICF Walls Caused Property Damage to Otherwise Conforming Work Performed by Others and Owned By The Navy***

34.    As described above, PCS's defective work ICF walls caused damage to other conforming, non-defective work at the Project by other subcontractors, including, but not limited to, work performed to construct and install steel beams, connecting steel joints, the second floor slab, and the roof for the Project as well as related items.  This property that was part of the primary structural framing system was physically injured because it could no longer carry the designed loads and/or suffered a loss of use due to the defective ICF walls.  The other conforming, nondefective work that was damaged by the defective ICF walls was paid for and owned by the Navy.  After the Navy's claim or order to Grimberg incurred costs, the Navy was involved in the remediation of damage caused by PCS's defective ICF walls.  Specifically, the Navy reviewed and approved

---

[2] The Navy sent its claim letter not just to Grimberg but also to Liberty Mutual, Grimberg's bond insurer that would have been responsible in the event Grimberg had not complied with the Navy's direction and repaired and reconstructed the ICF walls and the other parts of the Project's framing system as described below.

Corrective Action Plans that were submitted about how to repair or replace this separate property damage. This work includes ductwork, HVAC piping, insulation, metal decking, roofing, shoring and storing of structural steel, slab protection, underslab radon piping, underground electrical the other parts of the primary structural framing system and the implementation of the work foundation dowel bars, concrete masonry unit walls, fireproofing, mechanical, electrical and plumbing ("MEP") work, walls and doorframes, exterior wall waterproofing, vapor barrier, brickwork, and refurbishing materials. .

35. Grimberg also incurred significant shoring expenses. While the demolition and reconstruction, as specifically directed by the Navy's July 28, 2021 letter, attached hereto as **Exhibit B**. In view of the lack of structural integrity of the primary structural framing system, other parts of the Project, such as the structural steel, could not be used for its intended purpose and had to be braced or shored. Grimberg's bracing and shoring costs alone are approximately $1.5 million. This damage constitutes "property damage" as physically injured property and/or property that suffered a loss of use.

36. It was PCS's defective wall system that caused the above-described property damage to the non-defective parts of the primary structural framing system, not Grimberg's work to repair and reconstruct the ICF walls.

31.37. This unexpected and unintended property damage to otherwise non-defective work was taking place, property and material were stored on site, which were not under Grimberg's exclusive custody, care or control. of other subcontractors (owned by the Navy) was caused by PCS's defective ICF walls. The Navy sought damages in the form of remediation of injury or loss of use to property it owned (i.e., the conforming parts of the primary structural framing system).

38.     Grimberg seeks damages for the sums it paid in response to the Navy's claim to remediate damage to conforming property (*i.e.*, other parts of the primary structural framing system injured by PCS's defective walls) of at least the following:

| | |
|---|---|
| Costs of Shoring to Support Conforming Structural Steel | $1,459,397.81 |
| Amounts To Repair or Replace Damage to Otherwise Non-Defective Work Caused by PCS's Defective ICF Walls | $6,619,046.75 |
| Site Support Costs During Demolition and Rebuild | $1,450,791.00 |
| **Total** | **$9,529,235.56** |

Grimberg reserves the right to supplement or amend this computation.

### *The Nature of the Insurance Dispute*

39.     Grimberg's business is in large part as a government contractor.  At the time of issuing the liability insurance policies, the Defendants knew Grimberg was a government contractor. Grimberg's understanding and expectation was that its liability insurance policies would cover claims by the government.  This understanding is supported by the fact that the insurance policies at issue do not have an exclusion for claims by the government even though the insurance industry routinely uses such exclusions.

32.40.  Grimberg sought coverage from ~~its umbrella and excess liability insurers~~the Defendants for ~~damages~~damage that ~~fall~~falls within their policies during the coverage periods of 2018-2019, 2019-2020, and/or 2020-2021.  The ~~defendant insurers~~Defendants have refused to acknowledge any coverage for Grimberg and that refusal gives rise to this action.

