**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria, Division)**

| | |
|---|---|
| **JOHN C. GRIMBERG COMPANY, INC.** | |
| **Plaintiff,** | **Civil Action No. 1:23-cv-01690** |
| **v.** | |
| **XL SPECIALTY INSURANCE COMPANY, ARCH SPECIALTY INSURANCE COMPANY, XL INSURANCE AMERICA, INC., AND WATFORD SPECIALTY INSURANCE COMPANY** | |
| **Defendants.** | |

---

**PLAINTIFF JOHN C. GRIMBERG COMPANY, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO ALTER OR AMEND THE COURT'S JUNE 6, 2024 ORDER AND TO ALLOW THE FILING OF A SECOND AMENDED COMPLAINT**

---

## I.      INTRODUCTION

Plaintiff John C. Grimberg Company, Inc. ("Grimberg") submits this Reply in support of its previously filed Motion to Alter or Amend the Court's June 6, 2024 Order and to Allow for the Filing of a Second Amended Complaint (the "Motion") pursuant to Federal Rules of Procedure 59(e) and 15(a). Grimberg purchased liability insurance that was designed specifically to cover subcontractors' negligence causing property damage to other property.  In the Proposed Second Amended Complaint ("SAC" or "Second Amended Complaint"), Grimberg has alleged that the negligence of its subcontractor PCS in installing ICF Walls caused property damage to other parts of the primary framing system at the School.  Contrary to XL's assertion, Grimberg's claim is for *existing property damage*, not future property damage.  The allegations of the Second Amended Complaint state a plausible claim within the coverage of XL's liability insurance policies. Therefore, leave to amend should be granted and the case should proceed in discovery.

1

## II.    ARGUMENT

### A.  The Parties Agree on the Applicable Legal Standard

The parties  agree on the standards that apply to this Motion.  First, the parties agree that in evaluating whether to grant a post-judgment motion for leave to file an amended complaint, the Court applies the same standard as it would under Federal Rule of Civil Procedure 15(a).[1]  Under Rule 15(a), leave to amend should be freely granted to promote the resolution of cases on the merits.  Second, the Court must grant leave to amend unless the amendment would be futile.[2] "Leave to amend ... should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face."  *Rudolph v. Drynachan, LLC*, No. 3:18cv69, 2019 WL 13297172, at *3 (E.D. Va. April 15, 2019) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986)).  "[F]utility is a high standard and, at that early stage of the proceedings, it is difficult to find that a proposed amendment is futile."  *Liberty Ins. Underwriters, Inc. v. Beaufurn, LLC*, 406 F.Supp.3d 498, 509 (M.D.N.C. 2019).  As more fully described below, XL cannot demonstrate that Grimberg's arguments for coverage, supported by numerous cases, are clearly insufficient or frivolous and therefore leave to file the Second Amended Complaint should be granted.

### B.  XL Does Not Dispute the Well-Established Rules of Interpretation for Insurance Policies

Virginia law follows the rule of *contra proferentem*, applicable specifically to insurance contracts.  Under that principle, "insurance policies are to be liberally construed in favor of the

---

[1] On June 6, 2024, the Court granted XL's motion to dismiss Grimberg's Amended Complaint. (Doc. No. 79).

[2] XL agrees that the other grounds to deny a motion to amend (prejudice to an opposing party or bad faith) are not applicable in this case.

assured and exceptions and exclusions are to be strictly construed against the insurer." *Sentry Select Ins. Co. v. Acuna*, No. 1:11-cv-581, 2011 WL 5593159, at *5 (E.D. Va. Nov. 15, 2011). "[E]xclusions from coverage are enforceable only when the exclusions 'unambiguously bring the particular act or omission within [their] scope.'" *Builders Mut. Ins. Co. v. ARC Constr., LLC*, No. 1:15–cv–00406, 2015 WL 13066125, at *3 (E.D. Va. July 2, 2015) (quoting *Floyd v. Northern Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993)).   XL has the burden to establish the clear applicability of any exclusion.  *Id*.   Ambiguous language in an insurance policy is construed in favor of coverage.  *Id*.  XL takes no issue with the applicability of these rules of insurance policy construction.