Formatted: Widow/Orphan control

*The Excess Insurance Policies*

       *(a)*      *Policy Year 2018-2019*

~~33.~~41.  Old Republic sold Grimberg a commercial general liability insurance policy, effective from October 1, 2018 to October 1, 2019.  The Old Republic Policy contains a $1 million per-occurrence limit and a $2 million general-aggregate limit.  **Exhibit** ~~C~~E, Old Republic 2018-2019 Policy, "Renewal Declarations."  Exhibit ~~C~~E is a true and accurate copy of the Old Republic 2018-2019 Policy.  Grimberg and Old Republic have settled Grimberg's claims against Old Republic relating to the Project.  Grimberg's damages exceed the limits of the Old Republic Policy.

~~34.~~42.  In the same year, XL Specialty sold Grimberg a commercial Excess Follow Form and Umbrella Liability policy, No. US00063327LI18A, effective from October 1, 2018 to October 1, 2019.  The XL Specialty Policy contains a $25 million per-occurrence limit and a $25 million general-aggregate limit.  **Exhibit** ~~D~~F, XL Specialty 2018-2019 Policy, "Declarations."  Exhibit ~~D~~F is a true and accurate copy of the XL Specialty 2018-2019 Policy.

~~35.~~43.  The XL Specialty 2018-2019 Policy provides the following excess coverage:

    (A) **Insuring Agreement A - Excess Follow Form Liability**

        (1) We will pay on behalf of the **insured**, subject to Section IV. Limits of Insurance, those amounts the **insured** becomes legally obligated to pay as damages in excess of the **scheduled underlying insurance** as a result of a **claim** covered by the **scheduled underlying insurance**, but only if the **scheduled underlying insurance** has been exhausted by the actual payment of **loss** to which this policy applies.

        (2) Coverage under this Insuring Agreement A shall follow the terms, definitions, conditions and limitations of the **scheduled underlying insurance**, subject to the **policy period**, Limits of Insurance, premium, and any contrary provisions contained in this policy. . . .

The policy also provides the following umbrella coverage:

    (B) **Insuring Agreement B – Umbrella Liability Over Self-Insured Retention**

(1) We will pay on behalf of the **insured**, subject to Section IV. Limits of Insurance, those amounts not covered by the **scheduled underlying insurance** that the **insured** becomes legally obligated to pay as damages in excess of the **self-insured retention** because of **bodily injury**, **property damage** (including liability assumed by the **insured** under an **insured contract**) or **personal and advertising injury** taking place anywhere in the world and caused by an **occurrence** during the **policy period.**

(2) The coverage provided by the Insuring Agreement B will not apply to damages that would have been covered by the **scheduled underlying insurance** but for its exhaustion by the payment of **loss**.

(3) The coverage provided by Insuring Agreement B will not apply to any damages covered by Insuring Agreement A, or arising out of subjects of insurance or exposures to **loss** for which this policy requires the **scheduled underlying insurance** to be maintained.

*     *     *

**Exhibit** ~~D~~F, XL Specialty 2018-2019 Policy, "Insuring Agreements."

44.    The XL Specialty policy follows form to, and incorporates, the "your work" exclusion in the underlying Old Republic policy:

This insurance does not apply to:

* * *

**l.  Damage to your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard". [sic]

This exclusion does not apply if the damaged work or the work out of which it arises was performed on your behalf by a subcontractor.

Ex. C ~~[Doc. 1-4]~~ at p. 12 of 88 (bold typeface in original)]).

Relevant definitions in the XL policies include:

(BB) **Occurrence** means:

(1) With respect to **bodily injury** or **property damage**, an accident including continuous or repeated exposure to substantially the same general harmful conditions. All exposure to substantially the same general harmful conditions will be deemed to arise out of one **occurrence**.

19

*     *     *

(HH) **Property damage** means physical injury to tangible property, including all resulting loss of use of that property, and loss of use of tangible property that is not physically injured. . . .

**Exhibit** ~~D~~F, XL Specialty 2018-2019 Policy, "Definitions."

*(b)*     *Policy Year 2019-2020*

~~36.~~45.  Old Republic sold Grimberg a commercial general liability insurance policy, effective from October 1, 2019 to October 1, 2020.  The Old Republic Policy contains a $1 million per-occurrence limit and a $2 million general-aggregate limit.  **Exhibit** ~~E~~G, Old Republic 2019-2020 Policy, "Renewal Declaration."  Exhibit ~~E~~G is a true and accurate copy of the Old Republic 2019-2020 Policy.  Grimberg and Old Republic have settled Grimberg's claims against Old Republic relating to the Project.  Grimberg's damages exceed the limits of the Old Republic Policy.