## C.  Grimberg Has Alleged Physical Loss or Damage Caused By an Occurrence

As set forth in the Court's Order dated June 6, 2024 (Document 79) (the "June 6 Order"), the Fourth Circuit has held that there is an occurrence within the meaning of a general liability policy (referred to as a "CGL policy") when a subcontractor's defective workmanship causes property damage to someone else's work.  The rationale for the Fourth Circuit's holdings in *Stanley Martin Cos. v. Ohio Cas. Group*, 313 F. App'x 609 (4th Cir. 2009) and *French v. Assurance Co. of America*, 448 F.3d 693 (4th Cir. 2006) is based, in part, on the drafting history of the general liability form.  The policy form was expressly amended in 1986 to provide coverage for property damage caused by a subcontractor's negligence.  *French*, 448 F.3d. at 706; *Stanley Martin*, 313 F. App'x at 613, n.2; *see also* SAC ¶ 56-64.[3]

The SAC alleges PCS negligently installed a significant amount of the vertical steel rebar in the ICF walls, which caused the rebar to drift inward toward the middle of the ICF walls during

---

[3] Old Republic (the primary insurer) and defendant XL (an excess or umbrella insurer) chose not to use exclusions available to them that excluded coverage for property damage caused by subcontractor negligence.  SAC ¶¶ 63-64.

the concrete pours because the vertical rebar was not fixed in place between alternating rows of horizontal rebar.  SAC ¶ 18.  In addition, PCS's negligent work caused the ICF Walls to be out of plumbness.  *Id.* Ex. A, [Doc. 81-2], page 2 of 17.

As detailed in Grimberg's Memorandum of Law in Support of Its Motion (the "Memorandum in Support") (pp. 9-11), PCS's defective work constitutes an occurrence within the meaning of the policy.  SAC ¶¶ 18-23; *see Architex Ass'n v. Scottsdale Ins. Co*, 27 So. 3d 1148, 1156-57, 1162 (Miss. 2010) (the court found there was an occurrence when a subcontractor failed to install rebar in the foundation in a building causing structural damage).  XL does not dispute PCS negligently installed rebar in the ICF Walls and the rebar shifted or that PCS's negligent work caused the walls to be out of plumbness.  SAC ¶¶ 18-23; SAC ¶ 20 No. 3.  This is precisely the type of conduct that the Fourth Circuit in *French* described as meeting the definition of occurrence (*i.e.*, "an accident – that is 'any event that takes place without one's foresight or expectation'").

XL's argument instead focuses on whether PCS's defective work caused property damage to other work.  In its Opposition to the Motion ("Opposition" or "Opp."), XL starts with the false premise that Grimberg's original complaint alleged "that its insurers should have to pay for its own faulty construction of certain" ICF Walls.  Opp. at 5.  XL now alleges, "this case arises from Grimberg's defective work… ."  Opp. at 8.[4]  However, Grimberg does not seek, and has never sought, coverage under general liability policies for the costs of demolition or to rebuild the defective ICF Walls.  Grimberg's claim in this case against its excess general liability insurer XL is based on damage caused by Grimberg's subcontractor PCS to otherwise conforming work of others at the Project.  SAC  ¶¶ 74, 78, 84 ("The Defendants are obligated to provide Grimberg with

---

[4] Later in its brief (Opp. at 11 n.2), XL treats work by Grimberg or subcontractor PCS as Grimberg's work. However, the point remains that Grimberg does not seek coverage from XL for the costs of demolition or to rebuild the ICF Walls.

insurance coverage for property damage to conforming work caused by PCS's defective ICF walls at the Project[.]").[5]

XL wrongly asserts that Grimberg has failed to allege property damage to other work in the SAC and that Grimberg only adds conclusory allegations without factual allegations of injury. In fact, the SAC includes specific allegations of existing physical damage caused by PCS's defective work including the following:

> 34.     As described above, PCS's defective ICF walls caused damage to other conforming, non-defective work at the Project by other subcontractors, including, but not limited to, work performed to construct and install steel beams, connecting steel joints, the second floor slab, and the roof for the Project as well as related items.  This property that was part of the primary structural framing system was physically injured because it could no longer carry the designed loads and/or suffered a loss of use due to the defective ICF walls.  The other conforming, nondefective work that was damaged by the defective ICF walls was paid for and owned by the Navy.  After the Navy's claim or order to Grimberg, the Navy was involved in the remediation of damage caused by PCS's defective ICF walls.  Specifically, the Navy reviewed and approved Corrective Action Plans that were submitted about how to repair the other parts of the primary structural framing system and the implementation of the work.