~~37.~~46.  In the same year, XL Specialty sold Grimberg a commercial Excess Follow Form and Umbrella Liability Policy No. US00063327LI19A, effective from October 1, 2019 to October 1, 2020.  The XL Specialty Policy contains a $25 million per-occurrence limit and a $25 million general-aggregate limit.  **Exhibit** ~~F~~H, XL Specialty 2019-2020 Policy, "Declarations."  Exhibit ~~F~~H is a true and accurate copy of the XL Specialty 2019-2020 Policy.

~~38.~~47.  The XL Specialty 2019-2020 Policy has the same excess coverage grants and definitions of the XL Specialty 2018-2019 Policy and incorporates the "your work" exclusion from the Old Republic policy.  *See* ~~*supra* ¶ 35~~¶ 45.

*(c) Policy Year 2020-2021*

~~39.~~48.  Old Republic sold Grimberg a commercial general liability insurance policy, effective from October 1, 2020 to October 1, 2021.  The Old Republic Policy contains a $1 million per-occurrence limit and a $2 million general-aggregate limit.  **Exhibit** ~~G~~I, Old Republic 2020-2021 Policy,

"Renewal Declarations."  **Exhibit GI** is a true and accurate copy of the Old Republic 2020-2021

**Formatted:** Font: Bold

Policy.  Grimberg and Old Republic have settled Grimberg's claims against Old Republic relating

to the Project.  Grimberg's damages exceed the limits of the Old Republic Policy.

40.49.  In the same year, Arch Specialty sold Grimberg an Excess Third Party Liability policy, No.

UXP1040336-00, effective from October 1, 2020 to October 1, 2021.  The Arch Specialty Policy

contains a $1 million per-occurrence limit and a $2 million general-aggregate limit.  ~~Exhibit H,~~

~~Arch Specialty 2020-2021 Policy, "Declarations."  Exhibit H is true and accurate copy of the Arch~~

~~Specialty 2020-2021 Policy.~~  Watford Specialty is a 50% quota share participant with Arch

Specialty in the Policy.  ~~Id.  "Insurer Participation Endorsement."~~ Arch and Watford are no longer

defendants in this action.

~~41.     The Arch Specialty Policy relating to the scope of coverage states as follows:~~

~~**I.      INSURING AGREEMENTS**~~

~~We will pay on behalf of the **insured,** except as otherwise stated in this~~
~~policy, those amounts of **loss** for which coverage is provided under the~~
~~definitions, terms, conditions, limitations and exclusions of the **controlling**~~
~~**underlying insurance** in effect at the inception of this policy and which~~
~~exceeds the total Limits of Liability of **underlying insurance** as stated in~~
~~Items 3.a. and 3.b. of Schedule A – Schedule of Underlying Insurance of~~
~~this policy. . . .~~

~~**Exhibit H,** Arch Specialty 2020-2021 Policy, "Insuring Agreements."  The Arch Policy~~

~~incorporates the "1.  Damage to Your Work" exclusion from the Old Republic Policy.~~

42.50.  In the same year, XL America sold Grimberg an Excess Liability policy, No.

**Formatted:** Widow/Orphan control

US00102881LI20A, effective from October 1, 2020 to October 1, 2021.  The XL America Policy

contains a $10 million per-occurrence limit and a $10 million general-aggregate limit.  **Exhibit IJ**,

XL America 2020-2021 Policy, "Declarations."  Exhibit IJ is a true and accurate copy of the XL

America 2020-2021 Policy.

21

43.51.  The XL America Policy relating to the scope of coverage states:

**SECTION I – INSURING AGREEMENTS** . . .

A.  We will pay on your behalf all "Loss" that you become legally obligated to pay in excess of all "Underlying Insurance" as shown in Item 4. of the Declarations providing that:

1. Such "Loss" is insured by all of the policies shown in our Schedule of "Underlying Insurance". If any "Underlying Insurance" does not pay damages, for reasons other than exhaustion of the aggregate limit of insurance, then we shall not pay such damages.