> 35.     Grimberg also incurred significant shoring expenses, as specifically directed by the Navy's July 28, 2021 letter, attached hereto as Exhibit B.  In view of the lack of structural integrity of the primary structural framing system, other parts of the Project, such as the structural steel, could not be used for its intended purpose and had to be braced or shored.  Grimberg's bracing and shoring costs alone are approximately $1.5 million.  This damage constitutes "property damage" as physically injured property and/or property that suffered a loss of use.

---

[5] Paradoxically, at oral argument on XL's Motion to Dismiss the Amended Complaint, XL's counsel readily acknowledged that Grimberg is not seeking coverage for the replacement of the defective ICF walls.  Transcript of Oral Argument (May 15, 2024) at 9:15-18 ("The first [letter] is what the Navy asked Grimberg to do, which is replace the defective ICF walls.  That is something for which Grimberg is not seeking damages in this case."); *id.* at 10:6-8 ("And again, Grimberg does not seek coverage for those costs, the costs to replace the defective ICF walls.").

SAC ¶¶ 34-35 (emphasis added).[6]

The SAC also alleges the Navy's engineer, EwingCole, rejected Corrective Action Plan 31, as proposed by Grimberg's structural engineers, on the basis there was existing physical damage to the structural framing system that Grimberg's engineers did not consider.[7] Specifically, the SAC alleges:

> 19.    On June 14, 2021, Grimberg's structural engineers presented Corrective Action Plan 31. On July 1, 2021, the Navy's Engineer of Record, EwingCole, rejected structural calculations performed by Grimberg's structural engineers WDP and Thornton Tomasetti on the basis that there was existing physical damage to the buildings' structural framing system which Thornton Tomasetti did not consider. A copy of WDP and Thornton Tomasetti's calculations and EwingCole's response (also known as Corrective Action Plan 31) is attached hereto as **Exhibit A**.
>
> 20.    EwingCole identified present existing physical damage caused by the vertical rebar displacement from its design position in a multitude of areas, which produced injury to the structural integrity of other parts of the primary structural framing system and created unacceptable danger of injury or death to the occupants of the building due to the failure of the building's primary structural framing system. EwingCole specifically noted the following deficiencies in Thornton Tomasetti's calculations . . .
>
> 21.    In sum, EwingCole concluded that the analysis performed by Thornton Tomasetti was deficient in both overstating the as-built wall structural capacity (reference EwingCole comments 1, 3, 4, 11, 13, and 14) and also understating the required life safety loading (reference EwingCole comments 2, 5, 6, 7, 8, 9, and 10). The Navy adopted EwingCole's position finding, among other things, that Thorton Tomasetti's calculations did not comply with specifications. Exhibit A at page 1 of 16.

*Id.* ¶¶ 19-21 (emphasis added).

---

[6] Grimberg discusses below the bracing and shoring of the structural steel due to PCS's negligent work. This would qualify as property damage under either definition of property damage.

[7] On page 8 of its Opposition, XL cherry picks allegations from the SAC, but XL largely ignores the allegations in the SAC that Grimberg relied on to show PCS's defective work and damage to the property of others. *See, e.g.*, SAC ¶¶ 18-23, 30, 34–37.