2. "Underlying Insurance" has been reduced or exhausted by payment of "Loss" to which this policy applies. In the event of a reduction or exhaustion in the underlying limit due to payment of such "Loss" we will:

a. Pay excess over the reduced underlying limit of the "Underlying Insurance"; or

b. Continue in force should the "Underlying Insurance" be completely depleted.

B.  The terms, conditions, definitions, limitations and exclusions of the "Controlling Underlying Policy", as shown in the Schedule of "Underlying Insurance", apply to this policy unless they are inconsistent with the provisions of this policy. Insurance provided by this policy will not be broader than the insurance provided by the "Underlying Insurance."

**Exhibit** IJ, XL America 2020-2021 Policy, "Endorsement No. 5."  The XL Policy incorporates the "1. Damage to Your Work" exclusion from the Old Republic Policy.

44.52.  Both the Arch Specialty andThe XL America 2020-2021 polices havepolicy has the same definitions of "occurrence" and "property damage" found in the Old Republic 2020-2021 Policy. Those definitions are:

13.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

*     *     *

17.  "Property damage" means:

22

      **a.**  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

      **b.**  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**Ex. ~~G~~I**, Old Republic 2020-2021 Policy, "Definitions."

53.    None of the policies in this case define the phrases "legally obligated to pay" or "as damages." "Obligate" is defined as "to bind by a contract, promise, sense of duty, etc.; put under obligation." *Webster's New World Dictionary* (2d College ed.). The term "damages" in CGL policies has been interpreted to mean costs incurred to remediate or repair injured property. *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 780–81, 625 A.2d 1021, 1032 (1993) (citing *Webster's Third New International Dictionary of the English Language* 571 (1981)).

54.    At the time the Defendants sold the excess policies, Defendants knew or should have known that the undefined term "damages" in CGL policies was ambiguous and multiple courts had held that "damages" extended to costs incurred to repair, remediate, or replace injured property. *See, e.g., Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 780, 625 A.2d 1021, 1032 (1993). Insurance policy forms were available that define the term "damages" to exclude costs to repair, remediate, or replace damaged property, but neither Old Republic nor Defendants added such a definition to the policies.

55.    At a minimum, these phrases are ambiguous and should be construed in favor of coverage.

***The Excess ~~Insurers~~Insurance Policies, As Reflected by Their Plain Language and Drafting History, Are Intended to Cover Property Damage Caused by Negligent Work of Subcontractors***

56.     Most CGL policies, including the policies at issue, are drafted using standardized forms developed by the Insurance Services Office, Inc. ("ISO").  ISO maintains a large portfolio of policy forms and endorsements that can be used to amend a standard CGL policy.

57.     Each of the Old Republic Policies utilized policy form number CG 00 01 04 13, which is a policy form created by the ISO in or about 2012 and over which ISO asserts protection under U.S. copyright laws.  There have been several modifications to the ISO-form CGL policy, leading to policy form number CG 00 01 04 13.

58.     The drafting history of the CGL form by ISO confirms that it is intended to cover costs incurred by a general contractor to correct unexpected and unintended property damage to otherwise non-defective property caused by a subcontractor's defective workmanship.

59.     The standard-form CGL policy has undergone several revisions since the first one was promulgated in 1940.  In an earlier 1973 version of ISO's CGL policy form, there existed a work performed exclusion, which precluded coverage for "property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith."  **Exhibit K**.

60.     Courts had construed the work performed exclusion, and specifically the "on behalf of" language, to mean that there was no coverage for damage resulting from a subcontractor's work.

61.     In 1986, after contractors had expressed dissatisfaction at the lack of coverage for property damage caused by the defective work of subcontractors, ISO made a major revision to the CGL policy form and added an express exception to the "Your Work" exclusion, stating that the exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on [the insured contractor's] behalf by a subcontractor."  **Exhibit L**.  This drafting history has been cited and followed by many courts including the Fourth Circuit in *French v.*

24

*Assurance Co. of America,* 448 F.3d 693 (4th Cir. 2006) and *Stanley Martin Cos. v. Ohio Cas. Grp.,* 313 Fed. App'x. 609 (4th Cir. 2009).