XL argues Grimberg's allegations of damage to the structural integrity of the primary framing system of the School is not physical injury. Contrary to XL's argument, numerous courts have held that damage to the structural integrity of the building is physical injury constituting property damage within the meaning of a liability policy. *Addison Ins. Co. v. Korsmo*, 694 N.W.2d 510, at *5 (Wis. Ct. App. 2005) ("The Korsmos' complaint . . . alleges damage to the structural integrity of a building.  This is a physical injury to tangible property, satisfying the first definition of 'property damage' in the Addison policy"); *Ohio Cas. Ins. Co. v. Hanna*, Nos. 07CA0016–M, 07CA0017, 2008 WL 2581675, at *3 (Ohio Ct. App. June 30, 2008) (crooked framing of a house adversely affecting the structural integrity of a house caused physical injury and covered property damage); *U.S. Fid. & Guar. Co. v. Nevada Cement Co.*, 93 Nev. 179, 561 P.2d 1335, 1337 (1977) ("[D]oes compensable injury to or destruction of tangible property occur when defective cement destroys the structural integrity of a partially concrete building? In our view, the answer is affirmative."); *Webster v. Acadia Ins. Co.*, 934 A.2d 567, 571 (N.H. 2007) ("By alleging actual damage in the form of mildew, rot, and loss of structural integrity, the underlying writ was 'not simply a claim for the contractor's defective work,' but also a claim for the damage to other property suffered as a result"); *State ex rel. Nationwide Mut. Ins. Co. v. Wilson*, 778 S.E.2d 677, 684 (W. Va. 2015) (finding that negligent construction of a house that "adversely impacted the structural integrity" of the home is one of the covered allegations of property damage); *Mesa Underwriters Specialty Ins. Co. v. Universal Constr. Grp., Inc.*, No. LA CV18-08802, 2019 WL 7195326, at *10 (C.D. Cal. Aug. 21, 2019) ("Hudson, in conjunction with the reports that supplement his complaints, makes allegations as to damage to other property.  This includes alleged damage to the preexisting rear masonry wall footing on the Property and the structural integrity of Hudson's neighbor's bordering wall."); *Builders Mut. Ins. Co.*, 2015 WL 13066125,

at *1 n.2, *3 (recognizing  the duty to defend a claim that the insured violated its duty of care to plaintiffs "by mishandling lead paint debris, causing structural and other damage to the common wall of the duplex").[8]

XL relies on the inapposite case of *Depositors Insurance Co. v. W. Concrete, Inc.*, No. GLR-16-1018, 2017 WL 3383039 (D. Md. 2017) ("*Depositors Insurance*").  In that case, on cross motions for summary judgment, the court analyzed the insured's argument that defective placing and finishing of concrete caused property damage to non-defective work.  As a result of the defective placing and finishing, there was "exposed rebar and post-tensioning ducts."  The insured argued that exposed rebar, without more, constituted "physical injury to tangible property."  The court expressly rejected the insured's conditional allegations about future threat of, or potential for, "physical injury" as insufficient to establish "physical injury." *Id*. at *9-10.  Further, the court found that the "thrust" of the underlying action was that the insured's work (the placing and finishing of concrete) was defective—not that the insured's work caused damage to other contractor's work product. *Id.* at *10.  Thus, the decision in *Depositors Insurance* is readily distinguishable because (1) Grimberg has alleged present damage (not future hypothetical damage) to the structural integrity of other conforming property (*e.g.*, work performed to construct and install steel beams, connecting steel joints, the second floor slab, and the roof for the Project as well as related items); and (2) the claim for property damage is not for the ICF Walls but for the damage the ICF Walls caused to the work of other contractors at the Project.[9]

---

[8] *See also American Home Assurance Co. v. Oceaneering Int'l, Inc.*, no. 4:12-CV-02540, 2014 WL 11309800, at *5 (S.D. Tex. Feb. 14, 2014) ("Damage to structural integrity of the larger structure is not an implausible type of 'property damage'").

[9] Similarly, *W.M. Schlosser Co. v. Ins. Co. of N. Am.,* 325 Md. 301, 306-307, 600 A.2d 836, 838-839 (1992) is readily distinguishable. In that case, the court held that purely preventative costs (where there had been no occurrence and no claim by a third party as a result of property

XL similarly relies upon *St. Paul Guardian Insurance Co. v. Walsh Construction*, 99 F.4th 1035 (7th Cir. 2024).  The case involved the construction of a canopy and curtain wall system at O'Hare airport.  The city sued for breach of contact when it discovered cracks in the welds of the steel columns that were supporting the wall and canopy.  The issue in the case was whether, under Illinois law, the defects in the welds and columns were covered property damage.  The court held there was no property damage because there was no physical injury to tangible property beyond the negligent work of the steel subcontractor.  The policyholder argued once the welds cracked, the entire structure became structurally unstable.  On motion for summary judgment, the court rejected this argument because the insured offered no evidence of the structural instability and that the most that could be shown was "an increased potential for future property damage." *Id*. at 1041. In contrast, in this case, EwingCole identified present existing physical damage caused by the vertical rebar displacement from its design position in multiple areas, which produced injury to the structural integrity of the primary structural framing system.[10]

To the extent there is a split of judicial authority about whether damage to structural integrity of a building is present property damage, the issue is not properly decided on a motion to dismiss.  *Southeastern Wholesale Corp. v. Cox Commc'ns Hampton Rds., LLC*, No. 2:12cv701, 2013 WL 2147478, at *6 (E.D. Va. May 14, 2013) (denying a motion to dismiss because of the

---

damage) were not covered under a liability policy. Here, Grimberg has alleged a claim by the Navy for existing physical injury caused by an occurrence.