62.     The revised policy language was retained in subsequent CGL policy forms, including in policy form number CG 00 01 04 13, which is utilized in the Old Republic policies.

63.     Subsequently, it has been well-known in the insurance industry, including at the time that the subject excess policies were sold, that if an insurer does not want to assume the risk of negligence by subcontractors, insurance companies should utilize specific endorsements to preclude coverage for damages arising from work performed by subcontractors.  For example, Defendants had available to them ISO policy form number CG 22 94 10 01, labeled "EXCLUSION – DAMAGE TO WORK PERFORMED BY SUBCONTRACTORS ON YOUR BEHALF," which deletes the subcontractor exception from the "Your Work: exclusion."  **Exhibit M**.  Defendants also had available to them ISO policy form number CG 22 95 10 01, labeled EXCLUSION – DAMAGE TO WORK PERFORMED BY SUBCONTRACTORS ON YOUR BEHALF – DESIGNATED SITES OR OPERATIONS, which bars coverage for work performed by subcontractors at specified sites or operations.  **Exhibit N**.  Defendants chose not to include any such exclusion in the excess policies sold to Grimberg.

64.     Upon information and belief, Defendants deliberately chose not to incorporate such exclusions into the policies they sold to Grimberg.  On information and belief, Defendants made this decision with the knowledge and understanding that excluding such coverage from the excess policies would have been inconsistent with the parties' mutual intent and expectation that the Old Republic policies and excess policies provide coverage for damages caused by the negligent work of subcontractors.

*The Defendants* **Refuse to Provide Coverage**

| Formatted: Font: Not Bold, Not Italic |
| Formatted: Widow/Orphan control |

25

45.65.  In or about August or September 2021, Grimberg provided notice to the excess insurersDefendants of the Navy's demandclaim and the property damage caused by PCS's defective work at the Project.

46.66.  In order for an insurer to fulfill its obligations of good faith and fair dealing, the insurer must conduct an investigation of the insured's claim, apply the policy to the facts of the claim, and convey a prompt determination of coverage in view of the applicable case law to the insured.  The excess insurersDefendants failed to do so with respect to Grimberg's claim.

47.67.  Between August 2021 and March 2022, Grimberg had communications with the excess insurersDefendants and provided numerous documents relating to its claim for insurance coverage. During this period, Grimberg also asked for the excess insurers'Defendants' coverage positions.

48.68.  On March 22, 2022, XL Specialty and XL America denied coverage.  **Exhibit JO**, XL Denial Letter.  On October 6, 2022, Arch Specialty denied coverage.  **Exhibit K, Arch Specialty Denial Letter.**

49.69.  For the policies applicable from 2018 to 2020, XL Specialty denied coverage under the umbrella coverage erroneously asserting there was no "property damage" or "occurrence" within the meaning of the XL Specialty policy.  In doing so, XL Specialty failed to conduct a proper factual investigation by interviewing witnesses with knowledge of the Project and the claim.  XL Specialty did not cite any cases, and chose to ignore cases, in the construction defect context that found there was "property damage" caused by an "occurrence" when a subcontractor's defective work caused damage to other conforming work.  In connection with the umbrella coverage, XL Specialty asserted five exclusions (contractual liability; damage to impaired property; damage to real and personal property; damage to your product; and a professional services exclusion) without any factual analysis about how the exclusions might apply.  XL Specialty did not cite any of the

**Formatted:** Widow/Orphan control

exclusions it ~~now relies~~subsequently relied on in this litigation or attempt to explain how these exclusions might apply to Grimberg.

70.    XL Specialty and XL America also denied coverage under their excess coverage in the 2018 to 2021 policy years on the basis of Old Republic's denial of coverage and the failure to exhaust the underlying Arch and/or Old Republic policies. Under XL Specialty and XL America's interpretation, a denial of coverage by a primary insurer or underlying insurer forfeits coverage for the insured under umbrella or excess coverage in the same year. XL Specialty and XL America's position is directly contradicted by their excess policy language that allows exhaustion by the "actual payment of loss" but does not specify the primary insurer (as opposed to the insured) must make the payment of loss.