[10] Another distinguishing aspect of the *Walsh* decision is that the columns at issue in that case were repaired and the repair prevented damage to other property.  In this case, there was present existing property damage to the primary structural framing system due to PCS's negligence.   There was never an option to prevent damage to the other conforming work.  In fact, unlike columns in *Walsh*, the Navy ordered the ICF Walls to be demolished because they were so defective it was not feasible to repair them.

significant split of authority on an issue and little guidance from the Virginia courts); *Taylor v. Midland Funding, LLC*, 94 F.Supp.3d 941, 949 (N.D. Ill. 2015) (denying a motion to dismiss, in part, based on the split of legal authority on a legal issue); *Fitzgerald v. Bank of Am. Corp.*, No. 08-cv-3781, 2008 WL 4978218, at *3 (E.D. Pa. Nov. 20, 2008); *W Holding Co., Inc. v. AIG Ins. Co.*, 948 F.Supp.2d 199, 203 (D.P.R. 2013) ("Despite receiving substantial insight from the parties, the court follows the examples of fellow districts courts and exercises prudence in denying the motions to dismiss because of split authority on the issue"); *Pottstown Indus. Complex v. P.T.I. Services, Inc.*, No. 91–5660, 1992 WL 50084, at *10 (E.D. Pa. Mar. 10, 1992) (explaining that a "split in authority is reason enough to deny the motion to dismiss without prejudice[.]").

XL's argument relies on re-phrasing and modifying Grimberg's argument.  For example, XL argues that Grimberg alleged potential future damage, whereas in the SAC, Grimberg actually alleges present physical damage.  XL recasts  Grimberg's argument as "the mere fact that the ICF walls were structurally unsound meant that the framing system sitting atop them was also structurally unsound, rendering the entire structure 'physically injured.'"  Opp. at 6.  Nowhere does Grimberg allege the framing system sits atop the ICF Walls.  Instead, the allegations concern an integrated framing system.  SAC ¶¶ 13-16.

### D.  Grimberg Has Alleged Property Damage in the Form of Loss of Use

Grimberg's SAC alleges "In view of the lack of structural integrity of the primary structural framing system, other parts of the Project, such as the structural steel, could not be used for its intended purpose and had to be braced or shored."  SAC ¶ 35.  "Grimberg's bracing and shoring costs alone are approximately $1.5 million."  *Id*.  Grimberg specifically alleged that the Navy's July 28, 2021 letter ordered Grimberg to incur significant shoring expenses.  SAC Ex. B [Doc. 81-3].

XL's policies cover "loss of use" as a form of property damage.  "Property damage" is defined to include both (a) "[p]hysical injury to tangible property, including all resulting loss of use of that property" and (b) "loss of use of tangible property that is not physically injured."  SAC ¶ 52.  Nonetheless, XL gives little treatment to Grimberg's argument and instead argues (p. 10) that the Navy "never lost use of anything because … the Navy had not started using the School."  However, the loss of use is to conforming work owned by the Navy. SAC ¶¶ 18, 30, 34 and 37.

XL then pivots to assert that exclusion m (the "impaired property" exclusion) precludes coverage.  The impaired property exclusion applies only to "Insuring Agreement B- the Umbrella Liability Coverage," and not to "Insuring Agreement A- Excess Follow Form Coverage."[11]  SAC Ex. F, [Doc. 81-7], at 26-27 of 65.  XL has argued only the excess coverage is at issue, making the exclusion inapplicable.