~~50.~~71.  XL Specialty and XL America failed to disclose to Grimberg that the CGL form has been construed to cover ~~subcontractor's~~ damages to non-defective property caused by subcontractors. In addition, XL Specialty and XL America, now that ~~it has~~they have been sued, ~~has~~have asserted defenses that are not in ~~its~~their denial letter.  Upon information and belief, this is a business strategy designed to dissuade insureds from filing claims for coverage by increasing the costs of litigation. ~~XL's~~Defendants' defenses do not apply to Grimberg's claim.

~~51.~~72.  At a minimum, the XL Specialty and XL America's policies are ambiguous and must be construed in favor of coverage.  For example, and without limitation, exclusions j(4), j(5), and j(6) are ambiguous.  Exclusions j(5) and j(6) are ambiguous because the phrase "that particular part" is unclear and could be read to refer solely to the direct object on which the insured was operating." Further, courts have found the phrase "real property on which [the insured] . . . [is] performing operations" in j(5) to be ambiguous.  Exclusion j(4) also uses ambiguous terms, as the words "care", "custody" and "control" could have narrow or broad meaning, depending on the

circumstances.  These provisions and ~~others~~other ambiguous provisions must be construed in favor of coverage.

~~52.     Arch likewise erroneously denied coverage. Arch erroneously asserted three grounds: 1) the purported failure to exhaust the Old Republic coverage payment of judgments or settlements; 2) the "Pre-existing Injury or Damage and Continuous or Progressive Injury Or Damage Exclusionary" endorsement applies because "deficiencies were noted in a design inspection and occurred sometime prior to November 13, 2019"; and 3) there "may have been" a lack of consent by Arch to the settlement between the Navy and Grimberg.  Arch failed to conduct a proper claim investigation by failing to interview key witnesses with knowledge of the property damage at the Project.  Arch has failed to set forth facts in support of these defenses that demonstrate the absence of coverage.   Arch failed to disclose that the CGL form has been construed to cover a subcontractor's damages to non-defective property.  In addition, Arch, now that it has been sued, has asserted defenses that are not in its denial letter.  Upon information and belief, this is a business strategy designed to dissuade insureds from filing claims for coverage by increasing the costs of litigation.  Arch's defenses do not apply to Grimberg's claim.~~

~~53.     At a minimum, the Arch policy is ambiguous and must be construed in favor of coverage. Examples of ambiguous terms are those in the exclusions set forth in ¶ 51 above.~~

## COUNT I – DECLARATORY JUDGMENT

~~54.~~73.  Grimberg incorporates paragraphs 1 to ~~53~~72.

~~55.~~74.   The ~~excess insurers~~Defendants are obligated to provide Grimberg with insurance coverage for property damage to conforming work caused by ~~PCS~~PCS's defective ICF walls at the Project~~.~~ as detailed above.

56.75.  The ~~excess insurers~~Defendants have refused to provide insurance coverage under the ~~Policies~~policies sold to Grimberg.

57.76.  Accordingly, there is an actual and justiciable controversy concerning the ~~excess insurers'~~Defendants' obligations to Grimberg and Grimberg's rights under ~~such Policies~~Defendants' policies.

### COUNT II – BREACH OF CONTRACT

> **Formatted:** Widow/Orphan control, Don't keep with next

58.77.  Grimberg incorporates paragraphs 1 to ~~53~~72.

59.78.  The ~~excess insurers~~Defendants are obligated to provide insurance coverage to Grimberg for property damage ~~caused by PCS~~ to conforming work caused by PCS's defective ICF walls at the Project as detailed above.

60.79.  Grimberg has submitted a claim that is covered under one or more of the ~~defendants'~~Defendants' policies.

> **Formatted:** Widow/Orphan control

61.80.  No exclusion bars coverage for Grimberg's claim.

62.81.  The ~~defendant excess insurers'~~Defendants' refusal to provide coverage for Grimberg's claim is a breach of ~~their contracts~~the contract.

63.82.  As a result of the ~~excess insurers'~~Defendants' breach or breaches, Grimberg has suffered and continues to suffer damages.