The plain language of the exclusion also demonstrates the exclusion is inapplicable.[12]  The exclusion applies only to "impaired property" or property that has not been physically injured.  As explained above, the property in question has sustained physical injury.  Further, courts have held the impaired property exclusion is inapplicable to general contractors like Grimberg.  *Nautilus Ins. Co. v. Heartland Builders LLC*, 526 F.Supp.3d 914, 937-39 (D. Kan. 2021); *Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co.*, 189 F. Supp. 2d 1212, 1225 n.8 (D. Kan. 2002); *J.S.U.B., Inc. v.*

---

[11] The excess coverage follows the "terms, definitions, conditions and limitations of" the Old Republic policy, but not the exclusions.  SAC ¶¶ 43, 47.

[12] "Impaired property" is defined as "tangible property, other than 'your product' or 'your work', that cannot be used or is less useful because:

    a.  It incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous; or
    b.  You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of 'your product' or 'your work' or your fulfilling the terms of the contract or agreement."  SAC Ex. E, [Doc. 81-6], at 20 of 88.

*U.S. Fire Ins. Co.*, 906 So. 2d 303, 311 (Fla. 2d DCA 2005), *aff'd*, 979 So. 2d 871 (Fla. 2007).[13]

Finally, courts have found the exclusion to be ambiguous or unintelligible and, applying the rules of construction, construed it in favor of coverage. *Lumbermens Mut. Cas. Co. v. Corning, Inc.*, No. CV 07-0088, 2008 WL 11337841, at *12-13 (C.D. Cal. Dec. 24, 2008) (finding the exclusion ambiguous and noting courts and commentators have criticized the exclusion as ambiguous); *Computer Corner, Inc. v. Fireman's Fund Ins. Co.*, 46 P.3d 1264, 1269 (N.M. Ct. App. 2002) (referring to the exclusion as "nonsensical"). Importantly, the Fourth Circuit has held the subcontractor exception to the "Damage to your Work" exclusion informs the interpretation of the insurance policy form at issue. Courts have found the impaired property exclusion to be ambiguous because it would contradict the subcontractor exception providing that there is coverage for property damage (including loss of use) to non-defective work caused by subcontractors like PCS. *Cherrington v. Erie Ins. Prop. & Cas. Co.*, 745 S.E.2d 508, 526-28 (W. Va. 2013). In sum, exclusion m does not apply.[14]

### E.  The Proposed Second Amended Complaint Alleges Grimberg Was Legally Obligated to Pay Damages

---

[13] The exclusion also contains an exception stating it "does not apply to the loss of use of *other* property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use." (emphasis added). This exception raises numerous factual issues including the meaning of "other property" and "intended use" and whether there was "sudden and actual physical injury." *See Anthem Elec., Inc. v. Pac. Emps. Ins. Co.*, 302 F.3d 1049, 1059-60 (9th Cir. 2002); *Omega Products Corp. v. Liberty Mut. Ins. Co.*, 49 F. App'x. 745, 747 (9th Cir. 2002).

[14] Motions to dismiss are not the appropriate vehicle to determine fact-based exclusions like exclusion m. *Cincinnati Ins. Co. v. Crossmann Cmtys. of North Carolina, Inc.*, No. 4:09–CV–1379–RBH, 2013 WL 1282017, at *10 (D.S.C. March 27, 2013) (noting that "the application of a coverage exclusion *like the impaired property exclusion . . . is so driven by the applicable facts*") (emphasis added).

For the reasons detailed in Grimberg's Motion and Memorandum in Support, and as alleged in the Second Amended Complaint, Grimberg was "legally obligated to pay as damages" the sums at issue in this case.  XL contends that the Court need not reach the issue.  Regardless, XL's arguments miss the mark.

Both parties cite *Electric Motor and Contracting Co. v. Travelers Indemnity Co. of America*, 235 F. Supp. 3d 781 (E.D. Va. 2017) with respect to Grimberg's obligation to pay damages.  After analyzing the phrase "legally obligated to pay as damages" in a liability insurance policy, the *Electric Motor* court held a claim would fall within the meaning of this phrase "if the insured alleges 1) facts sufficient to show that a claim for monetary compensation or remediation existed and 2) facts sufficient to show that the insured was legally obligated to pay such a claim." *Id*. at 790.  XL does not dispute that a claim for remediation (*i.e.*, the process of improving or correcting a situation) is stated in the Navy's letters.  Opp. at 15.  In addition, Grimberg was legally obligated to pay sums to remediate because the Navy's letter constituted a claim within the meaning of the Federal Acquisition Regulations "(FAR")".  XL does not dispute the Navy's letter was a claim under FAR.  XL instead argues a full action under FAR was not pursued with a formal demand and a subsequent collection action.  However, Grimberg has shown it was the subject of a "coercive directive to pay" by the Navy's assertion of a claim under FAR.  Therefore, Grimberg has met the standard set out in *Electric Motor.  See Megonnell v. United Servs. Auto. Ass'n*., 368 Md. 633, 645–46, 796 A.2d 758, 765–66 (2002) ("The term 'legally liable' to pay damages depends not upon when, and if, a judicial determination is made, but, generally, upon the creation