> **Formatted:** Widow/Orphan control

### COUNT III – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

64.83.  Grimberg incorporates paragraphs 1 to ~~53~~72.

65.84.  The ~~excess insurers~~Defendants are obligated to provide insurance coverage to Grimberg for property damage to conforming work caused by ~~PCS~~PCS's defective ICF walls at the Project as detailed above.

66.85.  Grimberg has submitted a claim that is covered under one or more of the ~~defendants'~~Defendants' policies.

67.86.  No exclusion bars coverage for Grimberg's claim.

68.87.  The ~~defendant excess insurers~~Defendants failed to conduct a factual investigation of the claim, apply the policy to the facts of Grimberg's claim, and convey a prompt and/or for accurate determination of coverage in view of the applicable case law.

69.88.  The ~~defendant excess insurers~~Defendants lacked a reasonable basis to deny or compromise the claim.

70.89.  The ~~defendant excess insurers'~~Defendants' conduct in the handling of ~~this~~Grimberg's claim ~~breaches~~breached their implied duty of good faith and fair dealing.

71.90.  As a result of the ~~excess insurers'~~Defendants' breaches, Grimberg has suffered and continues to suffer damages.

**PRAYER FOR RELIEF**

WHEREFORE, Grimberg requests that this Court enter judgment in its favor as follows:

1.      Compensatory and consequential damages against the ~~excess insurers~~Defendants in an amount to be proven at trial;

2.      Prejudgment and post judgment interest;

3.      An award of court costs and costs incurred in obtaining the coverage due under the Policy or Policies;

4.      An award of attorneys' fees pursuant to Va. Code Ann. § 38.2-209;

5.      Interest on such court costs and attorneys' fees and costs;

30

6.      Declaratory judgment in favor of Grimberg and against the ~~excess insurers~~Defendants declaring that one or more of the policies provides coverage, in whole or in part, for amounts incurred in connection with Grimberg's claim; and

7.      Such other and further relief that this Court deems just and proper.

**JURY DEMAND**

Grimberg demands a trial by jury for all the triable issues according to Federal Rule of Civil Procedure 38 and Local Civil Rule 38.

Dated: ~~March 4~~July 3, 2024

                              Respectfully submitted,

                              **JOHN C. GRIMBERG COMPANY, INC.**

                              */s/ Arnie B. Mason*
                              Arnie B. Mason, Esq. (VSB #45611)
                              Zahra S. Abrams, Esq. (VSB #95997)
                              Williams Mullen
                              8350 Broad Street
                              Suite 1600
                              Tysons, VA 22102
                              Telephone: (703) 760-5200
                              Facsimile:   (703) 748-0244
                              amason@williamsmullen.com
                              zabrams@williamsmullen.com

Andrew M. Reidy (pro hac vice)
Ramy R. Simpson (pro hac vice)
Nossaman LLP
1401 New York Avenue, NW
Suite 800
Washington, DC 20005
Telephone: (703) 283-5576
areidy@nossaman.com
rsimpson@nossaman.com

Herman M. Braude (pro hac vice forthcoming)
Edward D. Manchester (pro hac vice forthcoming)
Braude Law Group, P.C.
11820 ParkLawn Drive, Suite 401
Rockville, MD 20852
Telephone: (202) 471-5400
hbraude@braudelawgroup.com
emanchester@braudelawgroup.com

*Counsel for Plaintiff*
*John C. Grimberg Company, Inc.*



**Formatted:** Widow/Orphan control, Keep with next

**Formatted:** Widow/Orphan control

**Formatted:** Widow/Orphan control, Keep with next

**Formatted:** Keep with next

32

**CERTIFICATE OF SERVICE**

Notice of electronic filing constitutes a certificate of service as to all parties to whom electronic notice is sent. I hereby certify that on this ~~4th~~3rd day of ~~March~~July 2024, I caused a true and accurate copy of the foregoing to be filed with the Clerk of Court and served pursuant to the Court's electronic filing procedures upon all counsel of record via email.

_/s/_____

Arnie B. Mason (VSB #45611)

**Formatted:** Widow/Orphan control

33