of circumstances by and/or between parties, whereby the parties, or one or the other of them, can enforce rights through legal process").[15]

### F. Discovery Should Proceed and the Case Should Be Determined on the Merits

All of the cases XL cites in its Opposition were decided on summary judgment with the benefit of full written discovery, fact depositions, and expert discovery.[16]  Grimberg's SAC sets forth a plausible claim for relief and Grimberg seeks discovery to develop its claim for coverage.

Prior to the Court's order dismissing the claim, the parties had engaged in discovery. Grimberg produced approximately 68,000 documents including engineering and damages documents that address the nature of the damage to the primary structural framing system. Grimberg had sought (but not yet obtained) drafting history and regulatory filings relating to the scope of the coverage provided under the CGL form used by Old Republic and XL for claims like the one at issue here.  This case presents an important issue about the scope of coverage available to general contractors and ought to be considered with the benefit of a fully developed factual record.

---

[15] There is no need for Grimberg to have paid sums directly to the Navy to fall within coverage.  In *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 625 A.2d 1021, 1033 (Md. Ct. App. 1993), the Court found an insured that paid environmental response costs had paid those sums as damages: "Policyholders will . . . reasonably infer that the insurer's pledge to pay damages will apply generally to compensatory outlays of various kind, including expenditures made to comply with administrative orders or formal injunctions.  The ordinary person understands 'damages' as meaning money paid to make good an insured loss."

[16] XL's procedural chronology states that Grimberg did not designate experts on May 13, 2024. However, XL neglects to mention that in a meet and confer, XL informed Grimberg that XL was designating an expert relating to "property damage" and "means and methods" and Grimberg stated its intention to designate rebuttal experts.  On June 6, the Court's order of dismissal mooted the XL's designation of experts and Grimberg's rebuttal experts.

## III.    CONCLUSION

For all of the foregoing reasons and those set forth in its Motion and Memorandum in Support, Grimberg requests that Grimberg's Motion be granted and the Court alter or amend its prior ruling, reactivate the case, and allow the filing of the Proposed Second Amended Complaint.

Dated:  August 14, 2024

Respectfully submitted,

**JOHN C. GRIMBERG COMPANY, INC.**

*/s/ Arnie B. Mason*
Arnie B. Mason, Esq. (VSB #45611)
Zahra S. Abrams, Esq. (VSB #95997)
Williams Mullen
8350 Broad Street, Suite 1600
Tysons, VA 22102
Telephone: (703) 760-5200
Facsimile:   (703) 748-0244
amason@williamsmullen.com
zabrams@williamsmullen.com

Andrew M. Reidy (pro hac vice)
Ramy R. Simpson (pro hac vice)
Nossaman LLP
1401 New York Avenue, NW - Suite 800
Washington, DC 20005
Telephone:  (703) 283-5576
areidy@nossaman.com
rsimpson@nossaman.com

Herman M. Braude (pro hac vice forthcoming)
Edward D. Manchester (pro hac vice forthcoming)
Braude Law Group, P.C.
11820 ParkLawn Drive, Suite 401
Rockville, MD 20852
Telephone: (202) 471-5400
hbraude@braudelawgroup.com
emanchester@braudelawgroup.com

*Counsel for Plaintiff*
*John C. Grimberg Company, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

Notice of electronic filing constitutes a certificate of service as to all parties to whom electronic notice is sent.  I hereby certify that on this 14th day of August 2024, I caused a true and accurate copy of the foregoing to be filed with the Clerk of Court and served pursuant to the Court's electronic filing procedures upon all counsel of record via email.

<em>/s/Arnie B. Mason</em>_____

Arnie B. Mason